UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

RAMOOE, INC.,                                    Index No. 13-cv-

                              Plaintiff,

                                                 **COMPLAINT**

        -against-

                                                 **JURY TRIAL DEMANDED**

THE CITY OF NEW YORK, a Municipal Corporation
of the State of New York, and the NEW YORK CITY
DEPARTMENT OF HOUSING PRESERVATION
AND DEVELOPMENT, an agency and governmental
subdivision of the City of New York,

                              Defendants.

---------------------------------------------------------------X

        Plaintiff RAMOOE, INC., by KUCKER & BRUH, LLP, its attorneys, as and for its

Complaint, states and avers as follows:

### Jurisdiction and Venue

        1. This Court has jurisdiction by virtue of 28 U.S.C. §§ 1331, 1343, 2201 and 2202, and

42 U.S.C. §§ 1983 and 1988.

        2. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to adjudicate

the plaintiff's state law claims because they arise out of the same set of facts and circumstances

that give rise to the plaintiff's federal claims asserted herein, so as to be part of the same case or

controversy as such federal claims under Article III of the United States Constitution.

        3. The venue of this action is proper in the Eastern District of New York pursuant to 28

U.S.C. § 1391(b) as the property that is the subject of the action is situated in this district, and a

substantial part of the events or omissions giving rise to the claims herein occurred in this

district.

**Parties**

4.   Ramooe, Inc. ("Ramooe" or "Plaintiff") is, and at all times relevant hereto was, a business corporation organized and existing under the laws of the State of New York, with its offices located at 527 Bedford Avenue, Brooklyn, New York 11211, and is the owner of certain real property in Kings County designated as Block 2269, Lot 45, having the address 43 Bartlett Street, Brooklyn, New York, 11206 (the "Plaintiff's Property").

3.   The City of New York (the "City") is, and at all times relevant hereto was, a municipal corporation organized and existing under the laws of the State of New York.

4.   The New York City Department of Housing Preservation and Development ("HPD") is, and at all times relevant hereto was, a governmental agency of the City of New York. The City and HPD are together the "Defendants".

**Preliminary Statement**

5. This action seeks declaratory and injunctive relief and monetary damages i) pursuant to 42 U.S.C. §§ 1983 and 1988 in respect of the infringement, by certain acts and omissions of the City as set forth herein below, of the Plaintiff's rights to property, procedural and substantive due process, and equal protection of the laws pursuant to the Fifth and Fourteenth Amendments of the United States Constitution, and ii) pursuant to the New York Eminent Domain Procedures Law ("EDPL") §§ 402(B), 406(A), and 502, and New York Civil Practice Law and Rules ("CPLR") §§ 3001 and 3017(b), in respect of the violation, by certain acts and omissions of the City as set forth herein below, of the procedures required pursuant to New York State law to validly exercise the power of eminent domain to acquire the Plaintiff's Property.

**The Underlying Facts**

6.   By resolution dated June 29, 1989, Calendar No. 21 (the "Plan Resolution"), the

2

former Board of Estimate of New York City, allegedly acting pursuant to Section 197-c of the New York City Charter and Article 15 of the New York General Municipal Law, created the Broadway Triangle Urban Renewal Plan (the "Plan") providing for the development of the Broadway Triangle Urban Renewal Area, comprising approximately 30 acres surrounding what was then an industrial facility owned and operated by Pfizer, Inc. (the "Plan Area").

7.  The Plan Resolution in relevant part determined that the Plan was for a public purpose for which the forced acquisition of private property by the City's exercise of its power of eminent domain would be warranted.

8.  The Plan Resolution in relevant part also approved the acquisition by the City of certain real property within the Plan Area, denominated the Broadway Triangle Urban Renewal Area, Phase II (the "Phase II Area), for development pursuant to the Plan (the "Phase II Acquisition").

9.  The Plaintiff's Property is within the Phase II Area, and is among the properties designated for acquisition pursuant to the Phase II Acquisition.

10.  No direct notice of the Plan Resolution, and the Phase II Acquisition providing for the forced acquisition of the Plaintiff's Property by eminent domain that was authorized thereby, was ever provided to the owner of the Plaintiff's Property at the time of the Plan Resolution, or was subsequently ever provided to the Plaintiff, by mail, personal service or any other means of delivery.

11.  The City never provided the Plaintiff with constructive notice of the Plan Resolution.

12.  The Plaintiff did not obtain actual notice of the Plan Resolution in time to seek judicial review of same in accordance with the procedures provided therefor pursuant to State law.

13.  On or about March 21, 1997, the Plaintiff's application for the construction of a new building on the Plaintiff's Property was granted by the New York City Department of Buildings ("DOB"), pursuant to which construction permit no. 300616769-01-EQ-FN was issued on June 23, 1998, and construction permit no. 300616769-01-NB was issued on June 30, 1998 (the "DOB Permits"). A copy of a printout of information regarding the DOB Permits from the DOB website is annexed hereto as Exhibit A.

14.  Pursuant to the DOB Permits, the Plaintiff commenced construction of a building, and by mid-1998 had excavated and constructed a foundation for said building on the Plaintiff's Property.

15.  On or about June 25, 1999, the City filed its verified petition (the "Acquisition Petition") commencing a special proceeding in New York Supreme Court, Kings County titled Matter of the Application of the City of New York re: Broadway Triangle Urban Renewal Area, Phase II, Index No. 22528/99 , for an order i) authorizing the City to file an acquisition map in the office of the Clerk of Kings County or the Office of the City Register; ii) directing that upon the filing of said map, title to the property sought to be acquired shall vest in the City; iii) providing that just compensation therefor be ascertained and determined by the Supreme Court without a jury, and iv) providing that notices of claim regarding compensation must be served and filed within one calendar year from the vesting date (the "Acquisition Proceeding"). A copy of the Acquisition Petition, together with Notice of Pendency of Proceeding ("Notice of Pendency") that was filed simultaneously therewith, is annexed hereto as Exhibit B.

16.  The Acquisition Petition asserted that the Plan Resolution satisfied the requirements of Article 2 of the Eminent Domain Procedure Law ("EDPL") regarding a public hearing on the issue of the public purpose and need to acquire property for a public project, stating at paragraph

4

11 thereof that "[t]he City of New York is exempt from compliance with the hearing provisions of Article 2 of the Eminent Domain Law by virtue of EDPL §206(A), in that this acquisition, and the project for which the property is being acquired, were approved pursuant to §197-c of the Charter, City of New York, and Article 15 of the General Municipal Law."

17.   The provisions of §197-c of the Charter, City of New York, and Article 15 of the General Municipal Law referenced in the Acquisition Petition do not require the City to provide, in like manner as required pursuant to EDPL §202(C), direct notice to the owners of the property sought to be acquired of the actions taken pursuant thereto to determine public purpose and necessity to authorize the governmental acquisition of such property by the exercise of the power of eminent domain.

18.   The Notice of Pendency annexed to the Acquisition Petition, at Schedule A thereto, incorrectly listed the Plaintiff's address in relevant part as "524 Bedford Avenue" instead of the Plaintiff's correct address of 527 Bedford Avenue.

19. On information and belief, the City had within its possession and control records of the Plaintiff's correct address of 527 Bedford Avenue, and thus had actual and constructive notice thereof.

20.   No direct notice of the Acquisition Proceeding was ever provided to the Plaintiff, by mail, personal service or any other means of delivery.

21.   The Plaintiff did not obtain actual notice of the Acquisition Proceeding in time to appear and oppose the relief sought therein in accordance with the procedures provided therefor pursuant to State law.

22.   On or about August 27, 1999, an order was entered in the Acquisition Proceeding granting the relief sought by the Acquisition Petition, and further decreeing "that upon filing of

this Order and acquisition map with said County Clerk or with the City Register, title to the property shown on said map shall vest in the City of New York," and "that each condemnee shall have a period of one calendar year from the date of title vesting in which to file a written claim, demand or notice of appearance with the Clerk of this Court and to serve a copy of same upon the Corporation Counsel of the City of New York" (the "Acquisition Order"). A copy of the Acquisition Order is annexed hereto as Exhibit C.

23. No direct notice of the Acquisition Order was ever provided to the Plaintiff, by mail, personal service or any other means of delivery.

24. The Plaintiff did not obtain actual notice of the Acquisition Order in time to seek judicial review of same in accordance with the procedures provided therefor pursuant to State law.

25. The project for which property was acquired pursuant to the Acquisition Order was planned to entail an industrial land use.

26. On or about October 19, 2009, the City Planning Commission issued resolution C 090415 HUK (the "2009 Resolution"), by which the original project for which property was acquired pursuant to the Acquisition Order was abandoned (the "Abandonment"), and the land use of the acquired property was changed from industrial to residential (the "Revised Use"). A copy of the 2009 Resolution is annexed hereto as Exhibit D.

27. The City has never offered the Plaintiff the right of first refusal to purchase the Plaintiff's Property for its fair market value, or indeed for any price, at any time, before or after the Abandonment.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Procedural Due Process – 42 U.S.C. § 1983)

28. The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

1 through 27 above, as though fully set forth herein.

29.  Pursuant to the due process clause of Section One of the Fourteenth Amendment of the United States Constitution, the Plaintiff has the right not to be deprived of its property without due process of law, or by governmental actions that are unrelated to any legitimate governmental interest.

30. The foregoing course of conduct taken under color of State law by the City, including but not limited to the failure to provide either direct or constructive notice of the Plan Resolution and the Phase II Acquisition to the owners of the properties sought to be acquired thereby; the failure to provide the Plaintiff with notice of the Acquisition Proceeding; the failure to provide the Plaintiff with notice of the Acquisition Order; the failure to provide the Plaintiff with notice of the 2009 Resolution and the Abandonment and Revised Use effectuated thereby; the failure to provide the owners of property to be acquired pursuant to the 2009 Resolution with notice of the 2009 Resolution and the Abandonment and Revised Use effectuated thereby, and the opportunity to appear and be heard in opposition thereto; and the failure after the Abandonment to offer the Plaintiff the right of first refusal to purchase the Plaintiff's Property for its fair market value, has deprived the Plaintiff of its privileges, rights and immunities secured by the United States Constitution, including but not limited to the right pursuant to Section One of the Fourteenth Amendment not to be deprived of property without due process of law.

31.  By reason of the foregoing course of conduct undertaken by the City, which conduct constitutes a municipal policy and/or custom on the part of the City, the Plaintiff is entitled to such relief against the City as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including the Plaintiff's reasonable attorney's fees.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Taking and Just Compensation Clause – 42 U.S.C. § 1983)

32. The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 31 above, as though fully set forth herein.

33. Pursuant to the taking and just compensation clause of the Fifth Amendment of the United States Constitution, the Plaintiff has the right not to have its property taken by the State through the power of eminent domain for a private use, regardless of the compensation offered therefor.

34. The foregoing course of conduct taken under color of State law by the City, including but not limited to the failure to provide either direct or constructive notice of the Plan Resolution and the Phase II Acquisition to the owners of the properties sought to be acquired thereby; the failure to provide the Plaintiff with notice of the Acquisition Proceeding; the failure to provide the Plaintiff with notice of the Acquisition Order; the failure to provide the Plaintiff with notice of the 2009 Resolution and the Abandonment and Revised Use effectuated thereby; the failure to provide the owners of property to be acquired pursuant to the 2009 Resolution with notice of the 2009 Resolution and the Abandonment and Revised Use effectuated thereby, and the opportunity to appear and be heard in opposition thereto; and the failure after the Abandonment to offer the Plaintiff the right of first refusal to purchase the Plaintiff's Property for its fair market value, has deprived the Plaintiff of its privileges, rights and immunities secured by the United States Constitution, including but not limited to the right pursuant to the taking and just compensation clause of the Fifth Amendment of the United States Constitution not to have its property taken by the State through the power of eminent domain for a private use, regardless of the compensation offered therefor.

35. By reason of the foregoing course of conduct undertaken by the City, which conduct

constitutes a municipal policy and/or custom on the part of the City, the Plaintiff is entitled to such relief against the City as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including the Plaintiff's reasonable attorney's fees.

### AS AND FOR A THIRD CLAIM FOR RELIEF
#### (Equal Protection – 42 U.S.C. § 1983)

36. The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 35 above, as though fully set forth herein.

37. Pursuant to the equal protection clause of Section One of the Fourteenth Amendment of the United States Constitution, the Plaintiff has the right to the equal protection of the laws, and not to be afforded disparate treatment from other similarly situated property owners.

38. The foregoing course of conduct taken under color of State law by the City, including but not limited to the failure to provide either direct or constructive notice of the Plan Resolution and the Phase II Acquisition to the owners of the properties sought to be acquired thereby; the failure to provide the Plaintiff with notice of the Acquisition Proceeding; the failure to provide the Plaintiff with notice of the Acquisition Order; the failure to provide the Plaintiff with notice of the 2009 Resolution and the Abandonment and Revised Use effectuated thereby; the failure to provide the owners of property to be acquired pursuant to the 2009 Resolution with notice of the 2009 Resolution and the Abandonment and Revised Use effectuated thereby, and the opportunity to appear and be heard in opposition thereto; and the failure after the Abandonment to offer the Plaintiff the right of first refusal to purchase the Plaintiff's Property for its fair market value, has deprived the Plaintiff of its privileges, rights and immunities secured by the United States Constitution, including but not limited to the right pursuant to Section One of the Fourteenth Amendment o be provided equal protection of the laws, and thus not to be afforded disparate

treatment from other similarly situated property owners.

39. By reason of the foregoing course of conduct undertaken by the City, which conduct constitutes a municipal policy and/or custom on the part of the City, the Plaintiff is entitled to such relief against the City as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including the Plaintiff's reasonable attorney's fees.

**AS AND FOR A FOURTH CLAIM FOR RELIEF**
**(Substantive Due Process – 42 U.S.C. § 1983)**

40. The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 39 above, as though fully set forth herein.

41. Pursuant to Section One of the Fourteenth Amendment of the United States Constitution, the Plaintiff is entitled to the privileges and immunities of citizens of the United States, and has the right to substantive due process in that such privileges and immunities may not be abridged.

42. The foregoing course of conduct taken under color of State law by the City, including but not limited to the failure to provide either direct or constructive notice of the Plan Resolution and the Phase II Acquisition to the owners of the properties sought to be acquired thereby; the failure to provide the Plaintiff with notice of the Acquisition Proceeding; the failure to provide the Plaintiff with notice of the Acquisition Order; the failure to provide the Plaintiff with notice of the 2009 Resolution and the Abandonment and Revised Use effectuated thereby; the failure to provide the owners of property to be acquired pursuant to the 2009 Resolution with notice of the 2009 Resolution and the Abandonment and Revised Use effectuated thereby, and the opportunity to appear and be heard in opposition thereto; and the failure after the Abandonment to offer the Plaintiff the right of first refusal to purchase the Plaintiff's Property for its fair market value, has

deprived the Plaintiff of substantive due process in that it has arbitrarily, capriciously and irrationally deprived the Plaintiff of its privileges, rights and immunities secured by Section One of the Fourteenth Amendment of the United States Constitution,

43.   By reason of the foregoing course of conduct undertaken by the City, which conduct constitutes a municipal policy and/or custom on the part of the City, the Plaintiff is entitled to such relief against the City as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including the Plaintiff's reasonable attorney's fees.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (New York Eminent Domain Procedure Law § 402)

44.   The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 43 above, as though fully set forth herein.

45.   The City failed to provide the Plaintiff with notice of the Acquisition Proceeding as required pursuant to New York Eminent Domain Procedure Law § 402(B).

46.   Upon information and belief, the City's failure to provide the Plaintiff with notice of the Acquisition Proceeding as required pursuant to New York Eminent Domain Procedure Law § 402(B) was not inadvertent.

47.   As a result of the lack of notice to the Plaintiff of the Acquisition Proceeding, no jurisdiction over the Plaintiff was acquired in the Acquisition Proceeding. The Acquisition Order is therefore null and void with respect to the Plaintiff, regarding which the Plaintiff is entitled, inter alia, to declaratory judgment pursuant to CPLR §§ 3001 and 3017(b).

## AS AND FOR A SIXTH CLAIM FOR RELIEF
### (New York Eminent Domain Procedure Law § 502)

48.   The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

1 through 47 above, as though fully set forth herein.

49.  The City failed to provide the Plaintiff with notice of the Acquisition Order as required pursuant to New York Eminent Domain Procedure Law § 502.

50.  As a result of the lack of notice to the Plaintiff of the Acquisition Order, the time in which the Plaintiff may file a claim for damages arising from the Acquisition Order pursuant to New York Eminent Domain Procedure Law § 503 was tolled and has not yet begun to run, regarding which the Plaintiff is entitled, _inter alia_, to declaratory judgment pursuant to CPLR §§ 3001 and 3017(b).

## AS AND FOR A SEVENTH CLAIM FOR RELIEF
### (New York Eminent Domain Procedure Law § 406)

51.  The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 50 above, as though fully set forth herein.

52.  After the Abandonment, the City failed to offer the Plaintiff the right of first refusal to re-purchase the Plaintiff's Property from the City for its fair market value as required pursuant to New York Eminent Domain Procedure Law §406(A).

53.  As a result of the failure of the City after the Abandonment to offer the Plaintiff the right of first refusal to re-purchase the Plaintiff's Property from the City for its fair market value as of the time of the abandonment as required pursuant to New York Eminent Domain Procedure Law §406(A), any disposition of the Plaintiff's property after the Abandonment is therefore null and void with respect to the Plaintiff, and the City is required forthwith to offer the Plaintiff the right of first refusal to re-purchase the Plaintiff's Property from the City for its fair market value as of the time of the abandonment, regarding which the Plaintiff is entitled, _inter alia_, to declaratory judgment pursuant to CPLR §§ 3001 and 3017(b).

## Prayer for Relief

**WHEREFORE,** the Plaintiff respectfully requests a judgment as follows:

A) On the First Claim for Relief:

    i)    Declaratory relief that the acts of the City complained of herein violate the procedural due process rights of the Plaintiff pursuant to the Due Process Clause of the Fourteenth Amendment of the United States Constitution, and that §206(A) of the New York Eminent Domain Procedure Law, both as enacted and as applied, violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

    ii)    Injunctive relief vacating the Acquisition Order;

    iii)    Compensatory damages in an amount to be determined at trial; and

    iv)    The costs and expenses of this action, including the Plaintiff's reasonable attorney's fees;

B) On the Second Claim for Relief:

    i)    Declaratory relief that the acts of the City complained of herein violate the property rights of the Plaintiff pursuant to the Takings and Just Compensation clause of the Fifth Amendment of the United States Constitution, and that §206(A) of the New York Eminent Domain Procedure Law, both as enacted and as applied, violates the Takings and Just Compensation clause of the Fifth Amendment of the United States Constitution;

    ii)    Injunctive relief vacating the Acquisition Order;

    iii)    Compensatory damages in an amount to be determined at trial; and

iv)   The costs and expenses of this action, including the Plaintiff's reasonable attorney's fees;

C)   On the Third Claim for Relief:

i)   Declaratory relief that the acts of the City complained of herein violate the rights of the Plaintiff pursuant to the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and that §206(A) of the New York Eminent Domain Procedure Law, both as enacted and as applied, violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

ii)   Injunctive relief vacating the Acquisition Order;

iii)   Compensatory damages in an amount to be determined at trial; and

iv)   The costs and expenses of this action, including the Plaintiff's reasonable attorney's fees;

D)   On the Fourth Claim for Relief:

i)   Declaratory relief that the acts of the City complained of herein violate the substantive due process rights of the Plaintiff pursuant to the Fourteenth Amendment of the United States Constitution, and that §206(A) of the New York Eminent Domain Procedure Law, both as enacted and as applied, violates the substantive due process requirements of the Fourteenth Amendment of the United States Constitution;

ii)   Injunctive relief vacating the Acquisition Order;

iii)   Compensatory damages in an amount to be determined at trial; and

iv)   The costs and expenses of this action, including the Plaintiff's reasonable

14

attorney's fees;

E) On the Fifth Claim for Relief:

    i)     Declaratory relief that the Acquisition Order is null and void with respect to the Plaintiff;

    ii)    Injunctive relief vacating the Acquisition Order;  and

    iii)   Compensatory damages in an amount to be determined at trial;

F) On the Sixth Claim for Relief:

    i)     Declaratory relief that the time in which the Plaintiff may file a claim for damages arising from the Acquisition Order pursuant to New York Eminent Domain Procedure Law § 503 was tolled and has not yet begun to run;

    ii)    Injunctive relief tolling the time in which the Plaintiff may file a claim for damages arising from the Acquisition Order pursuant to New York Eminent Domain Procedure Law § 503; and

    iii)   Compensatory damages in an amount to be determined at trial;

G) On the Seventh Claim for Relief:

    i)     Declaratory relief that any disposition of the Plaintiff's property after the Abandonment is null and void with respect to the Plaintiff, and the City is required forthwith to offer the Plaintiff the right of first refusal to re-purchase the Plaintiff's Property from the City for its fair market value as of the time of the abandonment;

    ii)    Injunctive relief nullifying any disposition of the Plaintiff's property made after the Abandonment, and requiring the City to forthwith offer the

Plaintiff the right of first refusal to re-purchase the Plaintiff's Property from the City for its fair market value as of the time of the abandonment; and

iii)   Compensatory damages in an amount to be determined at trial; and

H) Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      February 26, 2013

                                    KUCKER & BRUH, LLP
                                    Attorneys for Plaintiff Ramooe, Inc.

                                    By: _____
                                        Abner T. Zelman
                                    747 Third Avenue
                                    New York, NY 10017
                                    (212) 869-5030

Case 1:13-cv-01045-NGG-VMS   Document 1   Filed 02/27/13   Page 17 of 96 PageID #: 17





☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

## NYC Department of Buildings
## Work Permit Data

**Premises:** 43 BARTLETT STREET BROOKLYN                    **Filed At:** 43 BARTLETT STREET BROOKLYN

**BIN:** 3805390   **Block:** 2269   **Lot:** 45                              **Job Type:** NB - NEW BUILDING

### View Permit History

| | | | | |
|---|---|---|---|---|
| **Job No:** | 300616769 | | **Fee:** | STANDARD |
| **Permit No:** | 300616769-01-EQ-FN | **Issued:** 06/23/1998 | **Expires:** | 12/31/1998 |
| **Seq. No.:** | 02 | **Filing Date:** 06/23/1998 RENEWAL | **Status:** | ISSUED |
| **Work:** | | **Proposed Job Start:** 03/26/1997 | **Work Approved:** | 03/21/1997 |

NEW BUILDING - CONSTRUCTION EQUIPMENT - FENCE

**Use:**   B-2 - STORAGE (LOW HAZARD)                **Landmark:**      NO          **Stories:** 0

Review is requested under Building Code:   1968

---

**Issued to:**  CHAIM OSTREICHER                              **GENERAL CONTRACTOR:** 0002705-GC

**Business:**  INDUSTRIAL ENTERPRISES,LTD.
     527 BEDFORD AVENUE BROOKLYN NY 11211                **Phone:** 718-387-2100

If you have any questions please review these Frequently Asked Questions, the Glossary, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

Case 1:13-cv-01045-NGG-VMS   Document 1   Filed 02/27/13   Page 18 of 96 PageID #: 18





☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

### NYC Department of Buildings
## Work Permit Data

**Premises:** 43 BARTLETT STREET BROOKLYN                   **Filed At:** 43 BARTLETT STREET BROOKLYN

**BIN:** <u>3805390</u>   **Block:** 2269   **Lot:** 45                   **Job Type:** NB - NEW BUILDING

### <u>View Permit History</u>

| | | | |
|---|---|---|---|
| **Job No:** <u>300616769</u> | | **Fee:** | STANDARD |
| **Permit No:** 300616769-01-NB | **Issued:** 06/30/1998 | **Expires:** | 06/15/1999 |
| **Seq. No.:** 02 | **Filing Date:** 06/30/1998 RENEWAL | **Status:** | REVOKED |
| **Work:** | **Proposed Job Start:** 03/26/1997 | **Work Approved:** | 03/21/1997 |
| NEW BUILDING - | | | |

**Use:**   B-2 - STORAGE (LOW HAZARD)          **Landmark:**   NO          **Stories:** 0

**Review is requested under Building Code:** 1968

---

**Issued to:** CHAIM OSTREICHER               **GENERAL CONTRACTOR:** <u>0002705-GC</u>

**Business:** INDUSTRIAL ENTERPRISES,LTD.

527 BEDFORD AVENUE BROOKLYN NY 11211          **Phone:** 718-387-2100

If you have any questions please review these <u>Frequently Asked Questions</u>, the <u>Glossary</u>, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.





☒ CLICK HERE TO SIGN UP FOR BUILDINGS NEWS

NYC Department of Buildings
## Application Details

Premises: 43 BARTLETT STREET BROOKLYN
BIN: <u>3805390</u>  Block: 2269  Lot: 45

Job No: 300616769
Document: 01 OF 1
Job Type: NB - NEW BUILDING

| <u>Document Overview</u> | <u>Items Required</u> | <u>Virtual Job Folder</u> | <u>All Permits</u> | <u>Schedule A</u> | <u>Schedule B</u> |
|---|---|---|---|---|---|
| <u>Fees Paid</u> | <u>Forms Received</u> | | <u>All Comments</u> | <u>C/O Summary</u> | <u>Plumbing Inspections</u> |
| <u>Crane Information</u> | <u>Plan Examination</u> | | | <u>C/O Preview</u> | |
| <u>After Hours Variance Permits</u> | | | | | |

This job is not subject to the Department's Development Challenge Process. For any issues, please contact the relevant borough office.

---

---------------- * PROFESSIONALLY CERTIFIED * ---------------------

**Last Action: PERMIT ISSUED - ENTIRE JOB/WORK 06/30/1998 (R)**
**Application approved on: 03/21/1997**

Pre-Filed: 02/18/1997  **Building Type:** Other        **Estimated Total Cost:** $0.00
**Date Filed:** 03/04/1997                              **Electronically Filed:** No
**Fee Structure:** STANDARD
**Review is requested under Building Code:** 1968

<u>Job Description</u>   <u>Comments</u>

**1 Location Information (Filed At)**
House No(s): 43        Street Name: BARTLETT STREET
Borough: Brooklyn      Block: 2269        Lot: 45   BIN: <u>3805390</u>   CB No: 301
Work on Floor(s): ___        Apt/Condo No(s):        Zip Code: 11206

**2 Applicant of Record Information**
Name: ABRAHAM HERTZBERG
Business Name: HERTZBERG & SANCHEZ P.C        Business Phone: 516-482-3558
Business Address: 295 NORTHERN BLVD GREAT NECK NY 11021        Business Fax:
E-Mail:        Mobile Telephone:
        License Number: 029007

Applicant Type: ☒ P.E.  ☐ R.A  ☐ Sign Hanger  ☐ Other

Directive 14 Applicant
Not Applicable
Previous Applicant of Record
Not Applicable

**3 Filing Representative**
None

**4 Filing Status**
<u>Click Here to View</u>

**5  Job Types**

☐ **Alteration Type 1**                              ☒ **New Building**
  ☐ Change in Exits/Egress
  ☐ Change in Number of Stories         ☐ **Alteration Type 2**      ☐ **Full Demolition**
  ☐ Change in Number of Dwelling Units   ☐ **Alteration Type 3**      ☐ **Subdivision: Improved**
  ☐ Change in Room Count / Dwelling Units ☐ **Sign**                 ☐ **Subdivision: Condo**
  ☐ Change in Occupancy / Use
  ☐ Change inconsistent with current Cert. of Occup.
☐ **Alteration Type 1, OT "No Work"**         Directive 14 acceptance requested?  ☐ Yes   ☒  No

**6  Work Types**

☐ **BL - Boiler**          ☐ **FA - Fire Alarm**              ☐ **FB - Fuel Burning**   ☐ **FS - Fuel Storage**
☐ **FP - Fire Suppression**  ☐ **MH - Mechanical**            ☐ **PL - Plumbing**       ☐ **SD - Standpipe**
☐ **SP - Sprinkler**       ☒ **EQ - Construction Equipment**   ☐ **CC - Curb Cut**
☒ **OT -** GEN CONSTR

**7  Plans/Construction Documents Submitted**

Plans Page Count:  Not Provided

**8  Additional Information**

Enlargement proposed?
☒ No  ☐ Yes                    ☐ Horizontal ☐ Vertical
Total Construction Floor Area:   5,000   sq.ft.

**9  Additional Considerations, Limitations or Restrictions**

Yes No
☐  ☐   Structural peer review required per BC §1627      Peer Reviewer License No.(P.E.):
☐  ☒   Filed to Comply with Local Law                    Local Law No./Year:
☐  ☒   Other, Specify:
☐  ☐   Restrictive Declaration / Easement
☐  ☐   Zoning Exhibit Record (I,II,III,etc)
☐  ☒   Landmark
☐  ☐   Filed to Address Violation(s)
☐  ☐   Legalization
☐  ☒   "Little E" Hazmat Site
☐  ☐   Unmapped Street                                   Yes No
☐  ☐   Adult Establishment                               ☐  ☐   Included in LMCCC
☐  ☐   Compensated Development (Inclusionary Housing)     ☐  ☒   Infill Zoning
☐  ☐   Low Income Housing (Inclusionary Housing)          ☐  ☒   Loft Board
☐  ☒   Single Room Occupancy (SRO) Multiple Dwelling      ☐  ☒   Quality Housing
☐  ☐   Filing includes Lot Merger / Reapportionment (If Yes,17)
☐  ☐   Includes permanent removal of standpipe, sprinkler or fire suppression related systems
☐  ☐   Work includes partial demolition as defined in AC §28-101.5
☐  ☐   Structural Stability affected by proposed work
☐  ☐   Work includes lighting fixture and/or controls, installation or replacement. [§ECC 404 and 505]
☐  ☒   Site Safety Job / Project

BSA Calendar No.(s):
CPC Calendar No.(s):

**10  NYCECC Compliance** *New York City Energy Conservation Code*  **(Applicant Statement)**
Not Provided

**11  Job Description**
Not Applicable

**12  Zoning Characteristics**
District(s):  M1-2 - LIGHT MANUFACTURING DISTRICT (HIGH PERFORMANCE)

Case 1:13-cv-01045-NGG-VMS   Document 1   Filed 02/27/13   Page 21 of 96 PageID #: 21

Overlay(s):
Special District(s):
Map No.: 13B          Street legal width (ft.):          Street status: ☒ Public   ☐ Private
Zoning lot includes the following tax lots:  Not Provided

| | Proposed: Use | Zoning Area (sq.ft.) | District | FAR |
|---|---|---|---|---|
| Proposed Totals: | | -- | | |
| Existing Total: | | -- | | -- |

Proposed Lot Details:      Lot Type: ☐ Corner   ☐ Interior   ☐ Through
                          Lot Coverage (%):          Lot Area (sq.ft.):   Lot Width (ft.):
Proposed Yard Details:    ☐ No Yards  Or
                          Front Yard (ft.):    Rear Yard (ft.):    Rear Yard Equivalent (ft.):
                          Side Yard 1 (ft.):   Side Yard 2 (ft.):
Proposed Other Details:   Perimeter Wall Height (ft.):
                          Enclosed Parking? ☐ Yes  ☐ No   No. of parking spaces:

**13 Building Characteristics**

Primary structural system:   ☐ Masonry  ☐ Concrete (CIP)  ☐ Concrete (Precast)  ☐ Wood
                             ☐ Steel (Structural)  ☐ Steel (Cold-Formed)  ☐ Steel (Encased in Concrete)

                                         Proposed
Structural Occupancy Category:
Seismic Design Category:

                                                                         2008 Code
                                                                         Designations?
Occupancy Classification:    B-2 - STORAGE (LOW HAZARD)                  ☐ Yes ☒ No
Construction Classification: I-C: 2 HOUR PROTECTED                      ☐ Yes ☒ No
Multiple Dwelling Classification:
Building Height (ft.):       25
Building Stories:            1
Dwelling Units:

                             Mixed use building?  ☐ Yes   ☐ No

**14 Fill**
☐ Not Applicable     ☐ Off-Site          ☐ On-Site          ☐ Under 300 cubic yards

**15 Construction Equipment**
☐ Chute                    ☐ Sidewalk Shed     Construction Material: CHAIN LINK
☒ Fence                    Size:  linear ft.   BSA/MEA Approval No.:
☐ Supported Scaffold       ☐ Other

**16 Curb Cut Description**
Not Applicable

**17 Tax Lot Characteristics**
Not Provided

**18 Fire Protection Equipment**

| | Existing | | Proposed | | | Existing | | Proposed | |
|---|---|---|---|---|---|---|---|---|---|
| | Yes | No | Yes | No | | Yes | No | Yes | No |
| Fire Alarm | ☐ | ☐ | ☐ | ☐ | Sprinkler | ☐ | ☐ | ☐ | ☐ |
| Fire Suppression | ☐ | ☐ | ☐ | ☐ | Standpipe | ☐ | ☐ | ☐ | ☐ |

**19 Open Spaces**
Not Provided

**20 Site Characteristics**

| Yes | No | | Yes | No | |
|---|---|---|---|---|---|
| ☐ | ☐ | Tidal / Fresh Water Wetlands | ☒ | ☐ | Fire District |

Case 1:13-cv-01045-NGG-VMS   Document 1   Filed 02/27/13   Page 22 of 96 PageID #: 22

☐  ☐  **Urban Renewal**                    ☐  ☐  **Flood Hazard Area**

**21  Demolition Details**
Not Applicable

**22  Asbestos Abatement Compliance**
Not Applicable

**23  Signs**
Not Applicable

**24  Comments**

Comments for Document 01
I HEREBY STATE THAT I HAVE EXECISED A PROFESSIONAL STANDARD OF CARE IN CERT IFYING THAT THE FILED APPLICATION IS COMPLETE AND IN ACCORDANCE WITH APPLIC ABLE LAWS AS OF THIS DATE.

**25  Applicant's Statements and Signatures**      ( See paper form or check <u>Forms Received</u> )
Yes No
☐  ☐  **For New Building and Alteration 1 applications filed under the 2008 NYC Building Code only: does this building qualify for high-rise designation?**
☐  ☐  **Directive 14 applications only: I certify that the construction documents submitted and all construction documents related to this application do not require a new or amended Certificate of Occupancy as there is no change in use, exits, or occupancy.**

**26  Owner's Information**
                          Name: FAYE SCHWIMMER
         Relationship to Owner: SEC
                 Business Name: RAMOOE, INC                    Business Phone: 718-599-1942
              Business Address: 527 BEDFORD AVEQ B'KLYN NY 11211          Business Fax:
                        E-Mail:                                Owner Type: CORPORATION
                 Non Profit:  ☐ Yes   ☒  No

Yes  No
☐   ☐   **Owner's Certification Regarding Occupied Housing (Remain Occupied)**
☐   ☒   **Owner's Certification Regarding Occupied Housing (Rent Control / Stabilization)**
☐   ☒   **Owner DHCR Notification**
☐   ☐   **Owner's Certification for Adult Establishment**
☐   ☐   **Owner's Certification for Directive 14 (if applicable)**

**Condo / Co-Op or Corporation Second Officer**
                          Name: CHAIM OSTREICHER                    Title: OFFICER
                 Business Name: RAMOOE, INC             Business Phone: 718-599-1942
              Business Address: 527 BEDFORD AVE B'KLYN NY 11211        Business Fax:
                        E-Mail:

**Metes and Bounds**
Beginning at a point on the  NORTH  side of  BARTLETT ST
Distant  250  ft.  EAST  of the corner formed by the intersection of HARRISON AVE  and  BARTLETT ST
   Running Thence: NO 100 ft.              Thence: EA 50 ft.
   Running Thence: SO 100 ft.              Thence: WE 50 ft.
   Running Thence: 0 ft.                   Thence: 0 ft.
   Running Thence: 0 ft.                   Thence: 0 ft.

If you have any questions please review these <u>Frequently Asked Questions</u>, the <u>Glossary</u>, or call the 311 Citizen Service Center by dialing 311 or (212) NEW YORK outside of New York City.

http://a810-bisweb.nyc.gov/bisweb/JobsQueryByNumberServlet?requestid=3&passjobnumber=30061676...   2/22/2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: IA PART 74

------------------------------------------------------------------------x

In the Matter of the Application of the CITY OF
NEW YORK, relative to acquiring title in fee
simple absolute to certain real property where not
heretofore acquired for the same purpose, required
as a site for the

BROADWAY TRIANGLE URBAN RENEWAL
AREA, PHASE II

within the area bounded generally by Throop
Avenue to the East, Bartlett Street to the South,
Harrison Avenue to the West and Wallabout Street
to the North, in the Borough of Brooklyn, City and
State of New York.

------------------------------------------------------------------------x

**NOTICE OF
PETITION**

Index No. 22529/99

        **PLEASE TAKE NOTICE** that the Corporation Counsel of the City of New York

intends to make application to the Supreme Court of the State of New York, Kings County,

for certain relief.

        The application will be made at the following time and place: At 111 Livingston

Street, 19th Floor, in the Borough of Brooklyn, City and State of New York, on August 12,

1999, at 9:30 A.M., or as soon thereafter as counsel can be heard.

        The application is  for an order:

        1) authorizing the City to file an acquisition map in the office of the Clerk of

Kings County or the Office of the City Register;

        2) directing that upon the filing of said map, title to the property sought to be

acquired shall vest in the City;

bway-2.pet
June 10, 1999

3) providing that just compensation therefor be ascertained and determined by the Supreme Court without a jury; and

4) providing that notices of claim must be served and filed within one calendar year from the vesting date.

The City of New York, in this proceeding, intends to acquire title in fee simple absolute to certain real property where not heretofore acquired for the same purpose, for the **BROADWAY TRIANGLE URBAN RENEWAL AREA, PHASE II**, in the Borough of Brooklyn, City and State of New York.

The description of the real property to be acquired is as follows:

| TAX BLOCK | TAX LOT |
| --- | --- |
| 2269 | 14 |
| 2269 | 45 |
| 2269 | 49 |
| 2269 | 50 |

The property shall be acquired subject to encroachments, if any, of the structures, improvements and appurtenances standing or maintained partly upon the above described parcels and partly upon the lands and premises adjoining the same, as long as such encroachments shall stand.

Surveys, maps or plans of the property to be acquired are on file in the office of the Corporation Counsel of the City of New York, 100 Church Street, New York, New York 10007.

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to EDPL § 402(B)(4), any party seeking to oppose the acquisition must interpose a verified answer, which must contain

bway-2.pet
June 10, 1999

-2-

specific denial of each material allegation of the petition controverted by the opponent, or any statement of new matter deemed by the opponent to be a defense to the proceeding.   Pursuant to CPLR 403, said answer must be served upon the office of the Corporation Counsel at least seven (7) days before the  date that the petition is noticed to be heard.

Dated:      New York, New York
            June 23, 1999


                              MICHAEL D. HESS
                              Corporation Counsel
                              100 Church Street, Room 5-215
                              New York, New York 10007
                              Tel. (212) 788-0454

                    By:       _____
                              Joseph Bavuso
                              Assistant Corporation Counsel

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: IA PART 74

-----------------------------------------------------------------------x

In the Matter of the Application of the CITY OF
NEW YORK, relative to acquiring title in fee
simple absolute to certain real property where not
heretofore acquired for the same purpose, required
as a site for the

BROADWAY TRIANGLE URBAN RENEWAL
AREA, PHASE II

within the area bounded generally by Throop
Avenue to the East, Bartlett Street to the South,
Harrison Avenue to the West and Wallabout Street
to the North, in the Borough of Brooklyn, City and
State of New York.

**VERIFIED**
**PETITION**

Index No.

-----------------------------------------------------------------------x

   The petition of the City of New York respectfully shows, upon information and

belief, the following:

    1.  Pursuant to Sections 8 and 381 of the New York City Charter ("Charter"),

the City of New York, the petitioner above named, is authorized to acquire title in fee to real

property or any interest therein required for public use.

    2.  Pursuant to Sections 197-c and the Charter and Article 15 of the General

Municipal Law, the Broadway Triangle Urban Renewal Project, and the acquisition of the real

property described below for **BROADWAY TRIANGLE URBAN RENEWAL AREA, PHASE**

**II**, were  approved by the Board of Estimate on June 29, 1989 (Calendar No. 21).

    3.  On June 29, 1989 (Certificate No. CBX-8113), the Deputy Mayor approved

the acquisition of title in fee simple absolute to the subject real property required for

bway-2.ver

BROADWAY TRIANGLE URBAN RENEWAL AREA, PHASE II and ordered the Corporation Counsel to institute acquisition proceedings.

4.  The real property to be acquired herein is required for public use, namely, urban renewal purposes.

5.  The Corporation Counsel of the City of New York will file a Notice of Pendency of this proceeding simultaneously with the filing of a copy of this petition, in the office of the Clerk of the County of Kings.  A copy of the Notice of Pendency is attached hereto as Exhibit A.

6.  The real property which is to be acquired in fee simple absolute in this proceeding is described as follows:

| TAX BLOCK | TAX LOT |
|-----------|---------|
| 2269 | 14 |
| 2269 | 45 |
| 2269 | 49 |
| 2269 | 50 |

as shown on the Tax Map of the City of New York for the Borough of Brooklyn as said Tax Map existed on June 18, 1998.

7.  The above-described property shall be acquired subject to encroachments, if any, of structures, improvements and appurtenances standing or maintained partly upon the above described parcels and partly upon the lands and premises adjoining the same, as long as such encroachments shall stand.

bway-2.ver

8.    The subject property is shown on a map annexed hereto as Exhibit B, copies of which were filed in the office of the New York City Register, Kings County on June 21, 1999; in the Department of Housing Preservation and Development on June 21, 1999; in the office of the Department of Citywide Administrative Services, Division of Real Estate Services on June 21, 1999; in the Department of Design and Construction on June 22, 1999; and in the office of the Corporation Counsel on June 22, 1999.

9.    The Deputy Mayor in his approval of this acquisition, dated May 22, 1997 (Certificate No. CBX-8113), stated that the cost of acquisition of the above project is chargeable to City Funds under Capital Projects ED-380, HD-51 and HD-54.

10.    The names and addresses of the owners of the property to be acquired are set forth in Schedule A, which is part of the Notice of Pendency,  a copy of which is annexed hereto as Exhibit A.

11.    The City of New York is exempt from compliance with the hearing provisions of Article 2 of the Eminent Domain Procedure Law by virtue of EDPL § 206(A), in that this acquisition, and the project for which the property is being acquired, were approved pursuant to § 197-c of the Charter, the City of New York, and Article 15 of the General Municipal Law.

WHEREFORE, your petitioner respectfully requests that, upon proof of due compliance with the requirements of law, including the service, publication and posting of the Notice of Petition, an order be entered:

1.    authorizing petitioner to file an acquisition map in the office of the Clerk of the County of Kings or the office of the City Register;

bway-2.ver

2. directing that, upon the filing of the order granting this application to condemn and the within-mentioned acquisition map, title to the property sought to be acquired and described above shall vest in the City of New York;

3. providing that the compensation which should be made to the owners of the real property sought to be acquired and described above be ascertained and determined by the Court without a jury;

4. directing that within thirty days of the vesting of title, petitioner shall cause a notice of acquisition to be published in at least ten successive issues of The City Record, an official newspaper published in the City of New York, and shall serve a copy of such notice by first class mail on each condemnee or his, her, or its attorney of record; and

5. directing that each condemnee shall have a period of one calendar year from the date on which title to the real property vests in the City of New York, in which to file a written claim, demand or notice of appearance with the Clerk of this Court and to serve a copy of the same upon MICHAEL D. HESS, Corporation Counsel of the City of New York, 100 Church Street, New York, New York, 10007.

Dated: New York, New York
June 25, 1999

ROBERT PFEFFER
Acting Corporation Counsel

bway-2.ver                                    -4-

## VERIFICATION

ROBERT PFEFFER, an attorney licensed to practice law in the State of New York, affirms the following pursuant to CPLR 2106:

I have been duly designated as Acting Corporation Counsel of the City of New York and, as such, I am an officer of the City of New York, the petitioner in the within proceeding.

I have read the foregoing petition, and, upon information and belief, I assert the contents thereof to be true. The grounds for my belief are the minutes of the proceedings of various boards and agencies of the city government, and the maps or plans and other documents annexed to said petition.

The reason why this verification is not made by the petitioner is that it is a municipal corporation.

_____
ROBERT PFEFFER

Dated:     New York, New York
           June 25, 1999

bway-2.ver                      -5-

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS : IA PART 74

-------------------------------------------------------------------------x

In the Matter of the Application of the CITY OF
NEW YORK, relative to acquiring title in fee
simple absolute to certain real property where not
heretofore acquired for the same purpose, required
as a site for the

**BROADWAY TRIANGLE URBAN RENEWAL
AREA, PHASE II**

within the area bounded generally by Throop
Avenue to the East, Bartlett Street to the South,
Harrison Avenue to the West and Wallabout Street
to the North, in the Borough of Brooklyn, City and
State of New York.

**NOTICE OF PENDENCY
OF PROCEEDING**

Index No.

-------------------------------------------------------------------------x

NOTICE IS HEREBY GIVEN that a proceeding is being instituted by the City

of New York for the acquisition of title in fee to certain real property, hereinafter described, for

the **BROADWAY TRIANGLE URBAN RENEWAL AREA, PHASE II,** in the Borough of

Brooklyn, City and State of New York.

The names of the owners or other persons interested in said lands and premises

are set forth in Schedule "A" hereto annexed.

If there are other persons interested therein, either as owners or otherwise, their

names are unknown to the Corporation Counsel.

The lands and premises to be acquired, are bounded and more fully described as

follows:

bway-2.pen

| TAX BLOCK | TAX LOT |
|-----------|---------|
| 2269 | 14 |
| 2269 | 45 |
| 2269 | 49 |
| 2269 | 50 |

The above described property shall be acquired subject to encroachments, if any, of the structures, improvements, and appurtenances standing or maintained partly upon the above described parcels and partly upon the lands and premises adjoining the same so long as such encroachments shall stand.

Dated:  New York, New York
June 22, 1999

MICHAEL D. HESS
Corporation Counsel
100 Church Street, Room 5-215
New York, New York 10007
Tel. (212) 788-0454

By: _____
Joseph Bavuso
Assistant Corporation Counsel

TO:  THE CLERK OF THE COUNTY OF KINGS

Please index the above notice against each of the names listed in Schedule A, hereto annexed.

bway-2.pen

-2-

# BROADWAY TRIANGLE URBAN RENEWAL AREA, PHASE II
## BOROUGH OF BROOKLYN
## SCHEDULE A

## PART 1 - TAXPAYERS OF RECORD

| BLOCK | LOT | NAME AND ADDRESS |
|-------|-----|------------------|
| 2269 | 14 | 68 Gerry Realty Corp<br>68 Gerry Street<br>Brooklyn, New York  11206 |
| | | 68 Gerry Realty Corp.<br>1070 East 58th Street<br>Brooklyn, New York  11234-2510 |
| | | 68 Gerry Realty Corp.<br>2537 East 65th Street<br>Brooklyn, New York  11234-6926 |
| 2269 | 45 | Ramooe, Inc.<br>524 Bedford Avenue<br>Brooklyn, New York  11211-7605 |
| | | Ramooe, Inc.<br>43 Bartlett Street<br>Brooklyn, New York 11206 |
| 2269 | 49 | T Urban<br>37 Bartlett Street<br>Brooklyn, New York  11206-5037 |
| | | Thomas Urban<br>1 Oak Tree Drive<br>Smithtown, New York  11787-3611 |
| 2269 | 50 | T Urban<br>37 Bartlett Street<br>Brooklyn, New York  11206-5037 |
| | | Thomas Urban<br>1 Oak Tree Drive<br>Smithtown, New York  11787-3611 |

bway-2.pen

BROADWAY TRIANGLE URBAN RENEWAL AREA, PHASE II
BOROUGH OF BROOKLYN
SCHEDULE A

## PART 2 - LAST OWNERS AND INTERESTED PARTIES

| BLOCK | LOT | NAME AND ADDRESS |
|-------|-----|------------------|
| 2269 | 14 | 68 Gerry Realty Corp.<br>1070 East 58th Street<br>Brooklyn, New York |
| | | Melech Ruttner<br>683 Bedford Avenue<br>Brooklyn, New York |
| 2269 | 45 | Ramooe, Inc.<br>524 Bedford Avenue<br>Brooklyn, New York |
| 2269 | 49 | Thomas Urban<br>52-19 244th Street<br>Douglaston, New York |
| | | Virginia Urban<br>52-19 244th Street<br>Douglaston, New York |
| 2269 | 50 | Thomas Urban<br>52-19 244th Street<br>Douglaston, New York |

bway-2.pen

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: IA PART 74

In the Matter of the Application of the CITY OF NEW
YORK, relative to acquiring title in fee simple absolute to
certain real property where not heretofore acquired for the
same purpose, required as a site for the

BROADWAY TRIANGLE URBAN RENEWAL AREA,
PHASE II

within the area bounded generally by Throop Avenue to the
East, Bartlett Street to the South, Harrison Avenue to the
West and Wallabout Street to the North, in the Borough of
Brooklyn, City and State of New York.

NOTICE OF PENDENCY OF PROCEEDING

*MICHAEL D. HESS*
*Corporation Counsel of the City of New York*
*Attorney for the City of New York*
*100 Church Street, Room 5-215*
*New York, N.Y. 10007*

*Of Counsel: Joseph Bavuso*
*Tel: (212) 788-0454*
*NYCLIS No. 97CM000011*

*Due and timely service is hereby admitted.*

*New York, N.Y.* . . . . . . . . . . . . . . . . . . . *, 199 . .*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . *Esq.*

*Attorney for* . . . . . . . . . . . . . . . . .

## LEGEND

| 2269 | TAX BLOCK NUMBER |
| 14 | TAX LOT NUMBER |
| | BOUNDARY OF REAL PROPERTY TO BE ACQUIRED |
| | TAX LOT LINE |
| (1) | PARCEL NUMBER |

| ● PB | POINT OR PLACE OF BEGINNING OF LEGAL DESCRIPTION |
| | TAX BLOCK LINE |
| 9'-11" | DIMENSION ALONG BOUNDARY OF ACQUISITION |
| 9 11 | TAX LOT DIMENSION |

NOTES:

ALL STREET LINES HEREIN ARE FINAL CITY MAP LINES, AS AMENDED TO JUNE 18, 1990 WHICH ARE THE SAME AS THE TAX MAP LINES FOR THE STREETS ON THIS MAP UNLESS OTHERWISE NOTED.

THIS MAP IS IN ACCORDANCE WITH THE TAX MAP OF THE CITY OF NEW YORK FOR THE BOROUGH OF BROOKLYN -- TAX BLOCK 2269 -- AS SAID TAX MAPS EXISTED ON JUNE 18, 1990. SAID TAX BLOCK IS IN BROOKLYN TAX MAP SECTION 8. ALL TAX MAP DIMENSIONS ARE IN FEET AND INCHES. ALL REAR LOT DIMENSIONS ARE APPARENT THE SAME AS FRONT LOT DIMENSIONS EXCEPT AS OTHERWISE NOTED.

x _____  4/28/92
                             DATE
ASSISTANT COMMISSIONER OF PLANNING
HOUSING PRESERVATION AND DEVELOPMENT

APPROVED BY THE BOARD OF ESTIMATE -- CAL. No. 21-A and No. 21-B
Dated June 29, 1989

_____
JUSTICE SUPREME COURT
STATE OF NEW YORK

BROKER: _____

DATED: _____

## ACQUISITION MAP

SHOWING REAL PROPERTY TO BE ACQUIRED IN FEE SIMPLE FOR THE

# BROADWAY TRIANGLE
## PHASE 2
URBAN RENEWAL PROJECT
IN THE BOROUGH OF BROOKLYN
CITY OF NEW YORK

THE CITY OF NEW YORK
DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT
OFFICE OF POLICY AND PLANNING

SHEET 1 OF 2

THROOP AVENUE

WALLABOUT STREET

2266

GERRY STREET

2269

BARTLETT STREET

HARRISON AVENUE



# BROADWAY TRIANGLE
## PHASE 2
### URBAN RENEWAL PROJECT

IN THE BOROUGH OF BROOKLYN
CITY OF NEW YORK

## ACQUISITION MAP

SHOWING REAL PROPERTY TO BE ACQUIRED IN FEE SIMPLE FOR THE

THE CITY OF NEW YORK
DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT
OFFICE OF POLICY AND PLANNING

SHEET 2 OF 2

### LEGEND

HORIZONTAL BREAK
(TAX BLOCK IS LONGER
THAN SHOWN ON SHEET)

NOTE.  ALL DIMENSIONS SHOWN ON THIS SHEET
SHALL BE CONSIDERED "MORE OR LESS"

BROADWAY TRIANGLE URBAN RENEWAL PROJECT ACQUISITION MAP
BOROUGH OF BROOKLYN
SITE 4A

| Parcel No. | Tax Block | Tax Lot | Property Address | (Reputed) Property Owner | Transitional Assessed Valuations 96/97 Land | 96/97 Total | 97/98 Land | 97/98 Total | 98/99 Land | 98/99 Total | Actual Assessed Valuations 98/99 Land | 98/99 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2269 | 14 | Gerry Street | 88 Gerry Realty Corp. | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 | $25,200 |
| 2 | 2269 | 45 | 43 Bartlett Street | Ramooa Inc. | $28,395 | $28,125 | $28,125 | $28,125 | $28,125 | $28,125 | $28,125 | $28,125 |
| 3 | 2269 | 49 | 37 Bartlett Street | Thomas Urban | $16,875 | $16,875 | $16,875 | $16,875 | $16,875 | $16,875 | $16,875 | $16,875 |
| 4 | 2269 | 50 | 35 Bartlett Street | Thomas Urban | $16,875 | $16,875 | $16,875 | $16,875 | $16,875 | $16,875 | $16,875 | $16,875 |
| | | | | Assessed Value Totals: | $87,345 | $87,075 | $87,075 | $87,075 | $87,075 | $87,075 | $87,075 | $87,075 |

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

In the Matter of the Application of the CITY OF NEW
YORK, relative to acquiring title in fee simple absolute to
certain real property where not heretofore acquired for the
same purpose, required as a site for the

BROADWAY TRIANGLE URBAN RENEWAL AREA,
PHASE II

within the area bounded generally by Broadway and Throop
Avenue to the East, Park Avenue to the South, Marcy and
Union Avenues to the West and Lorimer Street to the
North, in the Borough of Brooklyn, City and State of New
York.

NOTICE OF PETITION
and
VERIFIED PETITION

*MICHAEL D. HESS*
*Corporation Counsel of the City of New York*
*Attorney for the City of New York*
*100 Church Street, Room 5-215*
*New York, N.Y. 10007*

*Of Counsel: Joseph Baruso*
*Tel: (212) 788-0454*
*NYCLIS No. 97CM000011*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

Index No.

In the Matter of the Application of the CITY OF NEW
YORK, relative to acquiring title in fee simple absolute to
certain real property where not heretofore acquired for the
same purpose, required as a site for the

BROADWAY TRIANGLE URBAN RENEWAL AREA,
PHASE II

within the area bounded generally by Broadway and Throop
Avenue to the East, Park Avenue to the South, Marcy and
Union Avenues to the West and Lorimer Street to the
North, in the Borough of Brooklyn, City and State of New
York.

NOTICE OF PETITION
and
VERIFIED PETITION

MICHAEL D. HESS
Corporation Counsel of the City of New York
Attorney for the City of New York
100 Church Street, Room 5-215
New York, N.Y. 10007

Of Counsel: Joseph Bavuso
Tel: (212) 788-0454
NYCLIS No. 97CM000011

At IA Part 74, of the Supreme Court of the State of New York, County of Kings, located at 111 Livingston Street, in the Borough of Brooklyn, City and State of New York, on the 12th day of *August* , 1999

**PRESENT:**

HON. Leonard Scholnick

**Justice.**

------------------------------------------------------------x

In the Matter of the Application of the CITY OF NEW YORK, relative to acquiring title in fee simple absolute to certain real property where not heretofore acquired for the same purpose, required as a site for the

**BROADWAY TRIANGLE URBAN RENEWAL AREA, PHASE II**

within the area bounded generally by Throop Avenue to the East, Bartlett Street to the South, Harrison Avenue to the West and Wallabout Street to the North, in the Borough of Brooklyn, City and State of New York.

**ORDER**

Index No. 22528/99

------------------------------------------------------------x

Petitioner, the City of New York, having applied to this Court for an order to condemn certain real property, where not heretofore acquired for the same purpose, required for **BROADWAY TRIANGLE URBAN RENEWAL AREA, PHASE II**, in the Borough of Brooklyn, City and State of New York, and to have the compensation which should be made to the respective owners of, or persons interested in the property, ascertained and determined by

this Court without a jury, in accordance with the approval of acquisition signed by the Deputy

Mayor on June 29, 1989 (Certificate No. 8113), and said application having come on to be heard

before me on August 12, 1999, and MICHAEL D. HESS, Corporation Counsel (by Joseph

Bavuso, Assistant Corporation Counsel), having appeared in support of said application; and

*No one having appeared in opposition ✓*
*(but claimant, Thomas Urbach , a claimant did appear + was heard*
~~having appeared in opposition thereto;~~ *but offered no opposition thereto*

NOW, on reading and filing the Notice of Petition, dated June 23, 1999; the

Petition of the City of New York, verified on June 25, 1999; the affidavit of Pauline Jones,

sworn to on July 6, 1999, showing the due mailing of copies of said Notice of Petition and the

Petition together with the relevant portion of the acquisition map to the last known owners and

taxpayers of record of the property to be acquired; the affidavit of ELI BLACHMAN, sworn

to on August 10, 1999, showing due publication of said Notice of Petition in at least ten

successive issues of The City Record, an official newspaper printed and published in the City

of New York; and the affidavit of  Moses Williams, sworn to on July 29, 1999, showing the

posting of said Notice of Petition in the form of handbills upon or near the property to be

condemned;

NOW, on motion of MICHAEL D. HESS, Corporation Counsel of the City of

New York, it is

ORDERED, that the Petition be, and the same hereby is granted in all respects,

and it is further

ORDERED, that the petitioner is authorized to file the acquisition map in the

office of the Clerk of the County of Kings, or in the office of the City Register, and it is further

**ORDERED**, that upon filing of this Order and the acquisition map with said County Clerk or with the City Register, title to the property shown on said map shall vest in the City of New York, and it is further

**ORDERED**, that the compensation which should be made to the owners of the property sought to be acquired in this proceeding be ascertained and determined by this Court without a jury, and it is further

**ORDERED**, that within thirty days after title vesting, petitioner shall cause a notice of acquisition to be published in at least ten successive issues of The City Record, an official newspaper published in the City of New York, and shall serve a copy of such notice by first class mail on each condemnee or his, her or its attorney of record, and it is further

**ORDERED**, that each condemnee shall have a period of one calendar year from the date of title vesting in which to file a written claim, demand or notice of appearance with the Clerk of this Court and to serve a copy of the same upon the Corporation Counsel of the City of New York, Tax and Condemnation Division, 100 Church Street, New York, New York, 10007.

E N T E R :

_____
J. S. C.

Hon. Leonard Scholnick

g:\bavusoj\document\bdwaytri.o05                    -3-

CITY PLANNING COMMISSION

October 19 /Calendar No. 7                                          C 090415 HUK

**IN THE MATTER OF** an application submitted by the Department of Housing Preservation and Development (HPD), pursuant to Section 505 of Article 15 of the General Municipal (Urban Renewal) Law of New York State and Section 197-c of the New York City Charter, for the First Amended Broadway Triangle Urban Renewal Plan for the Broadway Triangle Urban Renewal Area.

The First Amendment updates the land use of existing Sites 4A, 4B, 7A, and 7B from industrial to residential (the remaining industrial sites, 1A, 1B, 2 and 3 are being de-designated since these sites were not acquired pursuant to the Plan – the plan no longer includes any industrial sites); three privately owned properties, Block 2272, Lots 45, 46 and 147, are being acquired and added to existing Sites 7A and 7B to form a new Site 4; the plan no longer includes a commercial or public/semi-public land use; sites were renumbered to reflect site de-designations and reconfigurations; the boundary of the area has been modified to reflect site de-designations, and the language and format of the Plan have been revised to conform with HPD's current format for urban renewal plans; to facilitate the development of six sites containing residential, commercial and community facility uses within the Broadway Triangle Renewal Area Community District 1, Borough of Brooklyn. .

The application for the amendment of the Broadway Triangle Urban Renewal Plan was filed by the Department of Housing Preservation and Development on May 6, 2009. The proposed plan would no longer include any industrial sites; modifies the boundary of the urban renewal area; renumbers existing sites to reflect de-designations and reconfigurations; creates a new urban renewal site, and updates the Plan's language to conform to current standards. The amendment, in conjunction with the related actions, will facilitate affordable housing, while permitting local commercial and community facility uses.

**RELATED ACTIONS**

In addition to this application (C 090415 HUK) for the Broadway Triangle Urban Renewal Plan Amendment which is the subject of this report, implementation of the proposed development also requires action by the City Planning Commission on the following applications which are being considered concurrently with this application:

**C 090413 ZMK**     Application for an amendment of the Zoning Map.

**N 090414 ZRK**     Amendment to the Zoning Resolution.

**C 090416 HAK**     UDAAP Designation, Project Approval and Disposition of city-owned

property.

**BACKGROUND**

The New York City Department of Housing Preservation and Development (HPD) seeks approval of the First Amendment to the Broadway Triangle Urban Renewal Plan, along with zoning map and text amendments, an Urban Development Action Area and project approval and the disposition of city-owned property, to facilitate primarily residential development, much of which would be affordable.

**General Area Description and History**

The Broadway Triangle Urban Renewal Area is a small 17 block area in South Willimasburg, bounded by three main thoroughfares, Union Avenue, Broadway, and Flushing Avenue, forming a triangle. This area is developed with a mix of land uses including industrial businesses, residential and community facility uses and considerable vacant land. The area is zoned for manufacturing uses but it is surrounded by residential neighborhoods on three sides.

In 1989, the City adopted the Broadway Triangle Urban Renewal Plan(URP), which called for industrial development in the Williamsburg section of the area in Community District 1, and residential development in the Bedford-Stuyvesant area, south of Flushing Avenue in Community District 3. The residential component of the URP facilitate 313 units of affordable housing, but the industrial revitalization never took place. Since that time, the industrial base has continued to shrink. In 2008, the Pfizer Company, which had dominated the area, closed its last

production facility, an 8-story plant just south of Flushing Avenue. Pfizer still owns large parcels of vacant land and industrial property in the area. In 2008, independent of City efforts, Pfizer issued a Request for Proposal to develop their properties in the Broadway Triangle Area.

In the 1990s and early 2000s, a number of residential rezonings were approved to the west of the Broadway Triangle to accommodate the growing housing demand. During the same time the Board of Standards and Appeals granted approximately 37 variances to permit residential development in manufacturing districts in and west of the proposed rezoning area.

In light of the Mayor's mandate to increase housing production in the City, HPD launched a concerted effort to make use of the considerable city-owned vacant land in the Broadway Triangle Area. Consequently HPD is requesting several actions to facilitate the development of 1,851 dwelling units including 844 units of affordable housing on vacant and underutilized sites previously zoned for manufacturing uses in the Broadway Triangle URA.

EXISTING ZONING

Nine blocks located between Union, Harrison, and Throop Avenues, and Lynch and Whipple Streets (Blocks 2238, p/o 2245, 2246, 2250, 2266, 2269, 2272, and 2274) and currently zoned C8-2, M1-2, and M3-1 are proposed to be rezoned. They are developed with a mix of residential, commercial and light industrial uses and considerable vacant land. Out of these nine blocks seven blocks are zoned M1-2 for light manufacturing, one partial block west of Harrison Avenue is zoned M3-1 for heavy manufacturing and the northern most block between Middleton and Lynch streets is zoned C8-2 for heavy commercial uses.

The northern four blocks between Walton and Lynch Street are primarily developed with 2- to 3-story detached homes, 4-story residential buildings, an auto repair business and a public school. The three-story IS 318 occupies an entire city block between Walton and Lorimer streets, while the partial triangular Block 2245 between Union and Harrison avenues is entirely vacant.

The southern four blocks between Whipple and Walton streets are zoned M1-2 and are predominantly developed with warehouses, small industrial and auto repair uses, and significant vacant land. Two blocks (2266 & 2269) out of four, between Wallabout and Gerry streets are predominantly vacant comprising most of the city and privately owned vacant land in the Broadway Triangle area.  Block 2250, between Walton and Wallabout streets, is occupied by several active businesses, which include a smoked fish business, a door manufacturer and one-story ware houses.  Block 2272, between Bartlett and Whipple streets, is occupied with a five story private school fronting on Throop Avenue, a New York City Bartlett Street Playground, several three story dilapidated residential buildings and some vacant land.

The southernmost Block 2272 in the rezoning area is between Whipple Street and Flushing Avenue. It is triangular in shape with small lots developed with a mix of commercial uses fronting on Flushing Avenue and some small two-story residential buildings.

**Purpose and Need**

The objectives of this and the related applications are to maximize the production of housing, and to map an appropriate zoning designation for properties that are already predominantly built with residential and community facility uses.

The southern four blocks (Blocks 2250, 2266, 2269, and 2272) which are proposed to be rezoned to an R7A district, contain most of the city and privately owned vacant land in the Broadway Triangle area. The cluster of vacant and underutilized properties on these blocks present a unique opportunity to build approximately one thousand units of housing which would form the nucleus of a revitalized neighborhood in the Broadway Triangle area. Almost all of the city-owned land on these blocks are within Urban Renewal Plan sites being redesignated for residential use and is the subject of the related UDAAP application (C 090416 HAK) for disposition as well.

The second goal of this application is to rezone the northern four blocks of the rezoning area, which are predominantly built with residential and community facility uses, to a residential district that best reflects the existing land uses and built character of these blocks. The R6A district proposed for these blocks between Lynch and Walton streets would bring existing residences into conformance with the zoning resolution and also allow limited residential growth consistent with the scale of the existing residential character.

**Zoning Map Amendment**

The northern four blocks between Lynch and Walton streets, would be rezoned from C8-2, M3-1 and M1-2 to an R6A district with 100-foot deep C2-4 overlays along Lynch Street, Throop and Union avenues. The southern four blocks between Walton and Whipple streets would be rezoned from M1-2 to an R7A district with 100-foot deep C2-4 overlays along Harrison and Throop avenues. The southernmost block between Whipple Street and Flushing Avenue would be rezoned from M1-2 to a C4-3 district, which is also mapped on an adjacent block to the east along Flushing Avenue.

The proposed R6A and R7A are contextual districts that would allow residential and community facility uses with the approval of the related zoning text amendment (N090414 ZRK). The proposed R6A district would have a base FAR of 2.7 which could be increased to 3.6 with Inclusionary Housing bonuses. The maximum street wall height in R6A is 60 feet with a maximum building height of 70 feet.

The proposed R7A district has a base FAR of 3.45 which can be increased to 4.6 with the approval of the related zoning text amendment (N090414 ZRK). The R7A districts have a maximum street wall height of 40 to 65 feet with a maximum building height of 80 feet.  In both districts one off-street accessory parking space is required for 50% of the dwelling units.

The proposed C4-3 district on this block would allow commercial uses up to 3.4 FAR, residential uses up to 2.43 FAR, and community facility uses up to 4.8 FAR.  C2-4 overlays mapped in R6A

and R7A would allow retail uses up to 2.0 FAR, while commercial uses would be limited to first floor in a residential building. C2-4 overlays would not be mapped on two blocks containing community facilities in the rezoning area; IS 318 between Lorimer and Walton streets, and the private school on Throop Avenue between Bartlett and Whipple streets.

**Zoning Text Amendment to Section 23-922**

HPD is also proposing a Zoning Text amendment to apply the inclusionary housing program to R6A and R7A districts mapped as part of this action.

**Urban Renewal Plan Amendment**

In 1989 the City adopted the Broadway Triangle Urban Renewal Plan (URP), which comprised 17 blocks. The Urban Renewal Area (URA) straddles Community Districts 1 and 3, six blocks are south of Flushing Avenue in Community District 3, and 12 blocks are north of Flushing Avenue in Community District 1. The URP was created to promote development compatible with the existing land use patterns in the area, with residential uses in the southern portion of the URA in Community District 3 and industrial and manufacturing uses in the northern part of the URA in Community District 1.

The residential component of the URP was successful and produced 313 units of housing mostly in Community District 3, while the industrial sites in Community District 1 failed to attract development and remained vacant. In light of exceeding demand for affordable housing in adjacent neighborhoods HPD now proposes to amend the URP. These amendments are focused towards the still vacant sites in Community District 1, and would facilitate the development of affordable housing, neighborhood retail, and community facility uses on sites that were previously designated for industrial development. None of the proposed amendments impact the portion of the Urban Renewal Area in Community District 3.

C 090415 HUK

HPD proposes the following changes to the Broadway Triangle Urban Renewal Plan (URP):

- Sites 1A, 1B, 2, and 3 are deleted, since they were not acquired by the City for industrial development, as intended in the original URP.
- Since those sites were deleted the boundary of the URA has been modified and drawn further to the south to reflect that change.
- The land use designation of existing Sites 4A, 4B, 7A and 7B is proposed to be changed from industrial to residential and the same sites are re-numbered as new Sites 1, 2, 3A, 3B, 4A and 4B.
- Site 4B, which was previously known as Site 7B, is proposed to be enlarged by the proposed acquisition of 3 privately owned Lots 45, 46 and 147 to the east.

**Urban Development Action Area Project (UDAAP) designation project approval and disposition of city-owned property:**

HPD is also requesting UDAAP designation, project approval and disposition of 35 City-owned properties that would produce approximately 488 dwelling units of affordable housing, with space for commercial and community facility uses.

These 35 properties are located on Block 2269 and 2272 and are designated in the amended Urban Renewal Plan as Sites 1, 2, 3A, 3B, 4A, and 4B. Of these 35 properties, 26 are in city ownership and nine are in private ownership. Six of the nine private properties are on Block 2269 and were approved for acquisition in the original Urban Renewal Plan in 1989. At present HPD is seeking approval to acquire only three additional properties on Block 2272, with a total lot area of 10,000 SF. These properties comprise three vacant lots 45, 47 and 147, which are presently used for parking. The Urban Renewal sites would be developed pursuant to zoning. The proposed zoning of R7A with C2-4 commercial overlays would allow 6- to 8-story residential buildings with ground floor commercial uses on the avenues. In the future, the city owned properties would be conveyed to developers selected by HPD.

**ENVIRONMENTAL REVIEW**

This application (C 090415 HUK), in conjunction with the applications for the related actions (C 090413 ZMK, N 090414 ZRK, and C 090416 HAK) was reviewed pursuant to the New York State Environmental Quality Review Act (SEQRA), and the SEQRA regulations set forth in Volume 6 of the New York Code of Rules and Regulations, Section 617.00 et seq. and the City Environmental Quality Review (CEQR) Rules of Procedure of 1991 and Executive Order No. 91 of 1977. The designated CEQR number is 09HPD019K. The lead agency is the Department of Housing Preservation and Development.

After a study of the potential environmental impacts of the proposed action, it was determined that the proposed action may have a significant effect on the environment, and that an environmental impact statement would be required for the following reasons:

1. The action, as proposed, may result in significant adverse impacts related to land use, zoning, and public policy in the vicinity of the affected area.

2. The action, as proposed, may result in significant adverse impacts on socioeconomic conditions in the vicinity of the affected area.

3. The action, as proposed, may result in significant adverse impacts on community facilities in the vicinity of the affected area.

4. The action, as proposed, may result in significant adverse impacts on publicly accessible open space facilities in the vicinity of the affected area.

5. The action, as proposed, may result in significant adverse shadow impacts in the vicinity of the affected area.

6. The action, as proposed, may result in significant adverse impacts on historic resources (architectural resources) in the affected area.

7. The action, as proposed, may result in significant adverse impacts on urban design and visual resources in the vicinity of the affected area.

8. The action, as proposed, may result in significant adverse impacts on neighborhood character in the vicinity of the affected area.

9.    The action, as proposed, may result in significant adverse impacts on natural resources in the vicinity of the affected area.

10.   The action, as proposed, may result in significant adverse hazardous materials impacts in the affected area.

11.   The action, as proposed, may result in inconsistencies in Coastal Zone policies in the vicinity of the affected area with respect to the Waterfront Revitalization Program.

12.   The action, as proposed, may result in significant adverse impacts on infrastructure systems in the vicinity of the affected area.

13.   The action, as proposed, may result in significant adverse impacts on solid waste and sanitation services in the vicinity of the affected area.

14.   The action, as proposed, may result in significant adverse impacts on energy in the vicinity of the affected area.

15.   The action, as proposed, may result in significant adverse impacts to traffic and parking conditions in the vicinity of the affected area.

16.   The action, as proposed, may result in significant adverse impacts on transit services and pedestrian flows in the vicinity of the affected area.

17.   The action, as proposed, may result in significant adverse impacts to air quality in the vicinity of the affected area.

18.   The action, as proposed, may result in significant adverse noise impacts in the vicinity of the affected area.

19.   The action, as proposed, may result in significant adverse construction-related impacts.

20.   The action, as proposed, may result in significant adverse public health impacts in the vicinity of the affected area.

A Positive Declaration was issued on October 15, 2008, and distributed, published and filed, and the applicant was asked to prepare a Draft Environmental Impact Statement (DEIS). A public scoping meeting was held on the Draft Scope of Work on November 17, 2008 and a Final Scope of Work was issued on May 6, 2009.

The lead agency prepared a DEIS and issued a Notice of Completion on May 13, 2009,. Pursuant to the SEQRA regulations and the CEQR procedures, a joint public hearing was held on

9                                                                                    C 090415 HUK

the DEIS on September 9, 2009,, in conjunction with the Uniform Land Use Review Procedure (ULURP) applications (C090413 ZMK, N 090414 ZRK, and C 090416 HAK). The Final Environmental Impact Statement (FEIS) was completed, and a Notice of Completion of the FEIS was issued on October 7, 2009. The Notice of Completion for the FEIS identified the following significant impacts and proposed the following mitigation measures:

*SIGNIFICANT ADVERSE IMPACTS:*

**SOCIOECONOMIC CONDITIONS**

*INDIRECT RESIDENTIAL DISPLACMENT*
The Proposed Action could initiate a trend toward increased rents in the study area. Although there are ongoing trends of increased rent pressures in the study area and adjacent Williamsburg and Bushwick neighborhoods, the Proposed Action's contributions to rent pressures in the study area could be significant.

**OPEN SPACE**

The decrease in open space ratio would exceed the 5 percent threshold for possible impacts specified in the *CEQR Technical Manual.* In light of the very low open space ratios in the study area under No-Action conditions and worsening that would occur with the Proposed Action, there would be a significant adverse quantitative open space impact under CEQR.

**SHADOWS**

The Proposed Action would result in significant adverse impacts to two sunlight-sensitive resources:

10                                                                          C 090415 HUK

Bartlett Playground, located along the south side of Bartlett Street, would receive significant incremental shadow coverage resulting from the future condition, that would create a significant adverse impact during the May 6th analysis period because the resource would receive less than the minimum required amount of sunlight for its vegetative cover and trees during part of the growing season.

The "Project Roots" Community Garden, located along the south side of Walton Street, would receive significant incremental shadow coverage resulting from the future condition that could significantly reduce the exposure of vegetation (including the greenhouse) to less than the minimum required 4 hours and diminish the attractiveness of this open space and utility of the greenhouse.

## HISTORIC RESOURCES

The Proposed Action would not result in significant impacts to archaeological resources, but would result in construction-related impacts to two historic resources: the Lincoln Savings Bank and the All Saints Church. Construction activity associated with some projected development would result in potential construction-related impacts.

## TRAFFIC AND PARKING

The Proposed Action would result in significant adverse traffic impacts at a total of nine intersections:

- Broadway at Union Avenue/Heyward Street (AM)
- Broadway at Gerry Street (AM)
- Broadway at Whipple Street (AM)
- Flushing Avenue at Throop Avenue/Thorton Street (AM, PM)
- Flushing Avenue at Harrison Avenue (AM, MD, PM, SAT)
- Flushing Avenue at Union Avenue/Marcy Avenue/Gerry Street (AM, PM)

- Flushing Avenue at Lee Avenue/Nostrand Avenue (AM, MD, PM, SAT)
- Harrison Avenue at Gerry Street (AM, PM)
- Harrison Avenue at Bartlett Street (AM, PM)

## TRANSIT AND PEDESTRIANS

### *BUS SERVICE*

Project-generated demand could create a capacity shortfall of approximately 32 spaces on southbound B46 buses in the PM peak hour.

## CONSTRUCTION IMPACTS

Inadvertent direct construction-related impacts could potentially occur to two (the Lincoln Savings Bank and the All Saints Church) of the State and/or National Registers of Historic Places S/NR eligible resources as a result of development in the Project Area.

## *MITIGATION*

## SOCIOECONOMIC CONDITIONS

The significant adverse indirect residential displacement impacts that could occur as a result of the Proposed Action would be partially mitigated by the Proposed Action's provision of 844 affordable housing units for low income households which, unlike the existing unprotected units occupied by vulnerable populations, would be rent protected. Combined with the 370 affordable housing units that would be developed pursuant to City actions on other sites in the future without the No-Action, there are expected to be an additional 1,214 affordable housing units in the study area by 2018.

These and other factors may lessen the impact of the Proposed Action:

- **There is an existing trend toward increased rents that is expected to accelerate in the future without the Proposed Action.** Recent data show that there is already an existing trend toward rent increases due to post-2000 development. As evidenced through local real estate data, asking rents for rental units within the study area are

---

C 090415 HUK

considerably higher, particularly with respect to rental units closer to Williamsburg—a neighborhood that in recent years, has experienced an influx of new residential development consisting of market-rate and luxury rental units. Market pressures have in effect, spread to adjacent neighborhoods such as East Williamsburg, South Williamsburg, Bushwick, and Bedford-Stuyvesant. Census Tracts 491, 505, 507, 509, 527, 529, and 531, located in the northern portion of the study area (containing 1,189 at risk units) are those located closest to Williamsburg. Given their close proximity, it is likely that some vulnerable units already have been or will be displaced as a result of these existing market pressures.

Furthermore, 1990 and 2000 Census data indicate that within the Project Area, the poverty rate has decreased 73.6 percent between 1990 and 2000, while the median household income has increased 19.6 percent during that same period. Within the socioeconomic study area, the poverty rate has fallen by 5.0 percent while the median household income has increased by 9.4 percent between 1990 and 2000. This illustrates a shift in the socioeconomic profile of the neighborhood with a higher income population currently present in the study area. Therefore, increased market pressures in the area are the result of an existing trend spurred by the influx of higher income residents that would continue to exist in the future with or without the Proposed Action.

- **The Proposed Action would encourage a mix of market-rate and affordable housing.** The Proposed Action would introduce 1,851 units to the study area. As determined by the RWCDS, 844 units (45.6 percent) would be affordable through the redevelopment of city-owned property, utilization of the Inclusionary Housing program, or a combination of both. The new residential population would likely mirror the economic diversity of the existing population in the study areas and would likely be more diverse than the population that will be introduced to the study areas in the future without the Proposed Action. As detailed below, this diverse new population and increased housing supply could help to relieve the trend toward increased rents in the study areas, rather than accelerate it. The 844 affordable housing units generated by the Proposed Action, which would be rent protected units that would shield vulnerable populations from indirect displacement pressures unlike the existing unprotected units in the study area, would serve to partially mitigate the significant adverse indirect displacement impacts that potentially could occur as a result of the Proposed Action. Combined with the 370 affordable housing units that would be provided by known future developments under the 2018 no-action condition a total of 1,214 affordable units would be added to the study area by 2018.

The future no-action condition, by contrast, is not expected to include additional affordable housing within the Project Area and residents of unprotected units would remain potentially vulnerable to displacement pressures from the general trends of rising rents the area is experiencing.

- **The Proposed Action could serve to relieve, rather than increase market pressure in the study area.** Presently, there is a high demand for housing in the surrounding area due to its proximity to Manhattan, access to transit, and increased housing costs in nearby neighborhoods. The proposal would allow as-of-right residential development in an area that currently prohibits most new residential uses. The development of new residential buildings in the proposed Broadway Triangle Project Area would increase the supply of both market rate and affordable housing in an area where housing demand is high.

In conclusion, one of the key goals of the Proposed Action is to provide affordable housing units, which would be rent protected. These 844 projected affordable units would partially mitigate the significant adverse indirect residential displacement impacts that could occur to up to 1,189 unprotected units. While this EIS discloses this impact, in the future without the Proposed Action there would be no additional affordable housing units in the Project Area and the existing units would remain unprotected and households occupying them potentially vulnerable to indirect displacement due to rent increases.

## TRAFFIC AND PARKING

*TRAFFIC*

The Proposed Action would result in significant adverse traffic impacts at a total of nine signalized intersections in the vicinity of the Project Area in one or more peak hours by 2018. A traffic mitigation plan was therefore developed to address these impacts. This mitigation plan, summarized in Table ES-6, consists of changes to signal timing and phasing, and curb-side parking regulations in order to increase capacity.

The effectiveness of the proposed traffic mitigation plan, in terms of addressing significant adverse impacts that would result from the Proposed Action, is shown in Table ES-6. As discussed below, the proposed traffic mitigation measures would fully mitigate all of the traffic impacts that would occur as a result of the Proposed Action in each analyzed peak hour.

Broadway at Union Avenue/Heyward Street

As shown in Table ES-6, at this intersection it is proposed to add a "no standing, 7-10 AM Monday through Friday" regulation to the existing no parking anytime regulation along the

length of the east curb of northbound Broadway between Boerum Street and Union Avenue. With this parking regulation adjustment, the significant adverse impact to the northbound approach in the weekday AM peak hour would be fully mitigated. The northbound approach would operate with 37.2 seconds of delay (LOS D) in the AM under mitigated conditions compared to 88.4 seconds of delay (LOS F) in the future condition without the Proposed Action.

<u>Broadway at Gerry Street</u>

As shown in Table ES-6, at this intersection it is proposed to transfer one second of green time from the northbound/southbound (Broadway) phase to the eastbound/westbound (Gerry Street) phase in the weekday AM peak period. With this signal timing adjustment, the significant adverse impact to the eastbound Gerry Street approach in the weekday AM peak hour would be fully mitigated. The eastbound approach would operate with 44.8 seconds of delay (LOS D) in the AM compared to 46.7 seconds of delay (LOS D) with the Proposed Action and 41.3 seconds of delay (LOS D) with the future condition without the Proposed Action.

**Table ES-6**

**Proposed Traffic Mitigation Measures**

| Intersection | Approach | Period | Current Signal Timing (Seconds) | Mitigation Signal Timing (Seconds) | Description of Mitigation |
|---|---|---|---|---|---|
| Broadway (N-S) at Heyward St (W)/ Union Ave (E-W) | EB/WB NB/SB | AM | 48/36/48/36 72/54/72/54 | 48/36/48/36 72/54/72/54 | Implement no standing, 7-10 AM, Monday-Friday regulation along east curb of NB approach. |
| Broadway (N-S) at Gerry Street (E-W) | EB/WB NB/SB | AM | 36/36/36/36 84/54/84/54 | 37/36/36/36 83/54/84/54 | Transfer 1 sec. of green time from NB/SB phase to EB/WB phase in AM peak period. |
| Broadway (N-S) at Whipple St (E-W) | EB/WB NB/SB | AM | 48/36/48/36 72/54/72/54 | 47/36/48/36 73/54/72/54 | Transfer 1 sec. of green time from EB/WB phase to NB/SB phase in AM peak period. |
| Throop Ave (N) at Flushing Ave (E-W)/ Thorton Street | EB/WB NB SB | AM/PM | 54/40/54/40 36/27/36/27 30/23/30/23 | 55/40/55/40 36/27/36/27 29/23/29/23 | Transfer 1 sec. of green time from SB phase to EB/WB phase in AM and PM peak periods. |

C 090415 HUK

| (S) | | | | | |
|---|---|---|---|---|---|
| Harrison Ave (S) at Gerry Street (E-W) | EB/WB SB | AM/PM | 48/48/48/48 72/72/72/72 | 44/48/44/48 76/72/76/72 | Transfer 4 sec. of green time from EB/WB phase to SB phase in AM and PM peak periods. |
| Harrison Ave (S) at Bartlett St (E-W) | EB/WB SB | AM/PM | 48/48/48/48 72/72/72/72 | 48/48/48/48 72/72/72/72 | Implement no standing, 7-10 AM and 4-7 PM, Monday-Friday regulation for 100' along west curb of SB approach. |
| Harrison Ave (S) at Flushing Ave (E-W) | EB/WB SB | ALL | 60/45/60/45 60/45/60/45 | 63/47/64/47 57/43/56/43 | Transfer 3 sec. of green time from SB phase to EB/WB phase in AM peak period, 2 sec. in MD and Sat MD, and 4 sec. in PM. Implement no standing, 4-7 PM, Monday-Friday regulation for 100' along west curb of SB approach. |
| Union Ave (N)/ Marcy Ave (N) at Flushing Ave (E-W)/ Gerry Street (E-W) | EB/WB NB | ALL | 77/58/77/58 43/32/43/32 | 80/58/80/58 40/32/40/32 | Transfer 3 sec. of green time from NB phase to EB/WB phase in AM and PM peak periods. |
| Lee Ave (S)/ Nostrand Ave (S) at Flushing Ave (E-W) | EB/WB SB | ALL | 60/45/60/45 60/45/60/45 | 64/47/64/48 56/43/56/42 | Transfer 4 sec. of green time from SB phase to EB/WB phase in AM peak period, 2 sec. in MD, 4 sec. in PM and 3 sec. in Sat MD. |

Notes: AM/MD/PM/Sat MD signal timings indicate green plus yellow (including all-red) for each phase.
EB – eastbound; WB – westbound; NB – northbound; SB – southbound.


Broadway at Whipple Street

As shown in Table ES-6, at this intersection it is proposed to transfer one second of green time from the eastbound/westbound (Whipple Street) phase to the northbound/southbound (Broadway) phase in the weekday AM peak period. With this signal timing adjustment, the significant adverse impact to southbound Broadway in the weekday AM peak hour would be fully mitigated. The southbound approach would operate with 44.8 seconds of delay (LOS D) in the AM compared to 48.1 seconds of delay (LOS D) with the Proposed Action and 36.7 seconds of delay (LOS D) in the future condition without the Proposed Action.

C 090415 HUK

Flushing Avenue at Throop Avenue/Thorton Street

As shown in Table ES-6, at this intersection it is proposed to transfer one second of green time from the southbound (Thorton Street) phase to the eastbound/westbound (Flushing Avenue) phase in the weekday AM and PM peak periods.  With this signal timing adjustment, the significant adverse impacts to the eastbound Flushing Avenue approach in the weekday AM and PM peak hours would be fully mitigated.  In the AM peak hour, the eastbound approach would operate with 124.1 seconds of delay (LOS F) compared to 130.1 seconds of delay (LOS F) in the future condition without the Proposed Action.  In the PM peak hour, the eastbound approach would operate with 108.6 seconds of delay (LOS F) compared to 113.8 seconds of delay (LOS F) in the future condition without the Proposed Action.

Harrison Avenue at Gerry Street

As shown in Table ES-6, at this intersection it is proposed to transfer four seconds of green time from the eastbound/westbound (Gerry Street) phase to the southbound (Harrison Avenue) phase in the weekday AM and PM peak periods.  With this signal timing adjustment, the significant adverse impacts to the southbound Harrison Avenue approach in the weekday AM and PM peak hours would be fully mitigated.  The southbound approach would operate with 46.3 seconds of delay (LOS D) and 60.4 seconds of delay (LOS E) in the AM and PM peak hours, respectively, compared to 47.8 seconds of delay (LOS D) and 64.2 seconds of delay (LOS E), respectively, in the future condition without the Proposed Action.

Harrison Avenue at Bartlett Street

As shown in Table ES-6, at this intersection it is proposed to implement a no standing, 7-10 AM and 4-7 PM, Monday through Friday regulation for 100 feet along the west curb of southbound Harrison Avenue.  With this parking regulation adjustment, the significant adverse impacts to the southbound Harrison Avenue approach in the weekday AM and PM peak hours would be fully mitigated.  The southbound approach would operate with 22.2 seconds of delay (LOS C) and 29.1 seconds of delay (LOS C) in the AM and PM peak hours, respectively, compared to 40.4 seconds of delay (LOS D) and 49.8 seconds of delay (LOS D), respectively, in the future

condition without the Proposed Action.

<u>Harrison Avenue at Flushing Avenue</u>

As shown in Table ES-6, at this intersection it is proposed to implement a no standing 4-7 PM Monday through Friday regulation for 100 feet along the west curb of the southbound Harrison Avenue approach, and to transfer three seconds of green time from the southbound Harrison Avenue phase to the eastbound/westbound Flushing Avenue phase in the weekday AM peak period, two seconds in the midday, four seconds in the PM and two seconds in the Saturday midday peak period. With these parking regulation and signal timing adjustments, the significant adverse impacts to the eastbound approach in the weekday AM peak hour and to the westbound approach in all four peak periods would be fully mitigated. The eastbound approach would operate with 52.8 seconds of delay (LOS D) in the AM compared to 62.3 seconds of delay (LOS E) in the future condition without the Proposed Action. The westbound approach would continue to operate at LOS F in all periods with 122.9, 95.9, 118.9 and 117.8 seconds of delay in the weekday AM, midday and PM and Saturday midday peak hours, respectively, compared to 129.5, 110.6, 127.1 and 126.5 seconds of delay in these periods, respectively, in the future condition without the Proposed Action.

<u>Union Avenue/Marcy Avenue at Flushing Avenue</u>

As shown in Table ES-6, at this intersection it is proposed to transfer three seconds of green time from the northbound Marcy Avenue phase to the eastbound/westbound Flushing Avenue phase in the weekday AM and PM peak periods. With this signal timing adjustments, the significant adverse impacts to the eastbound approach in the weekday AM and PM peak hours would be fully mitigated. The eastbound approach would operate with 44.9 seconds of delay (LOS D) in the AM and 41.6 seconds (LOS D) in the PM compared to 46.7 seconds of delay (LOS D) and 24.6 seconds (LOS C) during these periods, respectively, in the future condition without the Proposed Action.

C 090415 HUK

*LEE AVENUE/NOSTRAND AVENUE AT FLUSHING AVENUE*

As shown in Table ES-6, at this intersection it is proposed to transfer four seconds of green time from the southbound Lee Avenue phase to the eastbound/westbound Flushing Avenue phase in the weekday AM peak period, two seconds in the midday, four seconds in the PM and three seconds in the Saturday midday peak period. With these signal timing adjustments, the significant adverse impacts to the eastbound and westbound approaches in all four peak periods would be fully mitigated. The eastbound approach would operate at LOS F in the weekday AM, midday and PM peak hours and LOS E in the Saturday midday (unchanged from the No-Action condition), with 102.4, 81.4, 90.4, and 65.5 seconds of delay during these periods, respectively, compared to 120.3, 84.0, 95.1 and 76.3 seconds of delay, respectively, in the future condition without the Proposed Action. The westbound approach would continue to operate at LOS F in all periods with 121.5, 169.1, 110.9 and 122 seconds of delay in the weekday AM, midday and PM and Saturday midday peak hours, respectively, compared to 124, 182.2, 120 and 127.7 seconds of delay in these periods, respectively, in the future condition without the Proposed Action.

**TRANSIT AND PEDESTRIANS**

*Local Bus*

The Proposed Action would result in significant adverse impacts to southbound B46 bus service in the PM peak hour in the 2018 build year. In the PM peak hour southbound B46 buses would be operating with a capacity shortfall of approximately 32 spaces, compared to a surplus of approximately 44 spaces in the future without the Proposed Action. According to current NYC Transit guidelines, increases in bus load levels to above their maximum capacity at any load point is considered a significant impact as it would necessitate the addition of more bus service along that route. As standard practice, NYC Transit routinely conducts ridership counts and adjusts bus service frequency to meet its service criteria, within fiscal and operating constraints. Therefore, no mitigation is needed for the Proposed Action.

*UNAVOIDABLE ADVERSE IMPACTS*

**OPEN SPACE**

The Proposed Action would result in a significant adverse impact to open space. In the future with the Proposed Action, open space ratios in the open space ratio would decrease by approximately 5.6 percent as compared to the future without the Proposed Action. The private recreational space created under the *Quality Housing Program* for all action-generated residential units in the future with the Proposed Action would contribute to alleviating some of the shortage of open space in the study area. In addition, there are several large open space resources just outside the study area and bike lanes on existing roadways in the area which would also partially alleviate the shortage of open space for residents of the study area. However, the decrease in open space ratio would exceed the 5 percent threshold for possible impacts, In light of the very low open space ratios for both passive and active recreation in the study area under No-Action conditions and worsening that would occur with the Proposed Action, there would be a significant adverse open space impact.

HPD has considered the following measures to mitigate the significant adverse quantitative open space impacts:÷

- The creation of new open space within the open space study area; or
- The enhancement and improvement of existing open spaces within the open space study area.

HPD has identified partial mitigation for the shortfall in passive open space. In order to partially mitigate the significant adverse open space impact, a new open space would be created within the open space study area at the junction of Beaver Street and Bushwick Avenue within the West Bushwick URA. The open space mitigation site is also known as URA Site 8 (Block 3137, Lots 1, 6, 9 and 11). The site is approximately 18,000 square feet and is City-owned (under HPD jurisdiction). HPD would transfer jurisdiction of the site to the Department of Parks and Recreation (DPR), which would create and maintain the site as passive open space. The creation of new passive open space would mitigate the passive open space impact; however, the study

area would continue to be underserved by active open space. Furthermore, due to the absence of available funding, enhancements and/or improvements to existing open spaces in the open space study area is not considered feasible and no commitments can be made at this time. As a result, significant adverse impacts related to active open space would remain unmitigated.

**SHADOWS**

The Proposed Action has the potential to result in significant adverse impacts due to shadows cast on the Bartlett Playground and the "Project Roots" Community Garden.

*Bartlett Playground*

Bartlett Playground, located along the south side of Bartlett Street, would receive significant incremental shadow coverage resulting from the future condition with the Proposed Action, specifically from future development at projected development sites 5 and 6. Sun sensitive resources located within the playground include deciduous trees, playground facilities, spray showers, benches and basketball courts. The duration of the shadow coverage over the four analysis periods (6 ¼ to 11 ¼ hours) would reduce the exposure of vegetation to sunlight to 3 hours on May 6th and 4 hours and 35 minutes on June 21st. While the reduction in sunlight exposure as a result of the Proposed Action would not significantly affect active recreation areas within the playground such as basketball courts, the lack of sunlight on the Bartlett Playground is a significant adverse impact during the May 6th analysis period because the resource would receive less than the minimum required for its vegetative cover and trees during part of the growing season.

HPD, in consultation with DPR, considered the following measures to mitigate significant adverse shadow impacts on the Bartlett Playground:

- Eliminating projected development sites 5 and 6 (the sites creating the shadow impact);
- reducing the height of buildings causing the shadow impact; or
- choosing shade tolerant species for vegetation to be planted in areas that would be in shadow.

C 090415 HUK

HPD explored the aforementioned measures and has determined that the measures are not feasible. Therefore, the significant adverse shadow impacts to the Bartlett Playground would remain unmitigated.

*"Project Roots" Community Garden*

The "Project Roots" Community Garden is located along the south side of Walton Street. Incremental shadows, as a result of the Proposed Action, would primarily result from development on projected development site 24, where a distinctly taller building (80 feet in height) is projected. The duration of the shadow coverage over the four analysis periods (6 ¼ hours to 12 hours) would significantly reduce the exposure of vegetation (including the greenhouse) to sunlight and diminish the attractiveness of the open space and utility of the greenhouse.

HPD, in consultation with DPR, considered the following measures to mitigate significant adverse shadow impacts on the "Project Roots" Community Garden:

- Eliminating projected development site 24 (the site creating the shadow impact);
- reducing the height of buildings causing the shadow impact;
- choosing shade tolerant species for vegetation to be planted in areas that would be in shadow; or
- realignment or relocation of the greenhouse to another area of the garden.

HPD explored the aforementioned measures and has determined that the measures are not feasible. Therefore, as described in Chapter 24 "Mitigation", the significant adverse shadow impacts to the "Project Roots" Community Garden would remain unmitigated.

## HISTORIC RESOURCES

The Proposed Action would not result in significant impacts to archaeological resources but

would result in unmitigated construction-related impacts to two historic (architectural) resources, as discussed below.

## CONSTRUCTION IMPACTS

Inadvertent direct construction-related damage could potentially occur to two (the Lincoln Savings Bank and the All Saints Church) of the S/NR eligible historic resources as a result of development in the Project Area.  Construction activity associated with projected development sites 1 and 34 would result in potential construction-related impacts.  The resource within 90 feet of projected development site 1 is the All Saints Church building, located on Throop Avenue. The resource within 90 feet of projected development site 34 is Lincoln Savings Bank which is located on Broadway.

These impacts would be unavoidable and remain unmitigated for privately owned development sites as no mechanism to require a Construction Protection Plan (CPP) is currently in place for private sites, aside from the standard Building Code measures

## *(E) DEISIGNATIONS*

## HAZARDOUS MATERIALS

All projected and potential development sites could reasonably be expected to be affected by hazardous materials due to historical and/or current land use.  For these sites, the predominant source of potential contamination stems from chemical manufacturing (associated with pharmaceutical products) and automobile repair facilities.   Other potential sources of contamination include machine shops and metal fabrication shops, petroleum storage tanks, dry cleaning establishments and printing shops.  Consequently, with the exception of City-owned sites, the Proposed Action would include (E) designations for projected and potential development sites.  For city-owned development sites, (E) designations are not recommended. Since development of these sites would occur through disposition to a private entity, similar mechanisms would be required through the Land Disposition Agreement (LDA) between HPD

and a private entity. The provisions would be similar to an (E) designation and would ensure that further investigative and/or remedial activities (as well as health and safety measures) prior to and/or during construction would be required under the City's contract of sale with the private entity selected to develop the site. Sites that would be mapped with (E) designations are included in Table ES-1.

The (E) designation would require that the fee owner of such a site conduct a Phase I Environmental Site Assessment (ESA) in accordance with the American Society of Testing Materials (ASTM) E1527-05, a subsurface testing and sampling protocol where appropriate, and remediation where appropriate, to the satisfaction of New York City Department of Environmental Protection (DEP). The (E) designation also includes a mandatory Construction Health and Safety Plan (CHASP) which must be approved by DEP prior to construction activities. Zoning Resolution § 11-15 indicates that the New York City Department of Buildings (DOB) may not issue a building permit for work on a tax lot labeled with an (E) designation due to potential hazardous materials contamination, if the building permit would allow: (1) a development; (2) an enlargement, extension or change of use involving a residential or community facility use; or (3) an enlargement that disturbs the soil, unless the DOB is provided with a report from the DEP stating that the hazardous materials requirements for the lot have been satisfied. Both the mapping of (E) designations on the zoning map for privately owned sites, and implementation provisions required through the Land Disposition Agreement (LDA) between HPD and a private entity on city-owned sites would preclude the potential for significant adverse hazardous materials impacts that could result from the Proposed Action.

**Table ES-1**
**Hazardous Materials E-Designations**

| Site No. | Block | Lot |
|---|---|---|
| Projected Development Sites | | |
| 1 | 2274 | 16 |
| | | |
| 2 | 2274 | 1 |

**Table ES-1**
**Hazardous Materials E-Designations**

| Site No. | Block | Lot |
|---|---|---|
|  | 2274 | 5 |
|  | 2274 | 6 |
|  | 2274 | 24 |
|  |  |  |
| 3 | 2272 | 3 |
|  |  |  |
| 4 | 2272 | 6 |
|  |  |  |
| 5 | 2272 | 9 |
|  |  |  |
| 6 | 2272 | 45 |
|  | 2272 | 46 |
|  | 2272 | 147 |
|  |  |  |
| 7 | 2272 | 54 |
|  | 2272 | 55 |
|  |  |  |
| 9 | 2269 | 1 |
|  |  |  |
| 10 | 2269 | 19 |
|  | 2269 | po40 |
|  | 2269 | 24 |
|  |  |  |
| 11 | 2269 | 25 |
|  |  |  |
| 12 | 2269 | 39 |
|  | 2269 | p/o 40 |
|  | 2269 | 42 |
|  |  |  |
| 13 | 2269 | 43 |
|  | 2269 | 43 |
|  |  |  |

C 090415 HUK

**Table ES-1**
**Hazardous Materials E-Designations**

| Site No. | Block | Lot |
|---|---|---|
| 14 | 2266 | 1 |
| | 2266 | 9 |
| | | |
| 15 | 2266 | 14 |
| | 2266 | 15 |
| | 2266 | 16 |
| | 2266 | 17 |
| | | |
| 16 | 2266 | 19 |
| | 2266 | 20 |
| | 2266 | 21 |
| | 2266 | 22 |
| | 2266 | 23 |
| | 2266 | 24 |
| | 2266 | 25 |
| | | |
| 17 | 2266 | 29 |
| | 2266 | 30 |
| | | |
| 18 | 2266 | 31 |
| | 2266 | 32 |
| | 2266 | 34 |
| | | |
| 19 | 2266 | 37 |
| | 2266 | 38 |
| | | |
| 20 | 2266 | 39 |
| | 2266 | 40 |
| | 2266 | 41 |
| | | |
| 21 | 2266 | 46 |
| | | |
| 22 | 2250 | 4 |

C 090415 HUK

**Table ES-1**
**Hazardous Materials E-**
**Designations**

| Site No. | Block | Lot |
|---|---|---|
| | | |
| | 2250 | 10 |
| 23 | 2250 | 11 |
| | 2250 | 12 |
| | | |
| | 2250 | 14 |
| 24 | 2250 | 46 |
| | 2250 | 48 |
| | | |
| | 2250 | 129 |
| 26 | 2250 | 32 |
| | 2250 | 33 |
| | | |
| | 2250 | 36 |
| 27 | 2250 | 37 |
| | | |
| | 2242 | 2 |
| 29 | 2242 | 3 |
| | | |
| | 2242 | 53 |
| 30 | 2242 | 54 |
| | | |
| | 2242 | 45 |
| 31 | 2242 | 46 |
| | 2242 | 47 |
| | | |
| 32 | 2242 | 22 |
| | | |
| 33 | 2238 | 49 |
| | | |
| 34 | 2238 | 27 |

C 090415 HUK

**Table ES-1**
**Hazardous Materials E-Designations**

| Site No. | Block | Lot |
|---|---|---|
| 35 | 2238 | 41 |
| | | |
| | 2245 | 136 |
| | 2245 | 35 |
| | 2245 | 40 |
| 36 | 2245 | 42 |
| | 2245 | 43 |
| | 2245 | 44 |
| | 2245 | 47 |
| | 2245 | 48 |
| **Potential Development Sites** | | |
| | 2250 | 27 |
| 25 | 2250 | 28 |
| | 2250 | 29 |
| | 2250 | 25 |
| | | |
| | 2250 | 38 |
| 28 | 2250 | 40 |
| | 2250 | 41 |
| | | |
| | 2250 | 6 |
| 37 | 2250 | 7 |
| | 2250 | 8 |

**AIR QUALITY**

The mapping of (E) designations on the zoning map for certain sites would ensure that future development would not result in any significant air quality impacts from HVAC emissions. In making this determination all proposed development parameters (locations, size, and building heights) were examined. The size of each development anticipated from the Proposed Action, including permitted zoning square footage, and estimated height of exhaust release, were utilized in this screening analysis. Based on CEQR criteria, No. 4 fuel, No. 2 fuel, and natural gas were

28                                                         C 090415 HUK

used for determining the maximum size of project development that would not result in significant HVAC and boiler air quality impacts on a typical nearby receiver or building. Where developments exceeded thresholds, (E) designations and restrictions for the development are listed in Table ES-2.

## Table ES-2
## CEQR Preliminary Screening Results for Individual HVAC Source

| Project Development Sites | | | Distance to Nearest Building (feet) | Fuel Type Passed | E- Requirements |
|---|---|---|---|---|---|
| Site No. | Block - Lot | Lot Area | Building Area | | |
| | | | Distance (ft) | Fuel Type | Requirement |
| **Projected Development Sites** | | | | | |
| 1 | 2274 - 16 | 7800 | 1440 | 119 | Fuel #4 | Fuel #4; no restriction |
| 2 | 2274 - 1 | 4167 | 5900 | 177 | Fuel #4 | Fuel #4; no restriction |
| | 2274 - 5 | 2125 | 0 | | | |
| | 2274 - 6 | 713 | 0 | | | |
| | 2274 - 24 | 6119 | 6119 | | | |
| | | 13124 | 12019 | | | |
| 3 | 2272 - 3 | 5000 | 0 | 34 | Fuel #2 | Fuel #2 at 34' from southern and eastern lot lines or natural gas with no restrictions |
| 4 | 2272 - 6 | 6975 | 0 | 40 | Fuel #2 | Fuel #2 at 37' from southern, eastern and western lot lines or natural gas with no restrictions |
| 5 | 2272 - 9 | 5000 | 4945 | 47 | Natural Gas | Fuel #2 at 55' from southern and western lot lines or natural gas at 42' from southern and western lot lines |
| | 2272 - 11 | 5000 | 0 | | | |
| | | 10000 | 4945 | | | |
| 6 | 2272 - 45 | 2500 | 0 | 50 | NONE | Natural gas at 60' from northern and western lot lines |
| | 2272 - 46 | 3750 | 0 | | | |
| | 2272 - 147 | 3750 | 0 | | | |
| | 2272 - 49 | 3282 | 0 | | | |
| | 2272 - 51 | 2150 | 0 | | | |
| | 2272 - 52 | 2000 | 0 | | | |
| | 2272 - 53 | 2000 | 0 | | | |
| | 2272 - 108 | 520 | 0 | | | |
| | | 19952 | 0 | | | |

C 090415 HUK

## Table ES-2

## CEQR Preliminary Screening Results for Individual HVAC Source

| Project Development Sites | | | | Distance to Nearest Building (feet) | Fuel Type Passed | E- Requirements |
|---|---|---|---|---|---|---|
| Site No. | Block - Lot | Lot Area | Building Area | Distance (ft) | Fuel Type | Requirement |
| 7 | 2272 - 54 | 2000 | 0 | 23 | Distance <30ft | Natural gas; no restriction |
| | 2272 - 55 | 2500 | 4875 | | | |
| | | 4500 | 4875 | | | |
| 8 | 2269 - 52 | 5000 | 21750 | 25 | Distance <30ft | Natural gas; no restriction |
| 9 | 2269 - 1 | 40000 | 0 | 25 | Distance <30ft | Natural gas at 82' from southern and western lot lines |
| 10 | 2269 - 14 | 3750 | 0 | 43 | NONE | Natural gas at 60' from southern, western and eastern lot lines |
| | 2269 - 16 | 3750 | 0 | | | |
| | 2269 - 17 | 2500 | 0 | | | |
| | 2269 - 18 | 2500 | 0 | | | |
| | 2269 - 19 | 7500 | 7500 | | | |
| | 2269 - p/o 40 | 2500 | 2500 | | | |
| | 2269 - 23 | 2500 | 0 | | | |
| | 2269 - 24 | 2500 | 2500 | | | |
| | | 27500 | 12500 | | | |
| 11 | 2269 - 25 | 5500 | 0 | 55 | Natural Gas | Fuel #2 at 70' from western lot line or Natural gas at 55' from western lot line |
| | 2269 - 27 | 1750 | 0 | | | |
| | 2269 - 28 | 1750 | 0 | | | |
| | 2269 - 29 | 1750 | 0 | | | |
| | 2269 - 30 | 1750 | 0 | | | |
| | 2269 - 31 | 3575 | 0 | | | |
| | 2269 - 33 | 3283 | 0 | | | |
| | 2269 - 35 | 1350 | 0 | | | |
| | 2269 - 36 | 7500 | 0 | | | |
| | | 28208 | 0 | | | |
| 12 | 2269 - 39 | 2500 | 4125 | 48 | Natural Gas | Fuel #2 at 55' from northern, western and eastern lot lines or Natural gas at 42' from northern, western and eastern lot lines |
| | 2269 - p/o 40 | 2500 | 2500 | | | |
| | 2269 - 41 | 2500 | 0 | | | |
| | 2269 - 42 | 2500 | 3375 | | | |
| | | 10000 | 10000 | | | |
| 13 | 2269 - 43 | 2500 | 2500 | 50 | NONE | Fuel #2 at 72' from northern, western and eastern lot lines or Natural gas at 60' from northern, western and |
| | 2269 - 43 | 2500 | 15000 | | | |
| | 2269 - 45 | 5000 | 0 | | | |

C 090415 HUK

## Table ES-2

## CEQR Preliminary Screening Results for Individual HVAC Source

| | Project Development Sites | | | Distance to Nearest Building (feet) | Fuel Type Passed | E- Requirements |
|---|---|---|---|---|---|---|
| Site No. | Block – Lot | Lot Area | Building Area | Distance (ft) | Fuel Type | Requirement |
| | 2269 – 47 | 2500 | 0 | | | eastern lot lines |
| | 2269 – 48 | 2500 | 0 | | | |
| | 2269 – 49 | 2500 | 0 | | | |
| | 2269 – 50 | 2500 | 0 | | | |
| | | 37500 | 33375 | | | |
| 14 | 2266 – 1 | 30000 | 0 | 77 | Natural Gas | Natural gas at 70' from eastern lot line |
| | 2266 – 9 | 800 | 1600 | | | |
| | | 30800 | 1600 | | | |
| 15 | 2266 – 14 | 2500 | 0 | 53 | Natural Gas | Natural gas at 40' from southern and eastern lot lines |
| | 2266 – 15 | 2500 | 0 | | | |
| | 2266 – 16 | 2500 | 0 | | | |
| | 2266 – 17 | 2500 | 0 | | | |
| | | 10,000 | 0 | | | |
| 16 | 2266 – 18 | 2500 | 0 | 53 | Natural Gas | Natural gas at 50' from southern, western and eastern lot lines |
| | 2266 – 19 | 2500 | 0 | | | |
| | 2266 – 20 | 2500 | 0 | | | |
| | 2266 – 21 | 1575 | 0 | | | |
| | 2266 – 22 | 2500 | 0 | | | |
| | 2266 – 23 | 2500 | 0 | | | |
| | 2266 – 24 | 2500 | 2500 | | | |
| | 2266 – 25 | 2500 | 0 | | | |
| | | 19,075 | 2500 | | | |
| 17 | 2266 – 29 | 7500 | 0 | 47 | Natural Gas | Fuel #2 at 55' from southern and western lot lines or Natural gas at 42' from southern and western lot lines |
| | 2266 – 30 | 2500 | 2500 | | | |
| | | 10000 | 2500 | | | |
| 18 | 2266 – 31 | 2500 | 2500 | 48 | Natural Gas | Natural gas at 40' from northern and western lot lines |
| | 2266 – 32 | 4952 | 0 | | | |
| | 2266 – 34 | 2548 | 0 | | | |
| | 2266 – 36 | 2500 | 0 | | | |
| | | 12500 | 2500 | | | |
| 19 | 2266 – 37 | 2500 | 7500 | 30 | Natural Gas | Natural gas; no restriction |
| | 2266 – 38 | 2500 | 2500 | | | |

## Table ES-2

## CEQR Preliminary Screening Results for Individual HVAC Source

| | Project Development Sites | | | Distance to Nearest Building (feet) | Fuel Type Passed | E- Requirements |
|---|---|---|---|---|---|---|
| Site No. | Block - Lot | Lot Area | Building Area | Distance (ft) | Fuel Type | Requirement |
| | | 2500 | 7500 | | | |
| 20 | 2266 - 39 | 2500 | 0 | 40 | Natural Gas | Natural gas at 35' from northern, western and eastern lot lines |
| | 2266 - 40 | 2500 | 0 | | | |
| | 2266 - 41 | 2500 | 0 | | | |
| | | 7500 | 0 | | | |
| 21 | 2266 - 46 | 20000 | 0 | 46 | NONE | Natural gas at 60' from northern, western and eastern lot lines |
| 22 | 2250 - 4 | 5000 | 5000 | 25 | Distance <30ft | Natural gas at 30' from northern and eastern lot lines |
| 23 | 2250 - 10 | 2500 | 0 | 42 | Natural Gas | Natural gas at 35' from southern, western and eastern lot lines |
| | 2250 - 11 | 2500 | 0 | | | |
| | 2250 - 12 | 2500 | 2500 | | | |
| | | 7500 | 2500 | | | |
| 24 | 2250 - 14 | 15000 | 15000 | 33 | NONE | Natural gas at 60' from western and southern lot lines |
| | 2250 - 46 | 5000 | 5000 | | | |
| | 2250 - 48 | 2500 | 1000 | | | |
| | | 22500 | 21000 | | | |
| 26 | 2250 - 129 | 3750 | 0 | 50 | Natural Gas | Natural gas at 40' from northern and western lot lines |
| | 2250 - 32 | 2500 | 2500 | | | |
| | 2250 - 33 | 5000 | 5000 | | | |
| | | 11250 | 7500 | | | |
| 27 | 2250 - 36 | 2500 | 0 | 25 | Distance <30ft | Natural gas at 30' from northern, western and eastern lot lines |
| | 2250 - 37 | 2500 | 2180 | | | |
| | | 5000 | 2180 | | | |
| 29 | 2242 - 2 | 2255 | 0 | 94 | Fuel #4 | Natural gas at 60' from eastern lot line |
| | 2242 - 3 | 20357 | 1950 | | | |
| | | 22612 | 1950 | | | |
| 30 | 2242 - 53 | 2500 | 0 | 70 | Fuel #4 | Natural gas; no restriction |
| | 2242 - 54 | 2500 | 0 | | | |
| | | 5000 | 0 | | | |

C 090415 HUK

## Table ES-2
## CEQR Preliminary Screening Results for Individual HVAC Source

| Project Development Sites | | | | Distance to Nearest Building (feet) | Fuel Type Passed | E- Requirements |
|---|---|---|---|---|---|---|
| Site No. | Block - Lot | Lot Area | Building Area | Distance (ft) | Fuel Type | Requirement |
| 31 | 2242 - 45 | 2200 | 2200 | 55 | Fuel #4 | Natural gas at 35' from northern lot line |
| | 2242 - 46 | 2200 | 0 | | | |
| | 2242 - 47 | 2500 | 0 | | | |
| | | 4700 | 0 | | | |
| 32 | 2242 - 22 | 2500 | 1375 | 46 | Fuel #4 | Natural gas; no restriction |
| 33 | 2238 - 49 | 57330 | 96728 | 89 | Natural Gas | Natural gas at 80' from eastern lot line |
| 34 | 2238 - 27 | 16550 | 0 | 45 | Natural Gas | Natural gas at 40' from western and southern lot lines |
| 35 | 2238 - 41 | 5000 | 4000 | 55 | Fuel #4 | Fuel #4; no restriction |
| 36 | 2245 - 136 | 5228 | 0 | 204 | Fuel #4 | Fuel #4; no restriction |
| | 2245 - 40 | 3500 | 0 | | | |
| | 2245 - 42 | 2500 | 0 | | | |
| | 2245 - 43 | 2000 | 0 | | | |
| | 2245 - 44 | 4000 | 0 | | | |
| | 2245 - 47 | 2470 | 0 | | | |
| | 2245 - 48 | 1955 | 0 | | | |
| | 2245 - 149 | 1813 | 0 | | | |
| | 2245 - 35 | 175 | 0 | | | |
| | | 23641 | 0 | | | |
| **Potential Development Sites** | | | | | | |
| 25 | 2250 - 27 | 2500 | 2500 | 41 | Natural Gas | Natural Gas at 40' from southern lot line |
| | 2250 - 28 | 2500 | 2500 | | | |
| | 2250 - 29 | 3750 | 3750 | | | |
| | 2250 - 25 | 2500 | 0 | | | |
| | | 11250 | 8750 | | | |
| 28 | 2250 - 38 | 5000 | 5000 | 46 | NONE | Natural gas at 50' from northern, western, and eastern lot lines |
| | 2250 - 40 | 2500 | 2500 | | | |
| | 2250 - 41 | 12500 | 12500 | | | |
| | | 20000 | 20000 | | | |
| 37 | 2250 - 6 | 2500 | 5000 | 38 | Fuel #2 | Fuel #2 at 40' from southern and |

33                                                                                  C 090415 HUK

**Table ES-2**

**CEQR Preliminary Screening Results for Individual HVAC Source**

| Project Development Sites | | | | Distance to Nearest Building (feet) | Fuel Type Passed | E- Requirements |
|---|---|---|---|---|---|---|
| Site No. | Block - Lot | Lot Area | Building Area | Distance (ft) | Fuel Type | Requirement |
| | 2250 - 7 | 2500 | 5000 | | | eastern lot lines or Natural gas with no restrictions |
| | 2250 - 8 | 2500 | 5000 | | | |
| | | 7500 | 15000 | | | |

C 090415 HUK

**NOISE**

To avoid the potential for noise impacts, (E) designations for noise be placed on the New York City Zoning Map privately owned tax lots requiring attenuation, based on the *CEQR Technical Manual*.  Table ES-4 and ES-5 present the projected and potential development sites along with their block and lot numbers and the level of attenuation needed to comply with the CEQR criteria for interior noise levels.

**Table ES-4**
**Minimum Required Noise Attenuation**
**For Projected Development Sites in Project Area**

| Proj Dev Site | Block | Lot | Address | Proposed Zoning | Governing Noise Analysis Site[a] | CEQR Max. Build $L_{10}$ | HUD Max. Build $L_{dn}$ | CEQR Required Attenuation Level[b] | HUD Required Attenuation Level[b] | Implementing Mechanism |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2274 | 16 | 134 Throop Avenue | C4-3 (R6) | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
|   | 2274 | 1 | 2 Whipple Street | C4-3 (R6) | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
| 2 | 2274 | 5 | 16 Whipple Street | C4-3 (R6) | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
|   | 2274 | 6 | Whipple Street | C4-3 (R6) | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
|   | 2274 | 24 | 687 Flushing Avenue | C4-3 (R6) | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
| 3 | 2272 | 3 | 207 Harrison Avenue | R7A/C2-4 | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
| 4 | 2272 | 6 | 24 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
| 5 | 2272 | 9 | 30 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|   | 2272 | 11* | 36 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
| 6 | 2272 | 45 | 11 Whipple Street | R7A | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
|   | 2272 | 46 | 9 Whipple Street | R7A | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
|   | 2272 | 147 | 5 Whipple Street | R7A | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
|   | 2272 | 49 | 669 Flushing Avenue | R7A | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
|   | 2272 | 51 | 665 Flushing Avenue | R7A | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
|   | 2272 | 52 | 665 Flushing Avenue | R7A/C2-4 | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
|   | 2272 | 53 | 663 Flushing Avenue | R7A/C2-4 | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
|   | 2272 | 108 | Bartlett Street | R7A | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
| 7 | 2272 | 54 | 661 Flushing Avenue | R7A | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
|   | 2272 | 55 | 659 Flushing Avenue | R7A | 6 | 71.4 | 73 | **30 dBA** | 30 dB | (E) designation |
| 8 | 2269 | 52* | 31 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
| 9 | 2269 | 1 | 58 Gerry Street | R7A/C2-4 | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
| 10 | 2269 | 14* | 68 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|   | 2269 | 16* | 72 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|   | 2269 | 17* | 74 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|   | 2269 | 18* | 76 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|   | 2269 | 19 | 78 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|   | 2269 | p/o 40 | 84 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|   | 2269 | 23* | 86 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|   | 2269 | 24* | 88 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
| 11 | 2269 | 25 | 90 Gerry Street | R7A/C2-4 | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|   | 2269 | 27* | 84 Throop Avenue | R7A/C2-4 | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|   | 2269 | 28* | 86 Throop Avenue | R7A/C2-4 | 5 | 64.2 | 66 | NONE | 25 dB | N/A |

| Proj Dev Site | Block | Lot | Address | Proposed Zoning | Governing Noise Analysis Site[e] | CEQR Max. Build $L_{10}$ | HUD Max. Build $L_{dn}$ | CEQR Required Attenuation Level[b] | HUD Required Attenuation Level[b] | Implementing Mechanism |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 2269 | 29* | 88 Throop Avenue | R7A/C2-4 | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 30* | 90 Throop Avenue | R7A/C2-4 | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 31* | 90 Throop Avenue | R7A/C2-4 | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 33* | 69 Bartlett Street | R7A/C2-4 | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 35* | 65 Bartlett Street | R7A/C2-4 | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 36* | 63 Bartlett Street | R7A/C2-4 | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 39 | 57 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
| 12 | 2269 | p/o 40 | 55 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 41* | 53 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 42 | 51 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 43 | 49 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 44 | 47 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 45* | 43 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
| 13 | 2269 | 47* | 41 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 48* | 39 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 49* | 37 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2269 | 50* | 35 Bartlett Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
| 14 | 2266 | 1 | Harrison Avenue | R7A/C2-4 | 4 | 66.6 | 71 | 25 dBA | 30 dB | (E) designation |
|  | 2266 | 9 | 366 Wallabout Street | R7A/C2-4 | 4 | 66.6 | 71 | 25 dBA | 30 dB | (E) designation |
|  | 2266 | 14 | 376 Wallabout Street | R7A | 4 | 66.6 | 71 | 25 dBA | 30 dB | (E) designation |
|  | 2266 | 15 | 378 Wallabout Street | R7A | 4 | 66.6 | 71 | 25 dBA | 30 dB | (E) designation |
| 15 | 2266 | 16 | 380 Wallabout Street | R7A | 4 | 66.6 | 71 | 25 dBA | 30 dB | (E) designation |
|  | 2266 | 17 | 382 Wallabout Street | R7A | 4 | 66.6 | 71 | 25 dBA | 30 dB | (E) designation |
|  | 2266 | 18* | 384 Wallabout Street | R7A | 4 | 66.6 | 71 | 25 dBA | 30 dB | LDA |
|  | 2266 | 19 | 386 Wallabout Street | R7A | 3 | 73.4 | 75 | 30 dBA | 30 dB | (E) designation |
|  | 2266 | 20 | 388 Wallabout Street | R7A | 3 | 73.4 | 75 | 30 dBA | 30 dB | (E) designation |
|  | 2266 | 21 | 390 Wallabout Street | R7A | 3 | 73.4 | 75 | 30 dBA | 30 dB | (E) designation |
| 16 | 2266 | 22 | 392 Wallabout Street | R7A | 3 | 73.4 | 75 | 30 dBA | 30 dB | (E) designation |
|  | 2266 | 23 | 394 Wallabout Street | R7A | 3 | 73.4 | 75 | 30 dBA | 30 dB | (E) designation |
|  | 2266 | 24 | 396 Wallabout Street | R7A | 3 | 73.4 | 75 | 30 dBA | 30 dB | (E) designation |
|  | 2266 | 25 | 398 Wallabout Street | R7A | 3 | 73.4 | 75 | 30 dBA | 30 dB | (E) designation |
|  | 2266 | 29 | 72 Throop Avenue | R7A/C2-4 | 3 | 73.4 | 75 | 30 dBA | 30 dB | (E) designation |
| 17 | 2266 | 30 | 74 Throop Avenue | R7A/C2-4 | 3 | 73.4 | 75 | 30 dBA | 30 dB | (E) designation |
|  | 2266 | 31 | 76 Throop Avenue | R7A/C2-4 | 3 | 73.4 | 75 | 30 dBA | 30 dB | (E) designation |
| 18 | 2266 | 32 | 78 Throop Avenue | R7A/C2-4 | 3 | 73.4 | 75 | 30 dBA | 30 dB | (E) designation |
|  | 2266 | 34 | 82 Throop Avenue | R7A/C2-4 | 3 | 73.4 | 75 | 30 dBA | 30 dB | (E) designation |
| 19 | 2266 | 37 | 97 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2266 | 38 | 95 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2266 | 39 | 93 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
| 20 | 2266 | 40 | 91 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2266 | 41 | 89 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
|  | 2266 | 46 | 75 Gerry Street | R7A | 5 | 64.2 | 66 | NONE | 25 dB | N/A |
| 21 | 2250 | 4 | 161 Harrison Avenue | R7A/C2-4 | 4 | 66.6 | 71 | 25 dBA | 30 dB | (E) designation |
| 22 | 2250 | 10 | 86 Wallabout Street | R7A | 4 | 66.6 | 71 | 25 dBA | 30 dB | (E) designation |
| 23 | 2250 | 11 | 88 Wallabout Street | R7A | 4 | 66.6 | 71 | 25 dBA | 30 dB | (E) designation |
|  | 2250 | 12 | 90 Wallabout Street | R7A | 4 | 66.6 | 71 | 25 dBA | 30 dB | (E) designation |

C 090415 HUK

| Proj Dev Site | Block | Lot | Address | Proposed Zoning | Governing Noise Analysis Site[e] | CEQR Max. Build $L_{10}$ | HUD Max. Build $L_{dn}$ | CEQR Required Attenuation Level[b] | HUD Required Attenuation Level[b] | Implementing Mechanism |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2250 | 14 | 94 Wallabout Street | R7A | 4 | 66.6 | 71 | 25 dBA | **30 dB** | (E) designation |
| | 2250 | 46 | 291 Wallabout Street | R7A | 4 | 66.6 | 71 | 25 dBA | **30 dB** | (E) designation |
| 24 | 2250 | 48 | 289 Wallabout Street | R7A | 4 | 66.6 | 71 | 25 dBA | **30 dB** | (E) designation |
| | 2250 | 129 | 56 Throop Avenue | R7A/C2-4 | 3 | 73.4 | 75 | **30 dBA** | 30 dB | (E) designation |
| | 2250 | 32 | 62 Throop Avenue | R7A/C2-4 | 3 | 73.4 | 75 | **30 dBA** | 30 dB | (E) designation |
| 26 | 2250 | 33 | 66 Throop Avenue | R7A/C2-4 | 3 | 73.4 | 75 | **30 dBA** | 30 dB | (E) designation |
| | 2250 | 36 | 313 Wallabout Street | R7A | 3 | 73.4 | 75 | **30 dBA** | 30 dB | (E) designation |
| 27 | 2250 | 37 | 311 Wallabout Street | R7A | 3 | 73.4 | 75 | **30 dBA** | 30 dB | (E) designation |
| | 2242 | 2 | 131 Harrison Avenue | R6A/C2-4 | 2 | 69.8 | 68 | 25 dBA | 25 dB | N/A |
| 29 | 2242 | 3 | 100 Harrison Avenue | R6A/C2-4 | 2 | 69.8 | 68 | 25 dBA | 25 dB | N/A |
| | 2242 | 53 | 153 Lorimer Street | R6A | 2 | 69.8 | 68 | 25 dBA | 25 dB | N/A |
| 30 | 2242 | 54 | 151 Lorimer Street | R6A | 2 | 69.8 | 68 | 25 dBA | 25 dB | N/A |
| | 2242 | 45 | 165 Lorimer Street | R6A | 2 | 69.8 | 68 | 25 dBA | 25 dB | N/A |
| 31 | 2242 | 46 | 167 Lorimer Street | R6A | 2 | 69.8 | 68 | 25 dBA | 25 dB | N/A |
| | 2242 | 47 | 165 Lorimer Street | R6A | 2 | 69.8 | 68 | 25 dBA | 25 dB | N/A |
| | 2242 | 22 | 196 Middleton Street | R6A | 2 | 69.8 | 68 | 25 dBA | 25 dB | N/A |
| 32 | 2238 | 49 | 120 Union Avenue | R6A/C2-4 | 2 | 69.8 | 68 | 25 dBA | 25 dB | N/A |
| 33 | 2238 | 27 | 240 Lynch Street | R6A/C2-4 | 1 | 77.0 | 73 | **35 dBA** | 30 dB | (E) designation |
| 34 | 2238 | 41 | 221 Middleton Street | R6A | 1 | 77.0 | 73 | **35 dBA** | 30 dB | (E) designation |
| 35 | 2245 | 136 | Harrison Avenue | R6A/C2-4 | 1 | 77.0 | 73 | **35 dBA** | 30 dB | (E) designation |
| | 2245 | 149 | Walton Street | R6A/C2-4 | 1 | 77.0 | 73 | **35 dBA** | 30 dB | (E) designation |
| | 2245 | 35 | Union Avenue | R6A/C2-4 | 1 | 77.0 | 73 | **35 dBA** | 30 dB | (E) designation |
| | 2245 | 40 | 148 Harrison Avenue | R6A/C2-4 | 1 | 77.0 | 73 | **35 dBA** | 30 dB | (E) designation |
| | 2245 | 42 | 152 Harrison Avenue | R6A/C2-4 | 1 | 77.0 | 73 | **35 dBA** | 30 dB | (E) designation |
| 36 | 2245 | 43 | 154 Harrison Avenue | R6A/C2-4 | 1 | 77.0 | 73 | **35 dBA** | 30 dB | (E) designation |
| | 2245 | 44 | Harrison Avenue | R6A/C2-4 | 1 | 77.0 | 73 | **35 dBA** | 30 dB | (E) designation |
| | 2245 | 47 | 79 Walton Street | R6A/C2-4 | 1 | 77.0 | 73 | **35 dBA** | 30 dB | (E) designation |
| | 2245 | 48 | 77 Walton Street | R6A/C2-4 | 1 | 77.0 | 73 | **35 dBA** | 30 dB | (E) designation |
| | | | | | | | | | | |

*Source:* Louis Berger Group, Inc., 2009

\* indicates publicly owned tax lot – all others are privately owned.

a) To supplement the maximum Build $L_{10}$ and $L_{dn}$ values shown above for the six analysis sites, the $L_{eq}$ noise contours provided by the SoundPLAN model run for the 2018 Build conditions (as described in Section F, under "*Mobile and Stationary Sources Cumulative Effects*") were used to more accurately represent the level of attenuation that would be required at the projected development sites within the Project Area. These SoundPLAN maps are available for reference in Appendix H.

b) Minimum required attenuation levels are shown in bold and highlighted. The higher requirement of the two analyses (CEQR and HUD) has been conservatively applied to the tax lot. Minimum required attenuation levels are shown for residential uses; commercial uses would require approximately 5 dBA less attenuation.

c) Sites listed as N/A under "Implementing Mechanism" were determined to be in the 65-70 dB "marginally acceptable" category according to CEQR, not requiring an (E)-designation. However, should new construction projects on these sites utilized HUD funding, they would be within the "normally unacceptable" category according to HUD noise guidelines, requiring the appropriate level of attenuation indicated in the table.

**Table ES-5**
**Minimum Required Noise Attenuation**

C 090415 HUK

**For Potential Development Sites in Project Area**

| Pot. Dev Site | Block | Lot | Address | Proposed Zoning | Governing Noise Analysis Site[a] | CEQR Max. Build $L_{10}$ | HUD Max. Build $L_{dn}$ | CEQR Required Attenuation Level[b] | HUD Required Attenuation Level[b] | Implementing Mechanism |
|---|---|---|---|---|---|---|---|---|---|---|
| 25 | 2250 | 27 | 52 Throop Avenue | R7A/C2-4 | 3 | 73.4 | 75 | **30 dBA** | 30 dB | (E) designation |
| | 2250 | 28 | 56 Throop Avenue | R7A/C2-4 | 3 | 73.4 | 75 | **30 dBA** | 30 dB | (E) designation |
| | 2250 | 29 | 56 Throop Avenue | R7A/C2-4 | 3 | 73.4 | 75 | **30 dBA** | 30 dB | (E) designation |
| | 2250 | 25 | 116 Walton Street | R7A/C2-4 | 3 | 73.4 | 75 | **30 dBA** | 30 dB | (E) designation |
| 28 | 2250 | 38 | 307 Wallabout Street | R7A | 3 | 73.4 | 75 | **30 dBA** | 30 dB | (E) designation |
| | 2250 | 40 | 305 Wallabout Street | R7A | 3 | 73.4 | 75 | **30 dBA** | 30 dB | (E) designation |
| | 2250 | 41 | 295 Wallabout Street | R7A | 3 | 73.4 | 75 | **30 dBA** | 30 dB | (E) designation |
| 37 | 2250 | 6 | 159 Harrison Avenue | R7A/C2-4 | 4 | 66.6 | 71 | 25 dBA | **30 dB** | (E) designation |
| | 2250 | 7 | 157 Harrison Avenue | R7A-C2-4 | 4 | 66.6 | 71 | 25 dBA | **30 dB** | (E) designation |
| | 2250 | 8 | 155 Harrison Avenue | R7A-C2-4 | 4 | 66.6 | 71 | 25 dBA | **30 dB** | (E) designation |

*Source:* Louis Berger Group, Inc., 2009

a)  To supplement the maximum Build $L_{10}$ and $L_{dn}$ values shown above for the six analysis sites, the $L_{eq}$ noise contours provided by the SoundPLAN model run for the 2018 Build conditions (as described in Section F, under *"Mobile and Stationary Sources Cumulative Effects"*) were used to more accurately represent the level of attenuation that would be required at the projected development sites within the Project Area.  These SoundPLAN maps are available for reference in Appendix H.

b)  Minimum required attenuation levels are shown in bold and highlighted.  The higher requirement of the two analyses (CEQR and HUD) has been conservatively applied to the tax lot.  Minimum required attenuation levels are shown for residential uses; commercial uses would require approximately 5 dBA less attenuation.

With the above (E) designations in place, no significant adverse impacts related to hazardous materials, air quality or noise are expected.

## UNIFORM LAND USE REVIEW

This application (C 090415 HUK) in conjunction with the related applications (C 090413 ZMK, and C 090416 HAK) was certified as complete by the Department of City Planning on May 18, 2009, and was duly referred to Community Board 1 and the Borough President in accordance with Title 62 of the Rules of the City of New York, Section 2-02(b), along with the related non-ULURP application (N 090414 ZRK) which were referred for information and review.

### Community Board Public Hearing

Community Board 1 held a public hearing on June 9, 2009 on this application (C 090415 HUK)

and the related applications (C 090413 ZMK, N 090414 ZRK, and C 090416 HAK), and on July 14, 2009, by a vote of 23 to 12 with 1 abstention, and 4 recusals, adopted a resolution recommending approval of the application with the following conditions:

1. The City shall commit sufficient money and resources to relocate existing businesses within the Broadway Triangle:
   a. Funding shall be provided for both property owners and renters operating in use groups 17 and 18 within the rezoning area.
   b. Funding shall be? separate from and incremental to any relocation funds required under Urban Renewal Plan.
   c. In order to allow the greatest continuity of operating by local businesses, the City shall commit to relocate businesses within 1 mile of their existing establishment.

2. The City shall commit sufficient money and resources to increase the amount of open space within the Broadway Triangle and to increase the current ratio of open space with a .5-mile radius of the rezoning area.

3. In order to retain affordable housing in the rezoning area to help local families stay local, the City shall amend the Inclusionary Housing Program to limit or (preferably) eliminate the offsite affordable housing option within the Broadway Triangle.

4. Any disposition of City-owned property within Community Board # 1 shall be carried out pursuant to a transparent, competitive process and not through sole-source disposition. In the event that the City or HPD as its agent should feel that it is necessary to dispose of a particular parcel through sole-source disposition, or provide any letters of support for a project which would result in a sole-source disposition should the proposed development be funded, the City shall consult with the Community Board allowing for a minimum of 60 days for review prior to the City taking any action regarding the subject parcel.

5. Community Board #1 reiterates its position that property currently owned by Pfizer should be devoted 100% to community use, either as affordable housing or as not-for-profit industrial space. The City shall commit to include Community Board #1 in a meaningful process to develop plans for the reuse of property owned by Pfizer within our Board boundaries, including any larger-scale development and rezoning (more than one city block or more that 300 units of housing).

**Borough President Recommendation**

This application (C 090415 HUK) and the related applications (C 090413 ZMK, N 090414 ZRK, and C 090416 HAK) were considered by the Borough President who issued a recommendation on August 20, 2009, approving the application with the following conditions:

INCREASED AFFORDABLE HOUSING

1. That in order to increase the amount of realized floor area for affordable housing, the Zoning Text Change Amendment 090414 ZRY regarding section ZR 23-922 "Inclusionary Housing Program" (the affordable housing floor area bonus) be further modified (as per the table below) to:

   a. Have a higher percentage of affordable housing in R7A districts as compared to R6A districts.

   b. Increase the percentage of affordable housing and decrease the proportion of market-rate floor area that can be developed to achieve 120 additional affordable housing units.

| Zone | Base FAR | a) BBPO Base FAR | Bonus Affordable FAR (20%) | Bonus FAR | b) BBPO Bonus Affordable FAR |
|------|----------|------------------|----------------------------|-----------|------------------------------|
| R6A | 2.7 | 2.0 | .72 | 3.6 | .9 (25%) |
| R7A | 3.45 | 2.0 | .92 | 4.6 | 1.38 (30%) |

2. That in order to achieve more affordable housing where additional height is appropriate, Zoning Map Change 090413 ZMK be further modified to change the proposed zoning for the portion of Block 2269 for the north side of Bartlett Street opposite the playground from R7A to R7D (an estimated minimum of 30 additional units, based on 10-stories) or a denser district if warranted.

GUARANTEE AFFORDABLE FOREVER

DISPOSITION OF CITY-OWNED PROPERTY – BUSINESS RELOCATION

3. That in order to ensure that the affordable housing remain in perpetuity, and that there be adequate public input regarding the disposition of city-owned property and that such disposition have minimal impact on businesses willing to relocate, Property Disposition 090416 HAK be modified as follows:

   a. HPD's Land Disposition Agreement shall guarantee that development on these sites be required to be 100 percent affordable and that such units remain "affordable forever."

b.  Pending the resolution of the relocation of Excellent Bus Service and Shanghai Stainless (see conditions 3d and 4), URP Sites 1 (129 affordable housing units), 3A (95 affordable housing units) and 3B (40 affordable housing units) and whether 4A (89 affordable housing units) and/or 4B (19 affordable housing units) should become part of an expanded Bartlett Street Playground (see condition 6) in lieu of housing, these sites shall be disposed subject to their own separate ULURPs.

c.  That for the resolution of the relocation of Excellent Bus Service HPD shall provide an interim rental arrangement for Excellent Bus Service to store its buses elsewhere on Block 2269 (appropriate combination of city-owned lots 14-18, 41, 45-50) prior to transferring lots 25 and 36 to the designated developer for URP Site 2, but in a timely manner as to not delay the production of these 97 affordable housing units.

BUSINESS RETENTION

4.  That in order to ensure property acquisition have minimal impact on established businesses such as Excellent Bus Service and Shanghai Stainless, acquisition according to the First Amendment to the Broadway Triangle Urban Renewal Plan 090415 HUK shall be in accordance to the following:

a)  HPD shall defer acquisition proceedings for Block 2269, Lots 19 (part of URP Site 1), 39 and 40 (part of URP Site 3B) until relocation logistics have been set in place.

b)  For acquired sites with active uses, HPD shall allow these firms to remain in place as tenants until adequate relocation sites have been secured with necessary improvements and that all financial resources are in place to facilitate the relocation and re-establishment of the business.

c)  HPD shall work expeditiously with the Economic Development Corporation in the review of its inventory of sites for possible relocation opportunity for the Shanghai Stainless and Excellent Bus Service, and if suitable property can be identified, provide for a seamless relocation.

d)  The City shall commit sufficient funding and resources, in a manner comparable to what was committed to businesses affected by the City's Willets Point development initiative, above and beyond standard settlement according to urban renewal law, policies and procedures, to relocate existing businesses within the Broadway Triangle, and that these funds and resources be eligible to businesses operated without regard to whether the business is a tenant or the owner of the property.

e) The City shall commit to funding non-profits towards their acquisition of additional property to be developed as a relocation resource.

f) HPD shall explore the feasibility of relocation to the Pfizer industrial building.

5. That in order ensure the continued operation of Service Smoked Fish, Zoning Map Change 090413 ZMK should be further modified (alternatively see further resolve item 5) to retain the M1-2 zoning to a depth of 125 feet along the southwest side of Throop Avenue between Walton and Wallabout streets as a means to minimize conflicts with potential area residents.

MORE OPEN SPACE

6. That in order to ensure expanded area for open space, the acquisition according to the First Amendment to the Broadway Triangle Urban Renewal Plan 090415 HUK should be modified as a means to expand the Bartlett Street Playground (see further resolve item 5) by changing the proposed land use from residential to open space for URP Site 4A (lot 11 for 19 affordable housing units) and/or part or all of 4B (Acquisition lots 45, 46 and 147 for 46 affordable housing units – and possibly also city-owned lots 49-53 and 108 for 43 affordable housing units).

GUARANTEE MORE PERMANENT AFFORDABLE HOUSING

1. That in order to increase the amount of realized floor area for affordable housing and to achieve more affordable housing where additional height is appropriate, the City should provide resources to neighborhood-based affordable housing advocacy organizations towards encouraging owners of existing residential buildings to have the building registered to become part of the City's Inclusionary Housing Plan as a means to permanently preserve existing housing as "affordable forever.

2. That in order to increase the amount of realized floor area for affordable housing and to achieve more affordable housing where additional height is appropriate, Harrison Avenue fronts opposite land owned by Pfizer which should be reconsidered for upzoning as part of the rezoning efforts for the Pfizer sites (50 or more housing units – based on 10-stories)

3. That in order to maximize community placement in newly created affordable housing stock:

a) The City should provide resources to neighborhood-based affordable housing advocacy organizations towards assisting area residents improve eligibility to comply with standards for affordable housing lotteries.

b) HPD should expand local preference to the 11206 zip code within Community Districts 3 and 4.

AFFORDABLE FOREVER – COMPETITIVE LAND DISPOSITION

4. That in order to ensure that the affordable housing remain in perpetuity, and that there be adequate public input regarding the disposition of city-owned property and that such disposition have minimal impact on businesses willing to relocate, the City should commit to the following:

   a) All sites to be disposed for housing development shall be 100 percent affordable and that such units shall remain "affordable forever.

   b) Subsequent disposition of city-owned property by the HPD, including the URP Sites and Block 2245, Lot 149 (5 affordable units), and Block 2266 Lots 18 (10 affordable units), 20 (10 affordable units) and 36 (10 affordable units), be subject to ULURP, (with exception to sole-source dispositions).

   c) Land disposition agreements for Block 2245, Lot 149 and Block 2266 Lots 18, 20 and 36, shall not permit these units to count towards meeting the Inclusionary Housing Program floor area bonus if these lots are combined with private properties.

BUSINESS RETENTION

5. That in order to ensure the continued operation of Service Smoked Fish, if retaining the existing Manufacturing District as referenced above in condition 5 to the approval of Zoning Map Amendment 090413 ZMK is not adopted by the City Planning Commission and City Council, Service Smoke Fish should be given the opportunity to be designated an urban renewal site for acquisition through a follow-up action as a means to provide sufficient resources to facilitate a relocation that allows for the business to expand.

MORE OPEN SPACE

6. That in order to ensure expanded area for open space, the City shall consider the following:

a) Mapping additional area to enlarge the Bartlett Street Playground by either:

   1) Partially (opposite the Bartlett Street Playground) or fully demapping Whipple Street from Flushing Avenue and Throop Avenue.

2) And/or acquiring URP Site 4A (lot 11 – 19 affordable housing units) and/or part or all of 4B (Acquisition lots 45, 46 and 147 for 46 affordable housing units – and possibly city-owned lots 49-53 and 108 for 43 affordable housing units)

b) Commit sufficient funds and resources for the above sites to be developed as parkland and others (including vacant land owned by Pfizer) that might be identified as a means to increase the amount of open space within the Broadway Triangle and to increase the current ratio of open space with a half-mile radius of the rezoning area.

**City Planning Commission Public Hearing**

On August 19, 2009 (Calendar No. 3), the City Planning Commission scheduled September 9, 2009, for a public hearing on this application (C 090415 HUK).   The hearing was duly held on September 9, 2009 (Calendar No. 24), in conjunction with the hearings for the related actions (C 090413 ZMK, N 090414 ZRK, and C 090416 HAK).

There were 25 speakers in favor of this and the related applications and 16 speakers in opposition.

HPD representatives described the proposed Urban Renewal Plan amendments and the related actions. They stated that this application would produce up to 844 units of affordable housing in the rezoning area and would help achieve PlaNYC's stated goals of increasing affordable housing in the city. The environmental consultants representing HPD also appeared in favor. In addition,  a representative of the New York City Council member from District 33; a representative of the New York State Assembly from District 53; representatives of United Jewish Organization and Ridgewood Bushwick Senior Citizen Center; members of Community Board 1 and area residents appeared in favor. They highlighted the desperate need for affordable housing in the community. and pointed out that the blighted conditions in the area would be ameliorated once the considerable city and privately owned vacant land is developed with much needed residential and commercial uses.

The speakers who spoke against the application included the New York City Council Member from District 34; representatives of the Broadway Triangle Community Coalition (BTCC), members of Community Board 1, and several  area residents and business owners.

Many of the speakers who testified in opposition were concerned that the planning process not inclusive enough and that the Pfizer owned properties were not included in the proposed rezoning. Speakers also suggested that the proposed residential districts should permit higher density and building heights to accommodate more affordable housing units. Several speakers and neighborhood organizations spoke of not being properly informed of the redevelopment plan for the area and its objectives. Two business owners from the rezoning area expressed concerns that the rezoning would adversely affect their businesses and that they would be forced out of the neighborhood. They also said that they were not informed of the kind and extent of relocation assistance the city would offer to them.

There were no other speakers and the hearing was closed.

## CONSIDERATION

The Commission believes that the proposed amendment to the Broadway Triangle Urban Renewal Plan for the Broadway Triangle Urban Renewal Area (C 090415 HUK), in conjunction with the related applications (C 090413 ZMK, N 090414 ZRK and C090416 HAK) are appropriate.

The Urban Renewal Plan amendment, zoning map amendment from predominantly commercial and manufacturing districts to residential districts, zoning text amendment that would apply the Inclusionary Housing program to the proposed residential zoning districts, and UDAAP designation, project approval and property disposition, would facilitate the development of a viable neighborhood with an appropriate mix of residential, commercial and community facility uses in the Broadway Triangle area. The proposed actions would result in the development of approximately 1,851 dwelling units of housing, of which up to 844 units would be affordable, 103,536 square feet of neighborhood retail space and 25,856 square feet of community facility space.

The Commission supports the objectives of this application, which are to maximize the production of affordable housing on city-owned land in the southern portion of the rezoning area,

and to rezone the northern blocks which are predominantly developed with residential and community facility uses to a residential district which brings them into conformance.

In light of the increasing demand for affordable housing, the urban renewal plan amendment will change existing land use site designations on vacant property on Blocks 2269 and 2272 from industrial to residential use. The proposed amendments to the Urban Renewal Plan would redesignate these sites for residential use, which would facilitate the development of affordable housing, neighborhood retail, and community facility uses on sites that were previously designated for industrial development. None of the proposed amendments affect the portion of the Urban Renewal Area in Community District 3.

The Commission further notes that the proposed changes by HPD to the Urban Renewal Plan along with rezoning of the area are necessary for the redevelopment of this area. These modifications would allow HDP to reassemble vacant and underutilized land into viable developmental sites for residential use. The Commission acknowledges the need for housing in the area and recognizes that the city-owned sites previously designated for industrial uses will be better suited for residential development.

The Commission believes that deleting Sites 1A, 1B, 2, and 3 from the Broadway Triangle Urban Renewal Area (URA) and modifying the URA boundaries is appropriate, since these sites were not acquired by the City for industrial development, as intended in the original URP. The Commission further notes, that the change of land use designation of the remaining Urban Renewal sites from Industrial to residential is appropriate since the amended URP calls for the development of affordable housing on these sites.

The Commission believes that rezoning of nine blocks from manufacturing and commercial districts M1-2, M3-1, and C8-2 to R6A, R7A and C4-3 residential districts with C2-4 commercial overlays along avenues is appropriate. The proposed R6A, and R7A are contextual districts that would allow much needed residential development and community facility uses in the rezoning area. The Commission further believes that the proposed R7A district on the

southern four blocks of the rezoning area would maximize the opportunities of residential development on city- and privately owned vacant land while maintaining the neighborhood context. Furthermore, the Commission believes that C2-4 commercial overlays along avenues would provide ample opportunities for neighborhood retail and commercial and community facility uses to serve existing and expected populations of the area.

The Commission notes that the northern four blocks between Walton and Lynch streets proposed to be rezoned to an R6A district are predominantly built with residential and community facility uses with scattered vacant sites. The proposed rezoning from manufacturing and commercial district to an R6A residential district would bring the residential uses into conformance and would also provide opportunities for limited residential growth within the neighborhood context.

The Commission further notes that the southernmost triangular block along Flushing Avenue containing small irregular lots with commercial uses is not appropriate for a contextual district. As such extending the adjacent C4-3 zoning district on that block is appropriate.

The Commission believes that the related zoning text amendment (N 090414 ZRK) would make the proposed R6A and R7A districts Inclusionary Housing designated areas, within which FAR bonuses would be available to incentivize the development of affordable housing. The Inclusionary Housing program would maintain height limits for the contextual districts while allowing a floor area bonus of up to 33 percent for developments providing 20 percent affordable housing.

The Commission believes this program, which has already resulted in hundreds of affordable units completed or in construction in Greenpoint and Williamsburg, is an effective tool for promoting affordable housing in conjunction with new developments and investment in rehabilitation and permanent preservation of existing affordable units.

The Commission notes that the application of inclusionary housing bonuses on privately owned

sites and the development of housing on city owned property would yield approximately 844 units of affordable housing in the rezoning area.

The Commission believes that the application (C 090416 HAK) for UDAAP designation and project approval and, the disposition of city-owned property is appropriate. The Commission further believes that the objectives of the Broadway Triangle Urban Renewal Plan cannot be realized without the assemblage of property and redevelopment pursuant to their disposition under this Urban Renewal Plan.

The Commission notes that UDAAP designation, project approval and, disposition of 35 City-owned properties in the Broadway Triangle Area would produce approximately 488 dwelling units of affordable housing, with space for commercial and community facility uses. The Commission recognizes the great need for affordable housing in the Broadway Triangle area , as well as the City policies that call for increased production of affordable housing. Of these 35 properties, 26 are currently in city ownership and 9 are currently in private ownership. The 9 privately owned properties would be acquired by the City prior to disposition. Six of the 9 private properties are on Block 2269 and were approved for acquisition in the original Urban Renewal Plan in 1989. At present HPD is seeking approval to acquire only three additional properties on Block 2272, with a total lot area of 10,000 SF. These properties comprise three vacant lots 45, 47 and 147, which are presently used for parking.

The Commission further notes that these Urban Renewal Sites would be developed pursuant to zoning. The proposed zoning of R7A with C2-4 commercial overlays would allow 6- to 8-story residential buildings with ground floor commercial uses on the avenues. In the future, the city owned properties would be conveyed to developers selected by HPD.

The Commission acknowledges the Community Board 1 and Borough President's recommendations supporting the application with conditions. The Commission concurs with the community board's statement that the Broadway Triangle Urban Renewal Plan and the area rezoning is a balanced approach to redevelop the long vacant industrial blocks to a viable

residential neighborhood with affordable housing. The Commission further concurs that the proposed contextual districts R6A and R7A are well suited for these blocks considering that the adjacent residential neighborhoods are also developed to the same densities and heights as proposed here.

The Commission notes that the higher density residential districts such as R7D for block 2269 on Bartlett Street and the frontage of Blocks 2269 and 2266 on Harrison Avenue in the rezoning area as recommended by the Borough President is not appropriate. The Commission further notes that the objectives of the redevelopment of Broadway Triangle area were not only to maximize affordable housing on city owned sites but also to facilitate development that is consistent in scale and density with the immediate neighborhood context. The Commission notes that the surrounding area is predominantly zoned R6 which allows 2.43 FAR. An increase in density was made from R6 (2.43 FAR) to R7A (4.6 FAR) with a height limit of 80 feet to maximize the opportunities for affordable housing on the southern portion of the area. The suggested R7D with 5.6 FAR and 100 feet building heights would far exceed the existing neighborhood context and would be inappropriate for this area.

The Commission notes that tall buildings similar to Mitchell Lama and NYCHA developments surrounding the neighborhood, including the Lindsay Park, Sumner, Tompkins Bushwick, and the Marcey Houses are all currently zoned R6. These tower-in-the park super-block developments are not appropriate for regularly laid out street grid of the Broadway Triangle area. The proposed R7A (4.6 FAR with IZ bonus) district for a portion of the rezoning area would be the highest residential zoning district in the immediate neighborhood.

The Commission recognizes that the Pfizer owned properties to the west and south of the proposed rezoning area constitute a large assemblage of vacant and underutilized land in private ownership that offers a great potential for future residential development. However, the Commission notes that HPD concluded that Pfizer has no concrete development plans for these sites and that including larger Pfizer sites in the current rezoning proposal without first obtaining commitments from Pfizer regarding their development intentions would have been premature and inappropriate. The Commission further notes that the future development of Pfizer sites with

any uses not permitted by the current M3-1 zoning would require ULURP approval , which would grant the Community Board, Borough President and the surrounding community an active voice.

The Commission notes that the FEIS has identified the lack of accessible public open space in the area and that Community Board 1 and the Borough President called for additional open space in their recommendations. In response, HPD has stated in a letter dated October 2, 2009 that they have identified an approximately 17,000-square-foot open space within the West Bushwick URA.  The proposed open space site is a few blocks east of the rezoning area within the open space study area boundaries.  The site represents partial mitigation that completely offsets the deficiency in passive open space created by the project. HPD further stated in a letter dated September 18, 2009 that they would work with the NYC Department of Parks and Recreation and the Department of Education to improve existing parks and play grounds in the rezoning area and to expand  the Joint Operated Properties Program for school playgrounds in the area as per PlaNYC's Schoolyards to Playgrounds program.

The Commission believes that altering Inclusionary Housing (IZ) bonuses for the proposed R6A and R7A districts as recommended by Community Board 1 and the Borough Presidnet in this area is inappropriate. The existing base and bonus FARs and the off-site option included under the IZ program have been shown to work throughout New York City, and many affordable units have been constructed in other neighborhoods including Community District 1 in Brooklyn. The IZ bonus has been carefully calibrated to provide an incentive that maximizes the provision of permanently-affordable housing and also allows for appropriate development where affordable housing is not possible.  The program has citywide applicability and is maintained in accordance with a consistent set of well established rules administered HPD.

With regard to expanding  the 50% local preference for the affordable housing units to adjacent Community Boards 3 and 4, the Commission notes that HPD's 50% local preference is for the community board where the project is located and the remaining 50% is open to the entire city which includes the adjacent Community Boards 3 and 4.  However, the Commission further

notes that HPD has informed the Department that it is considering reviewing the request to extend the Community Board's 50% preference for affordable housing to the residents of adjacent Community Boards 3 and 4. In addition the Commission notes that HPD is committed to making 100% of the residential units developed on city owned property affordable..

With regard to the testimony relating to business relocation, the Commission notes that, at this time businesses cannot be offered relocation assistance until after the ULURP is completed. Relocation logistics are part of the appraisal and acquisition, which cannot precede ULURP. However, HPD  has stated that they are committed to working with area businesses that are subject to acquisition. In a letter dated September 18, 2009, HPD stated that it has sought the assistance of the Department of Small Businesses Services (SBS) and the New York City Economic Development Corporation (EDC) to facilitate future relocation of the businesses.  The Commission further notes that HPD has reached out to the area tenants and businesses to inform them of the process of relocation and their rights under the URP.

Regarding the testimony at the public hearing concerning outreach during the planning process for the proposed actions, although not within the Commission's purview, the Commission is, nevertheless, encouraged that HPD intends to continue a dialogue with all stakeholders.

The Commission believes that these proposed modifications to the Broadway Triangle Urban Renewal Plan and the related actions help support the continued redevelopment of Southern Williamsburg and contribute to the City's goal of providing  affordable housing to all New Yorkers.

## RESOLUTION

**RESOLVED,** that having considered the Final Environmental Impact Statement (FEIS), for which a Notice of Completion was issued on October19, 2009 with respect to this

application (CEQR No. 09HPD019K), the City Planning Commission finds that the requirements of the New York State Environmental Quality Review Act and Regulations have been met and that consistent with social, economic and other essential considerations:

1.      From among the reasonable alternatives thereto, the actions to be approved are one which minimizes or avoids adverse environmental impacts to the maximum extent practicable; and

2. The adverse environmental impacts disclosed in the FEIS will be minimized or avoided to the maximum extent practicable by incorporating as conditions to the approval, those mitigation measures that were identified as practicable.

The report of the City Planning Commission, together with the FEIS, constitutes the written statement of facts, and of social, economic and other factors and standards, that form the basis of the decision, pursuant to Section 617.11(d) of the SEQRA regulations; and be it further

RESOLVED, that the City Planning Commission certifies, pursuant to Section 505, Article 15 of the General Municipal Law of New York State, that: (1) the proposed Broadway Triangle Urban Renewal Plan, as amended herein, is an appropriate plan for the area involved and conforms to the finding set forth in Section 504, Article 15 of the General Municipal Law of New York State; and (2) the First Amended Broadway Triangle Urban Renewal Plan conforms to the comprehensive community plan for the development of the municipality as a whole and is consistent with local objectives, in compliance with the provisions of subdivision seven of Section 502, Article 15 of the General Municipal Law of New York State; and be it further

RESOLVED, that the City Planning Commission certifies its qualified approval of the First Amended Broadway Triangle Urban Renewal Plan, pursuant to subdivision 2 of Section 505, Article 15 of the General Municipal Law of New York State; and be it further

RESOLVED, by the City Planning Commission, pursuant to Section 197-c of the New York

City Charter, the Uniform Land Use Review Procedure, and Section 505, Article 15 of the General Municipal Law of New York State, and after due consideration of the appropriateness of this action, that the proposed Broadway Triangle Urban Renewal Plan for the Broadway Triangle Area, Community District1, Borough of Brooklyn, submitted by the Department of Housing Preservation and Development on May 6, 2009, is approved (C 090415 HUK).

The above resolution (C 090415 HUK), duly adopted by the City Planning Commission on October 19, 2009 (Calendar No. 7), is filed with the Office of the Speaker, City Council and the Brooklyn Borough President, pursuant to Section 197-d of the New York City Charter.

**AMANDA M. BURDEN, FAICP, Chair**
**KENNETH J. KNUCKLES, ESQ., Vice Chairman**
**RAYANN BASSER, IRWIN G. CANTOR, P.E. ALFRED C. CERULLO, III, BETTY Y. CHEN, MARIA M. DEL TORO, RICHARD W. EADDY, NATHAN LEVENTHAL, ANNA H. LEVIN, SHIRLEY A. MCRAE, Commissioners**

**KAREN A. PHILLIPS, Commissioner, Voting No**

**ANGELA M. BATTAGLIA, Commissioner, recused**

Dissenting Statement by Commissioner Karen A. Phillips

The Broadway Triangle project is important to this city because it proposes the development of affordable housing on city owned land. This action is a follow up to the designation 20 years ago of the Urban Renewal Area that encompassed a much larger area of three community boards and several distinctive neighborhoods.

The project before us that seeks to advance development within a portion of the Urban Renewal Area represents a courageous step from a couple of community based organizations to create much needed affordable housing. However, comprehensive redevelopment in the entire Broadway Triangle area is important to foster economic development. Other coalition groups in all of the affected neighborhoods should not be overlooked in the desire to expedite immediate goals. The City Planning Commission will have future decisions about vacant privately owned sites surrounding this project compromised by this decision. The leverage that New York City will have with other development proposals will be diminished as well.

The issues involved with this project have been passionately presented to us from both sides of the debate.  There are several other well established CDCs in the surrounding area that could assist in the creation of more affordable housing while increasing the economic stability of the residents if the full extent of the URA was incorporated into this rezoning action.

The EIS clearly indicates that the development impact of this project is a larger area than one neighborhood, as does the HPD recent plan to create open space to serve the Broadway Triangle area in another CB.  The underlying complex problems raised by these actions before us are so critical those I am not comfortable in supporting housing that will continue the divisiveness created by public policy. Therefore I vote NO.

C 090415 HUK