UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAMOOE, INC.,<br><br>         Plaintiff,<br><br> -against-<br><br>THE CITY OF NEW YORK, a Municipal Corporation of the State of New York, and the NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT, an agency and governmental subdivision of the City of New York,<br><br>         Defendant. | Docket No.: 13-cv-01045 NGG-VMS |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION TO SET ASIDE SETTLEMENT AGREEMENT**

Israel Goldberg
Steven A. Weg
GOLDBERG WEG & MARKUS PLLC
122 West 27th Street, 11th Floor
New York, New York 10001
(212) 697-3250

Domenic M. Recchia, Jr.
LAW OFFICE OF DOMENIC M. RECCHIA, JR.
172 Gravesend Neck Road
Brooklyn, New York 11223
(718) 336-5550
*Attorneys for Plaintiff*

**SERVED ON FEBRUARY 22, 2019**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .................................................................................................................... 4

    A. History of the Project and this Action ...................................................................... 4

    B. Discovery .................................................................................................................. 8

ARGUMENT .......................................................................................................................... 9

CONCLUSION ..................................................................................................................... 13

# **TABLE OF AUTHORITIES**

**Cases**

*Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) ............................................. 10

*Broadway Triangle Cmty. Coal. v. Bloomberg*, 35 Misc. 3d 167, 941 N.Y.S.2d 831 (Sup. Ct. NY Cty. 2011) .................................................................................................................................. 7

*Cervera v. Bressler*, 106 A.D.3d 683, 964 N.Y.S.2d 587 (2nd Dept. 2013) ................................... 9

*Gessin Elec. Contractors, Inc. v. 95 Wall Assocs.*, LLC, 74 A.D.3d 516, 520, 903 N.Y.S.2d 26, 29 (2nd Dept. 2010) ................................................................................................................. 10

*In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) ........................................ 10

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.*, 696 F. Supp. 897, 902 (S.D.N.Y. 1988) ........................................................................................................................................ 10

*Ostman v. St. John's Episcopal Hosp.*, 918 F. Supp. 635, 643 (E.D.N.Y. 1996) ........................... 9

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ................................................... 10

*Texas 1845, LLC v. Kyaw*, 117 A.D.3d 1028, 1031, 986 N.Y.S.2d 574, 576 (2nd Dept. 2014) ..... 9

*Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 498 (S.D.N.Y. 2004) ........................................................................................................................................ 10

**Rules**

Fed. R. Civ. P. 60 ............................................................................................................................ 1

Plaintiff Ramooe, Inc. ("Plaintiff" or "Ramooe") respectfully submits this Memorandum of Law in support of its motion to set aside the settlement agreement between Plaintiff and defendants The City of New York and New York City Department of Housing Preservation and Development [Doc. 18] pursuant to Fed. R. Civ. P. 60(b)(3) and (6).

## **PRELIMINARY STATEMENT**

This motion seeks to vacate a wrong that it premised on a wrong. First, the Defendants did not serve the Plaintiff with condemnation proceedings in the Supreme Court, Kings County, purported to take Plaintiff's property unlawfully, and did not bother telling the state court that Plaintiff had no idea that the proceedings were going on. Then, after this action was commenced to right that wrong, Defendants committed their second wrong when they failed to disclose to Plaintiff that Defendants revoked contingent site authorization (commonly called "site control") to two popular community organizations that were charged with developing the subject property. In 2013 Defendants and Plaintiff held a settlement conference to attempt resolution of this case. Defendants knew that a major consideration for Plaintiff to settle this action was the greater good of Plaintiff's principal's community; Defendants taking advantage of that good will, did not disclose information known to the Defendant significantly before the settlement conference, to wit: that the two community organizations lost their funding and their site control and Defendant NYC took back site control of the Property. Plaintiff, a result of the non-disclosure, was induced to waive its defense of failure of service of the condemnation proceeding and settle for far less than the property was worth.

Plaintiff commenced this case to overturn the unlawful taking of Plaintiff's real property, known as 43 Bartlett Street, Brooklyn, New York 11206 (hereinafter the "Property")[1] by the City

---

[1] The Property in question is located is located in the controversial "Broadway Triangle" area of Brooklyn.

of New York ("NYC") and its agency the New York City Department of Housing Preservation and Development ("HPD" and together with NYC the "City" or "Defendants"). Just a few months after NYC renewed a building permit for Plaintiff to develop the Property, Defendant NYC commenced a special proceeding in the Supreme Court of the State of New York, County of Kings, under Index No. 22528/99 titled <u>Matter of the Application of the City of New York re: Broadway Triangle Urban Renewal Area, Phase II</u> the "Acquisition Proceeding"). The special proceeding ostensibly sought to take Plaintiff's Property under Article 2 of New York Eminent Domain Procedures Law ("EDPL). The problem with the Acquisition Proceeding is that Defendants never served Plaintiff with process of the Acquisition Proceeding, whether by mail, personal service or any other means of delivery.[2]

It is now known that Defendants knew that Plaintiff did not receive notice of the Acquisition Proceeding but never alerted the Supreme Court, Kings County, as to the same. Instead, Defendants concealed their failure to serve Plaintiff and proceeded in the State Court as if process had been properly served and jurisdiction obtained. Plaintiff, as the owner of a Property in the early stages of construction, could not timely contest any of the proceedings in the Acquisition Proceeding. Upon learning of the City's scheme, Plaintiff commenced the instant action in February 2013. Plaintiff's action sought declaratory and injunctive relief and monetary damages (i) under 42 U.S.C. §§1983 and 1988 for the infringement by Defendants of Plaintiff's rights to property, procedural and substantive due process, and equal protection of the laws pursuant to the Fifth and Fourteenth Amendments of the United States Constitution; and (ii) pursuant to New York Eminent Domain Procedures Law ("EDPL") and the New York Civil

---

[2] Records obtained from Defendants (discussed below) evidence that service of the Condemnation proceeding was made to an address that was not the address for Plaintiff Ramooe.

Practice Law and Rules ("CPLR"), in respect of the violation of Defendants of the procedures required for Defendants to validly exercise the power of eminent domain to acquire the Property. This action was ultimately settled by the parties in December 2013 and so-ordered by Hon. Sandra L. Townes. [Doc. 18]. The settlement generally provided that Plaintiff would sign a quitclaim deed in exchange for $400,000 (a price that was well below the Property's value).

After the settlement was so-ordered, Plaintiff's principals learned that the City was not forthright with Plaintiff when the parties negotiated the settlement. After it entered into the settlement agreement with Defendant, Ramooe learned from local community leaders that the funding from various New York State agencies to two community organizations to develop the project had expired and that the funding was not renewed. In Court-ordered discovery directed by Magistrate Vera Scanlon, Ramooe further learned that HPD revoked site control from the two community organizations that had been sole sourced to develop the Property. As explained below, the City, through HPD, reached an agreement with two developers to build housing units on City owner Property: Ridgewood Bushwick Senior Citizens Council ("RB," which was founded by former Assemblyman and Democratic County Leader for Brooklyn Vito Lopez) and the United Jewish Organizations of Williamsburg ("UJO"). Contrary to typical City policy, RB and UJO were designated to develop the Property without the issuance of a Request for Proposals ("RFP") even though neither of the aforementioned entities owned parcels contiguous to Plaintiff's parcel.[3] Such a privilege is typically reserved for owners of properties contiguous to City owned land.

Plaintiff accepted far less than the actual value of the Property as a settlement in this action because Ramooe's principals understood that the entities were developing the property for the

---

[3] Interestingly, recognizing a need to have an open bidding process Defendant has now, unlike the manner in which the project was awarded previously, published an RFP for development of the subject Property as part of a larger development (with a carve out for the property if Defendants do not get title to the property and/or this Court grants the instant motion).

3

benefit of the community and did not want to upset prominent community organizations in its community. Many members of the Ostreicher family live in Williamsburg, Brooklyn and are members of the Hasidic community that strongly supports UJO and RB's activities. Plaintiff wanted to keep the peace with UJO and RB when it agreed to settle with the Defendants. The City knew that Plaintiff would be opposed to going against UJO and RB and only once the hurdle of the Property was resolved to HPD's satisfaction (i.e. the City agreed to pay well below market value to Plaintiff to keep the assemblage intact) did HPD's general counsel formalize that which was already been effectuated: HPD's general counsel, Matthew Shafit, presented a letter to HPD Commissioner Vicki Been in 2016 for her signature to formalize the termination of site control that had been dead for 3 years (i.e. when the funding was withdrawn).

The City clearly and purposely concealed the lapse in funding and withdrawal of site control from Plaintiff to induce Plaintiff to settle. Had Plaintiff known that RB and UJO were no longer involved in the project they never would have settled. Plaintiff's unilateral mistake, which was induced by Defendants, warrants the vacating of the settlement agreement between the parties.

## BACKGROUND

### A. History of the Project and this Action

Plaintiff Ramooe acquired the Property by deed dated January 15, 1997. *See*, **Exhibit A** to the Declaration of Chaim Ostreicher dated February 20, 2019 ("Ostreicher Dec."). In 1998, the NYC Department of Buildings renewed a building permit to Plaintiff (**Exhibit B** to the Ostreicher Dec.) and Plaintiff poured a foundation for anticipated construction at the Property. Ostreicher Dec, ¶3.

Just a few months after NYC renewed a building permit to Plaintiff to construct a building on the Property, NYC commenced the Acquisition Proceeding on June 25, 1999. The special

4

proceeding sought an Order under Article 2 of the EPTL (i) authorizing the Defendants to file an acquisition map in the Kings County Clerk's Office or the Office of the City Register; (ii) directing that upon the filing of said map, title to the property sought to be acquired shall vest in the City; (iii) providing that just compensation therefor be ascertained and determined by the Supreme Court without a jury; and (iv) providing that notices of claim regarding compensation must be served and filed within one year from the vesting date (the "Acquisition Proceeding"). A copy of the Petition filed in the Acquisition Proceeding is annexed to the Complaint [Doc. 1] as Exhibit B. The Acquisition Proceeding purported to encompass the Property as one of the properties that Defendants sought to vest in the City as part of a greater "Broadway Triangle" project. The problem with the Acquisition Proceeding is that Defendants did not serve Plaintiff with notice of the Acquisition Proceeding, whether by mail, personal service or any other means of delivery.

The Notice of Pendency filed by Defendants in the Acquisition Proceeding incorrectly listed Plaintiff's address as "524" Bedford Avenue, Brooklyn, New York instead of "527" Bedford Avenue, Brooklyn, New York (which are not on the same block). A copy of the Note of Pendency is annexed to the Complaint [Doc. 1]; *see also*, Complaint, ¶19. Plaintiff never received any other notice of the Acquisition Proceeding and Plaintiff did not have actual notice of the proceeding to timely appear and oppose it. Complaint, ¶¶20-21. An Order was entered in the Acquisition Petition that, among other things, gave "each condemnee... a period of one calendar year from the date to title vesting in which to file a written claim, demand or notice of appearance." Complaint, ¶22; *see also*, Order annexed as Exhibit C to the Complaint. Plaintiff did not receive notice of the Order in the Acquisition Proceeding in time to seek judicial review of the same. Complaint, ¶24. A copy of an affidavit of service produced by Defendants in discovery showing that Ramooe was served at "524 Bedford Avenue, Brooklyn, New York" and "Bartlett Street, Brooklyn, New York"

5

(no number provided) is annexed as **Exhibit A** to the Declaration of Israel Goldberg dated February 21, 2019 ("Goldberg Dec.").

Plaintiff has learned through discovery this case that the City knew that 524 Bedford Avenue, Brooklyn, New York was not a proper address for Plaintiff. Annexed as **Exhibit B** to the Goldberg Dec. is a document provided by Defendants in discovery in which the Defendants crossed out "524" and handwrote "527" in its place. While it is unclear when the City learned of its mistake, it is clear that the City did, in fact, learn of its mistake and never corrected the same in the State Court.

Plaintiff commenced this action in February 2013. Plaintiff sought declaratory and injunctive relief and monetary damages (i) under 42 U.S.C. §§983 and 1988 for the infringement by Defendants of Plaintiff's rights to property, procedural and substantive due process, and equal protection of the laws pursuant to the Fifth and Fourteenth Amendments of the United States Constitution; and (ii) pursuant to the EDPL and the New York Civil Practice Law and Rules ("CPLR"), with respect of the violation of Defendants of the procedures required for Defendants to validly exercise the power of eminent domain to acquire the Property. *See*, Complaint [Doc. 1].

Later that year, in December 2013, the parties settled this action. [Doc. 18]. The settlement agreement provided in pertinent part that Plaintiff would sign a quitclaim deed for the Property in exchange for compensation of $400,000, a woefully low number that was strenuously negotiated. Ostreicher Dec., ¶¶8, 16. The reason why Ramooe ultimately agreed to such a low number was because it was well known that two local organizations with strong ties to the local community, RB and UJO, had been chosen to develop the Property (and a few neighboring properties).[4]

---

[4] In fact, the circumstances surrounding UJO and RB's involvement in the project, when placed under a magnifying glass by former HPD Commissioner Vicki Been, was less than transparent. Former Commissioner Been testified that one way for a developer to obtain site control without an RFP is if the developer owns an adjacent Property. *See*, Deposition of Vicki Been ("Been Dep." and annexed to the

6

Ostreicher Dec., ¶9. UJO is run by Rabbi David Niederman, a local leader in the Williamsburg Satmar Hasidic community to which the Ostreicher family belongs. Ostreicher Dec., ¶9. RB is also an influential organization that was started by Vito Lopez. *Id.* Members of the Ostreicher family discussed often that they were settling for less than the value of the Property because of UJO and RB's involvement. Ostreicher Dec., ¶10. Plaintiff put their community first to keep the peace with the two local community organizations. Ostreicher Dec., ¶10. In addition, Plaintiff was told that various legal challenges, including an injunction against the City in a proceeding in the Supreme Court, New York County, entitled *Broadway Triangle Community Coalition v. Bloomberg* (Index No.: 112799/09) was close to being resolved. *See*, *Broadway Triangle Cmty. Coal. v. Bloomberg*, 35 Misc. 3d 167, 941 N.Y.S.2d 831 (Sup. Ct. NY Cty. 2011). **Defendants unquestionably knew from the back and forth and negotiations, as well as their general understanding of the political and communal landscape in South Brooklyn, that these factors (especially UJO's involvement) was important to Plaintiff's agreement to settle**. Ostreicher Dec., ¶12.

After Ramooe learned that it had been misled by Defendants and sought to vacate the settlement agreement, Magistrate Judge Vera Scanlon supervised discovery. During discovery, Plaintiff learned that Defendants were well aware that Plaintiff was being misled. Plaintiff knew that UJO and RB had lost their site control years earlier but that HPD did not make it official until 2016. The facts learned in discovery prove that the settlement agreement should be vacated.

---

Goldberg Dec. as **Exhibit C**), 27:7-18. Former Commissioner Been testified that she believed in competition and transparency. Been Dep., 50:23-25. A review of public records does not reveal any contiguous property owned by UJO or RB. Former Commissioner Been did not know how UJO and RB obtained site control of the Property. Been Dep., 51:15. It appears from documents produced by the Defendants that RB simply sent a letter expressing interest in the Property to obtain site control. *See*, **Exhibit D** to the Goldberg Dec. (produced by Defendants as D255). After submitting various paperwork, UJO and RB were awarded site control by HPD on February 4, 2009. *See*, **Exhibit E** to the Goldberg Dec. (produced by Defendants as D257-260).

7

**B. Discovery**

Plaintiff obtained documentation in discovery that shows that New York State authorized funding for the Project in August 2009. *See*, *e.g.*, **Exhibit F** to Goldberg Dec. (produced by Defendants as D273-280). Due to the injunction in the Supreme Court, New York County, the funding ultimately expired and New York State withdrew its funding for the project by letter dated January 24, 2013. *See*, **Exhibit G** to the Goldberg Dec. (produced by Defendants as D285). The expiration of the funding came approximately one month before this action was commenced.

Plaintiff took the deposition of Jack Hammer, (the former HPD Director of Development for Brooklyn). Mr. Hammer testified at his deposition that he was one of the members of HPD's site control committee responsible for the award of site control of Plaintiff's Property to RB and UJO. Hammer Deposition (hereinafter the "Hammer Dep." and annexed as **Exhibit H** to the Goldberg Dec.), 26:7-13; 56:7-57:22. Mr. Hammer also testified that revoking RB and UJO's site control from was discussed with members of HPD's Site Control Committee because RB and UJO did not meet the contingencies set out by the City. Hammer Dep., 111:15-23. There was no formal termination until 2016. Hammer Dep., 111:24-112:5.

After taking Mr. Hammer's deposition, Plaintiff took the deposition of Matthew Shafit, the long-time Deputy Commissioner and General Counsel for HPD (since 1995). Mr. Shafit explained that after NYC and HPD granted RB and UJO contingent site authorization (i.e. site control), RB and UJO were able to seek, and subsequently obtained, financing from New York State to build housing on three assemblages in the Broadway Triangle that the City obtained by eminent domain.[5] *See*, Deposition of Matthew Shafit (hereinafter the "Shafit Dep." and annexed as **Exhibit I** to the Goldberg Dec.). Mr. Shafit also testified that he drafted a letter for HPD Commissioner Been to

---

[5] In addition, Mr. Shafit testified that "HPD is a major construction lender" that provides permanent financing and tax exemptions or abatements, zoning benefit and subsidies to property owners. Shafit Dep., 24:18-25:18.

8

sign in 2016 that formally withdrew contingent site authorization from RB and UJO.  Shafit Dep., 45:3-8.  A copy of said letter is annexed as **Exhibit J** to the Goldberg Dec. (and was produced by Defendants as D4).  Former Commissioner Been testified that her signature is found on the letter but that Mr. Shafit (or someone working for him) drafted it.  Been Dep. (**Exhibit C** to the Goldberg Dec.), 39:23-40:14.  Been explicitly testified that the reason why she withdrew site control from RB and UJO was on the advice of counsel.  Been Dep., 34:13-36:21.  Defendants' attorneys objected on privilege grounds to testimony on further details.  *Id*.

Mr. Shafit's testimony, which was taken after Mr. Hammer and Commissioner Been's testimony, was tailored to contradict Mr. Hammer's testimony.  Most notably, Mr. Shafit testified explicitly that he did not recall hearing the name "site control committee" used (Shafit Dep., 36:7-9) and to his knowledge there was no such committee even though former Commissioner Been explicitly testified that she dealt with the committee (Been Dep., 16:6-10) and Mr. Hammer testified that he was on the committee (Hammer Dep., 26:7-13).  Shafit would not reveal why HPD waited until 2016 to withdraw site control and testified that "somebody" told him to write the letter approximately one month earlier.  *See*, Shafit Dep. 51:16- 52:2; *see also*, *gen.*, Shafit Dep., pp. 56-59.  Essentially, Defendants hid behind the attorney-client privilege.  *See*, Shafit Dep., 59:15-19.

## ARGUMENT

Plaintiff sought to rescind its settlement agreement with the Defendants soon after signing it in late 2013 under the principal of unilateral mistake.  "A settlement agreement is a contract that is subject to the ordinary rules of contract construction and interpretation."  *Ostman v. St. John's Episcopal Hosp.*, 918 F. Supp. 635, 643 (E.D.N.Y. 1996); *see also*, *Texas 1845, LLC v. Kyaw*, 117 A.D.3d 1028, 1031, 986 N.Y.S.2d 574, 576 (2nd Dept. 2014) citing *Cervera v. Bressler*, 106 A.D.3d 683, 964 N.Y.S.2d 587 (2nd Dept. 2013) (accord).

9

New York recognizes rescission of an agreement if there is unilateral mistake coupled with fraudulent concealment by one party. *See*, *e.g.*, *Travelers Indem. Co. of Illinois v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 498 (S.D.N.Y. 2004). "The elements of a claim for rescission based on fraud are misrepresentation, concealment or nondisclosure of a material fact; an intent to deceive; and an injury resulting from justifiable reliance by the aggrieved party." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.*, 696 F. Supp. 897, 902 (S.D.N.Y. 1988). "A 'strong inference of fraudulent intent' may be established either '(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994).

"[A] court sitting in equity can rescind a contract for unilateral mistake if failure to rescind would unjustly enrich one party at the other's expense, and the parties can be returned to the status quo ante without prejudice. *Gessin Elec. Contractors, Inc. v. 95 Wall Assocs.*, LLC, 74 A.D.3d 516, 520, 903 N.Y.S.2d 26, 29 (2nd Dept. 2010).

Defendants knew from settlement negotiations that Plaintiff's principals were aligned with the UJO. Plaintiff's principal, Eugene Ostreicher, attended settlement meetings and his son, Chaim Ostreicher, attended at least one. Ostreicher Dec., ¶13. Defendants were cognizant of the Ostreichers' appearance to be that of Hasidic Jews and Defendants knew that Plaintiff's address on Bedford Avenue is in Williamsburg in an area in which Hasidic Jews reside. The Ostreichers also reinforced to Defendants' representatives that their interests were aligned with those of UJO. Ostreicher Dec., ¶14.

The revocation of contingent site authorization (commonly referred to as site control) was not public and was held close to the vest by HPD until 2016. *See*, **Exhibit J** to the Goldberg Dec. In 2016, well after the settlement agreement was signed and years after authorization for project funding was withdrawn, HPD's General Counsel Matthew Shafit presented Commissioner Been a letter that he drafted to formally withdraw contingent site authorization for the RB and UJO project at the Property. Commissioner Been signed that letter. No one from HPD would shed any light for the delay in the "formal" revocation of contingent site authorization in 2016 when New York State withdrew its funding much earlier, in 2013, and the Site Control Committee had discussed terminating RB and UJO's site control at that time. Instead, everyone from HPD hid behind an attorney/client privilege.

Defendants had both the motive and opportunity to hold the withdrawal of funding and withdrawal of site control from Plaintiff. Defendants knew that UJO was important, Defendants knew that they were getting a great deal for the Property, and Defendants knew that if they buried the site control issue within their agency for a few years then Plaintiff would never find out in time to raise objection.

At bottom, Defendants had the opportunity to make sure that it resolve a public relations nightmare for the City of New York, its taking of the Property (and numerous other properties in the Broadway Triangle) without the owner even knowing, for a bargain. Defendants did not want to lose that opportunity and withheld relevant information so Plaintiff would think that UJO would benefit from the parties' settlement agreement. Defendants knew that was not true, did not say anything, and concealed the true nature of UJO's future with the Property: none! The settlement agreement should accordingly be vacated in its entirety.

## **CONCLUSION**

For the reasons set forth herein, the Settlement Agreement between the parties should be set aside in its entirety pursuant to Fed. R. Civ. P. 60(b)(3) and (6).

Dated: New York, New York
February 21, 2019

/s/ Steven A. Weg
GOLDBERG WEG & MARKUS PLLC
By: Israel Goldberg
Steven A. Weg
122 West 27th Street, 11th Floor
New York, New York 10001
(212) 697-3250

LAW OFFICE OF DOMENIC M. RECCHIA, JR.
By: Domenic M. Recchia, Jr.
172 Gravesend Neck Road
Brooklyn, New York 11223
(718) 336-5550

*Attorneys for Plaintiff*