UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

RAMOOE, INC.,

                      Plaintiff,

-against-

THE CITY OF NEW YORK, a Municipal
Corporation of the State of New York, and the NEW
YORK CITY DEPARTMENT OF HOUSING
PRESERVATION DEVELOPMENT, an agency and
governmental subdivision of the City of New York,

                      Defendants
------------------------------------------------------------------X

**DECLARATION OF HOLLY R. GERSTENFELD IN SUPPORT OF CITY DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SET ASIDE SETTLEMENT AGREEMENT**

13-CV-01045 (NGG) (VMS)

       HOLLY R. GERSTENFELD, an attorney duly admitted to practice in the Eastern District of New York, declares pursuant to 28 U.S.C. § 1746, under penalty of perjury, as follows.

       1. I am an Senior Counsel in the Office of Zachary W. Carter, Corporation Counsel of the City of New York, attorney for defendants City of New York ("City") and the New York City Department of Housing Preservation and Development ("HPD")(together "City Defendants").

       2. I submit this declaration in opposition to Plaintiff's motion to set aside the settlement agreement filed as Document 18 on the instant docket, pursuant to Fed. R. Civ. P. 60(b)(3) and (6). I am familiar with the facts and circumstances stated herein based upon personal knowledge, the books and records of the City of New York, and conversations with its agents and employees.

       3. In August 1999, the City acquired Brooklyn Tax Block 2269, Lot 45 ("Subject Property") by eminent domain, which was condemned as part of the City's Broadway

Triangle Urban Renewal Plan for the Broadway Triangle revitalization project. Part of this Project involved the rezoning of the Broadway Triangle neighborhood of Brooklyn from manufacturing to residential use in order to bring more affordable housing options to its residents, consistent with the Broadway Triangle Urban Renewal Plan, and its first amendment. Upon information and belief, City Defendants followed the procedures set forth in the Eminent Domain Procedure Law to effectuate the taking. Copies of the City Planning Commission reports approving the Plan and its first amendment are collectively annexed hereto as Exhibit 1. Copies of the City Defendants' papers that were filed, published and posted, along with the accompanying affidavits attesting to the same, and are annexed hereto as Exhibit 2.

4. Upon information and belief, prior to the commencement of this lawsuit, Ridgewood Bushwick Senior Citizens Counsel, Inc. and United Jewish Organizations of Williamsburg, Inc. ("Ridgewood Bushwick" and "UJO," respectively) had together sought tax credits and funding from the State to develop the Subject Property with affordable housing. As part of their application process with the State, Ridgewood Bushwick and UJO were required to obtain from HPD a contingent site authorization letter, which indicates that HPD has contingently authorized these two developers to seek funding from the State for a project to develop the Subject Property, if they meet certain criteria, including deadlines, outlined in the January 26, 2009 letter. A copy of this letter is annexed hereto as Exhibit 3.

5. Upon information and belief, Ridgewood Bushwick and UJO applied for, and contingently received, tax credits and funding from the State to develop the Subject Property. Copies of the letters awarded to Ridgewood Bushwick and UJO – two private developers - to develop the Subject Property, are collectively annexed hereto as Exhibit 4; see also Exhibit F to the Declaration of Israel Goldberg, dated February 21, 2019 ("Goldberg Decl.").

6. Some of the State-imposed funding deadlines were initially extended, but due in part to the injunction issued in Broadway Triangle Community Coalition et al v. Bloomberg et al., Supreme Court of the State of New York, New York Co., Index No. 112799/2009, (the "State Court Action"),[1] they ultimately expired on January 31, 2012 and January 24, 2013, respectively, prior to the initiation of this lawsuit. Copies of extension letters are annexed hereto as Exhibit 5; see also Exhibit G to the Goldberg Decl. The letters terminating the State's tax credits and funding were issued to the two private developers – not to Plaintiff.[2]

7. I was the lead attorney assigned to this case since its inception in 2013, and Fred Kolikoff was my supervisor up until his retirement in 2015. Prior to the City filing its Answer to the instant lawsuit in May 2013, the parties had an in person meeting at the New York City Law Department ("Law Department") on April 15, 2013 ("April 15th Meeting"). Although I set up this April 15th Meeting at Plaintiff's request, at the last minute I was not able to be there as I was attending a funeral. Annexed hereto as Exhibit 6 are copies of email

---

[1] In 2009, several community groups initiated a lawsuit against the City to challenge the rezoning, claiming, amongst other things, that the rezoning favored some ethnic groups over others. Broadway Triangle Community Coalition et al v. Bloomberg et al. was brought in the Supreme Court of the State of New York, New York County, under Index No. 112799/2009. By Order dated December 23, 2011, Justice Emily Goodman enjoined the defendants (the City) from transferring City owned land and proceeding with development of three groups of sites within the Broadway Triangle, one of them referred to in that litigation as "35 Bartlett Street," which included the Subject Property. See Broadway Triangle Community Coalition et al v. Bloomberg et al., 35 Misc. 3d 167, 178 (Sup. Ct N.Y. Co. 2011).

[2] Ultimately, since the parties to the State Court Action were in "settlement discussions," upon advice of HPD's counsel, HPD withdrew its contingent site authorization, via a letter dated June 20, 2016 (Exhibit J to the Goldberg Decl.). This letter of revocation formally terminated contingent site authorization originally awarded to Ridgewood Bushwick and UJO by way of the January 26, 2009 letter that was in place up until that termination letter was issued. It recited the expiration dates in the state funding letters noted above. This letter was not sent to Plaintiff – the former owner of the Subject Property who lost title via condemnation in 1999, but rather to Ridgewood Bushwick and UJO, the original recipients of the contingent site authorization in 2009.

correspondence that indicate the reason for my absence. Mr. Kolikoff attended the meeting in my place.

8. Copies of correspondence between myself and Abner Zelman of Kucker & Bruh, LLP, Plaintiff's prior counsel until 2014, indicate the parties anticipated to be in attendance at the meeting, and are annexed hereto as Exhibit 7. Those individuals whose names were placed on the Law Department's office building's security list were: Fred Kolikoff; Jack Hammer (HPD's Director of Brooklyn Planning at the time of the meeting); Matthew Shafit (HPD's General Counsel at the time of the meeting); Eugene Ostreicher (principal of Ramooe, Inc. at that time); and Plaintiff's prior counsel. Chaim Ostreicher's name was not on this list. Id.[3]

9. Contrary to the unsupported assertions in paragraph 13 of the Declaration of Chaim Ostreicher, dated February 20, 2019 ("Ostreicher Decl."), the April 15th Meeting was the only meeting between representatives of the Law Department, and HPD, and principals of Ramooe, Inc. that occurred in connection with the instant action.

10. The Declaration of Fred Kolikoff, dated April 29, 2019 ("Kolikoff Decl."), is annexed hereto as Exhibit 8. In his Declaration, Mr. Kolikoff, who was present at the April 15th Meeting, indicates that he recalls that only one of Plaintiff's principals attended the meeting and that this representative was Eugene Ostreicher, not Chaim Ostreicher. Mr. Kolikoff's Declaration also describes the content of the April 15th Meeting, in that Plaintiff expressed its desire to obtain (or retain) title to the Subject Property that was condemned by the City so that it could build it out. As indicated by Mr. Kolikoff, there was no discussion about

---

[3] Although I requested the Law Department office building's security records from April 15, 2013, in an attempt to discern the individuals that checked into my office building on that day, the records are no longer available as the security system has since changed.

the Subject Property being developed by Ridgewood Bushwick, UJO, or any other private developer.

11. Furthermore, the Declaration of Jack Hammer, dated April 29, 2019 ("Hammer Decl."), is annexed hereto as Exhibit 9. This Declaration also confirms that the entire discussion at the April 15th Meeting rested on the notion that Plaintiff wanted to develop the Subject Property itself; there was no discussion of Ridgewood Bushwick or UJO.

12. As far as I am aware, with the exception of the April 15th Meeting, Mr. Kolikoff and I were the only representatives of the City to engage in settlement discussions with anyone on Plaintiff's behalf in 2013.

13. Neither Mr. Zelman, who represented Plaintiff through early 2014, nor anyone else on Plaintiff's behalf, ever expressed to me (or to my knowledge Mr. Kolikoff) Plaintiff's supposed desire to have UJO or Ridgewood Bushwick, or any other third party developers, build out the Subject Property. This alleged motivating factor was not conveyed during settlement discussions in 2013. There was no indication whatsoever from Plaintiff, or anyone representing Plaintiff, during settlement negotiations in 2013, that Plaintiff's interests were supposedly aligned with Ridgewood Bushwick and UJO. I had no idea that Ridgewood Bushwick or UJO's involvement in the development of the Subject Property for the City was supposedly the impetus for Plaintiff's agreement to settle.

14. Instead, it was expressed to me (and Mr. Kolikoff) during settlement discussions during 2013 that Plaintiff wished to obtain (or retain) title to the Subject Property so that Plaintiff could develop it.

15. Following the April 15th Meeting, I informed Plaintiff's counsel that the City was not interested in giving back the Subject Property, but that we would be willing to discuss a

monetary settlement. Once Plaintiff's counsel was informed that the City would not give back the Subject Property for Plaintiff to develop it, the settlement discussions focused solely on the monetary value of it, without regard to who would subsequently develop it.

16. Following the April 15th Meeting, my negotiations with Plaintiff's counsel regarding a monetary settlement focused on whether the Subject Property should be valued as of 1999 or 2013 for settlement purposes. We did not have any discussions that Plaintiff was willing to settle at a supposed discount because of who would be developing the Project. Copies of emails reflecting these negotiations are annexed hereto as Exhibit 10.

17. Indeed, once this lawsuit was initiated, in 2013 I re-sent to Mr. Zelman the Certification of Advance Payment that the Law Department had initially sent to Plaintiff several years back, and hand wrote onto the form the Plaintiff's correct address. See Exhibit B to the Goldberg Decl. This award was based upon the appraised value of the Subject Property in 1999 when it was condemned.

18. The parties eventually agreed to settle this matter for $400,000. Rather than representing any supposed discount to the City, this amount actually significantly exceeded the City's appraised value of $125,000.

19. On December 17, 2013 the parties entered into a Stipulation of Settlement, that was "so ordered" by the Honorable Sandra L. Townes on December 30, 2013 (Docket No. 18). However, Plaintiff did not adhere to the terms of the stipulation in that it failed to provide a quit claim deed to the City, a prerequisite to the City issuing the settlement award. Attached hereto as Exhibit 11 is correspondence between myself and Mr. Zelman, which shows that after many months, Mr. Zelman resigned as counsel.

20. Since 2014 Plaintiff, by way of its current counsel, Goldberg, Weg & Markus PLLC, and its firm's predecessors, has been trying to convince the court to vacate the settlement. A copy of a June 24, 2014 letter that Plaintiff submitted to the Court in support of its theory is annexed hereto as Exhibit 12. This letter was filed in an attempt to have the Court vacate the settlement and indicates that Plaintiff's goal was for the return of the Subject Property so that it could continue to develop it as it was prior to the City's taking. It also indicates that Plaintiff wanted to vacate the settlement because it believed the Project to have been abandoned by the City, and characterized the City's statements to the contrary as a misrepresentation.

21. Annexed hereto as Exhibit 13 is a transcript of a hearing held on June 26, 2014, wherein these same sentiments were expressed by Plaintiff to the Court. Plaintiff mentioned other reasons for thinking that the Project was abandoned as well.

22. Annexed hereto as Exhibit 14 is a follow-up letter dated July 7, 2014, submitted by Plaintiff to the Court containing hearsay allegations that supposedly explain statements it made at the June 26, 2014 conference in support of its abandonment theory.

23. On September 9, 2016, the Court held another conference on this matter, and Plaintiff reiterated its belief that the City had abandoned the Project. A copy of the transcript from the September 9, 2016 Conference is annexed hereto as Exhibit 15. At this conference, counsel did not claim that the City misrepresented any facts, just that the City did not affirmatively disclose the fact that the contingent site authorization letter issued by HPD to Ridgewood Bushwick and UJO regarding the Subject Property was formally terminated. Id. at 9-11. At no point during the September 2016 conference did Plaintiff express that the reason it entered into the settlement agreement was because UJO or Ridgewood Bushwick specifically

would be developing the Subject Property; only that they thought that the Project, as described in the Urban Renewal Plan, would not proceed. Indeed, Plaintiff again reiterated at this conference that its intention was to develop the Subject Property on its own. See Exhibit 15, at 8.

24. In December 2017, the State Court Action settled, and therefore the injunction was no longer in place. A copy of the settlement stipulation in the State Court Action is annexed hereto as Exhibit 16. As a result, and contrary to the contentions Plaintiff made from 2014-2016, the Project moved forward.

25. Under the terms of the settlement of the State Court Action, HPD issued a RFP for the Project, which remained open through October 1, 2018. A copy of the Broadway Triangle RFP information is annexed hereto as Exhibit 17, also found at: https://www1.nyc.gov/site/hpd/developers/request-for-proposals/broadway-triangle-rfp.page.

26. As the City's statements that the Project had not been abandoned were proven true, Plaintiff was forced to abandon its abandonment theory and had to come up with a new purported reason for vacating the settlement. Astoundingly, Plaintiff's counsel asserted in open court for the first time on March 28, 2018 that the Plaintiff agreed to the settlement because it was "under the impression that it [the development of the Subject Property by UJO and Ridgewood Bushwick] was going to be helpful to their [Hasidic] community." A copy of the transcript of March 28, 2018 hearing is annexed hereto as Exhibit 18, pp. 29-30. Amplifying this statement, counsel asserted that the Plaintiff's potential "economic benefit" of a higher settlement award was weighed against the importance of the communal benefit to the Plaintiff's religious group within Williamsburg. See id. at pages 31-32.

27. However, on March 19, 2019, HPD designated the Unified Neighborhood Partners, a development team comprised of five distinct groups, to develop the Project. See Exhibit 17. Two of the members of this development team are UJO and Ridgewood Bushwick's successor organization, called RiseBoro Community Partnership. Id. Thus, the community groups that Plaintiff claims it is aligned with will be the ones developing the Project, and the only thing holding up the Subject Property's inclusion in that development is the pendency of this litigation.

28. Finally, a copy of the transcript of the December 20, 2017 hearing, is annexed hereto as Exhibit 19.

## SUMMARY OF ARGUMENT SET FORTH IN MEMORANDUM OF LAW

29. The law surrounding settlement enforcement is unequivocally clear. In New York, "[s]tipulations of settlement are favored by the courts and not lightly set aside." Hallock v. State of New York, 485 N.Y.S.2d 510, 512 (1984) (citing Matter of Galasso, 35 N.Y.2d 319, 321 (1974)); see also Downes v. O'Connell, 103 F. Supp. 2d 579, 582 (E.D.N.Y. 2000). "Stipulations of settlement…are judicially favored and, as such, will not be set aside absent grounds sufficient to invalidate a contract, i.e., fraud, collusion, mistake or accident." Matter of McLaughlin, 97 A.D.3d 1051, 1052 (3d Dept. 2012)(internal citations omitted); Downes, 103 F. Supp. 2d at 582; see also Matter of Frutiger, 29 N.Y.2d 143, 149-150 (1971); Bailey v. New York City Transit Auth., 602 N.Y.S.2d 177, 178 (2d Dept.1993). For all of the reasons set forth herein, and in the City's accompanying Memorandum of Law, the "so ordered" settlement (Docket No. 18) reached between the Plaintiff and the City must be enforced if the Plaintiff cannot prove that the City's actions were fraudulent or that the City misrepresented a material fact upon which the stipulation of settlement – a contract - was made.

30. "[A] unilateral mistake—in and of itself—is an insufficient basis upon which to set aside a stipulation of settlement." Matter of McLaughlin, 97 A.D.3d at 1053 (citation omitted). Instead, "[i]t is well settled that in order for a court to allow rescission of a contract on the basis of a unilateral mistake, a party must establish that (i) he entered into a contract under a mistake of material fact, and that (ii) the other contracting party either knew or should have known that such mistake was being made." Ludwig v. NYNEX Serv. Co., 838 F. Supp. 769, 795 (S.D.N.Y 1993). Moreover, the mistake must be "accompanied by some fraud committed by the other contracting party." Aniero Concrete Co. v. New York City Constr. Auth., 1997 U.S. Dist. LEXIS 22 at *52 (S.D.N.Y. Jan. 3, 1997)(citations omitted); see also ABA Consulting, LLC v. Liffey Van Lines, Inc., 67 A.D.3d 401, 403 (1st Dept. 2009) (there must be evidence of fraudulent inducement to rescind a settlement based on unilateral mistake); Long v. Fitzgerald, 240 A.D.2d 971, 974 (3d Dept. 1997) ("Plaintiffs cannot obtain relief for unilateral mistake of contract absent a showing of fraud, duress or similar inequitable conduct").

31. "To rescind a contract because of unilateral mistake, therefore, the plaintiff must show 'misrepresentation, concealment or nondisclosure of a material fact; an intent to deceive; and an injury resulting from justifiable reliance by the aggrieved party.'" Aniero Concrete Co., 1997 U.S. Dist. LEXIS 22 at *53 (quoting Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 [2d Cir. 1991]). Furthermore, a unilateral mistake can only void a contract "where the asserted mistake concerns 'a basic assumption on which the contract was made.'" Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc., 157 F.3d 933, 940 (2d Cir. 1998) (quoting Restatement (Second) of Contracts §§ 152 and 153).

32. The party claiming unilateral mistake "bears the burden of proving both its own mistake and fraudulent concealment by the other party." See Winmar Co., Inc. v. Teachers

Ins. & Annuity Ass'n of Am., 870 F. Supp. 524, 537 (S.D.N.Y 1994). In order "to overcome the heavy presumption that a deliberately prepared and executed written instrument manifested the true intention of the parties, evidence of a very high order is required. And well that it is, for freedom to contract would not long survive courts' ready remaking of contracts that parties have agreed upon." George Backer Management Corp. v. Acme Quilting Co., 46 N.Y.2d 211, 219 (1978). Indeed, "a party seeking to overturn an otherwise unambiguous contract on the grounds of mistake bears a heavy burden because there is a conclusive presumption that a party who signs a contract has knowledge of its contents, assents to the contents, and is thus bound by the contract." National Union Fire Ins. Co. v. Walton Ins., Ltd., 696 F. Supp. 897, 903 (S.D.N.Y. 1988).

33. As discussed more fully in the City's Memorandum of Law, Plaintiff has a high burden to prove that City Defendants materially misrepresented a basic assumption of the settlement agreement, and therefore caused Plaintiff to make a unilateral mistake which could serve as the basis to void such contract. Plaintiff has failed to do so.

34. Throughout the litigation of this case, Plaintiff has presented various arguments and/or theories which it asserts would support vacatur of the 2013 settlement, and pursued discovery in support thereof. Plaintiff originally informed the Court that it should not be held to the terms of the settlement because Plaintiff believed that the Project had been abandoned, contrary to assertions made by the City at the time of the settlement. See Exhibit 12 hereto; Exhibit 13 hereto, pp. 9, 19 and 22. However, the settlement of the State Court Action in December 2017 unequivocally proved that the Project was indeed not abandoned, but, rather, moving forward. Plaintiff's Project abandonment theory was therefore abandoned by counsel, who were forced to proffer another theory: the Plaintiff only entered into the 2013 settlement

agreement because at the time it was signed, Plaintiff believed that the lot would ultimately be jointly developed by Ridgewood Bushwick and UJO, the two local Brooklyn-based community groups whose interests were purportedly aligned with those of Plaintiff. This new theory fares no better, and even if it was credited, Plaintiff still cannot show that the City knew or should have known that this was a basic assumption on which the contract was made, let alone that there was any fraud on the City's part. See e.g., Independent Order of Foresters, 157 F.3d at 940; Ludwig, 838 F. Supp. at 795; Aniero Concrete Co., 1997 U.S. Dist. LEXIS 22 at *52.

35. Furthermore, as explained in the accompanying Memorandum of Law, even if Plaintiff's new theory that it informed the City that its interests were vaguely "aligned" with Ridgewood Bushwick and UJO were credited, this would still not enable Plaintiff to vacate the settlement. Merely saying that Plaintiff's interests are "aligned" with the developers is not nearly enough for the City to have known that Ridgewood Bushwick and UJO's continued involvement in the Project was "'a basic assumption on which the contract was made.'" Independent Order of Foresters, 157 F.3d at 940 (citation omitted).

36. Therefore, as outlined in the City's Memorandum of Law, to suggest that the City improperly kept Plaintiff out of the loop regarding the development of the Subject Property, which Plaintiff hadn't owned since 1999, is a red herring. Plaintiff was not one of the two private developers, never indicated that any of its members might also be members of either Ridgewood Buswick and/or UJO, nor did it ever indicate its alleged alliance with these developers until March 2018, some four years after the settlement was reached. Accordingly, whether HPD or its employees knew during the pendency of the instant litigation in 2013 that the tax credits and funding contingently awarded by the State ultimately expired is of no import here. The City had no reason to know that this information was relevant to the Plaintiff's

decision making, and does not constitute either fraud or a misrepresentation of a material fact made by City Defendants. See Ludwig, 838 F. Supp. at 795.

37. Accordingly, the parties to this litigation entered into a fair settlement agreement that was negotiated in 2013, and ultimately "so ordered" by the Court. And that settlement must be adhered to as a matter of contract law. See Downes, 103 F. Supp. 2d at 581. In light of the above considerations, and for the reasons set forth in the accompanying Memorandum of Law, dated May 3, 2019, City Defendants respectfully assert that the "so ordered" settlement agreement should be enforced. To that end, City Defendants respectfully request that the Court issue an order directing the Plaintiff to execute the quit claim deed, and provide it to the City in an effort to effectuate the settlement and have this case finally resolved.

Dated:   New York, New York
         May 3, 2019

_____
HOLLY R. GERSTENFELD

Index No. 03 CV 01045 (NGG)(VMS)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RAMOOE, INC.,

                Plaintiff,

-against-

THE CITY OF NEW YORK, a Municipal Corporation of the State of New York, and the NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION DEVELOPMENT, an agency and governmental subdivision of the City of New York,

                Defendants.

## DECLARATION OF HOLLY R. GERSTENFELD

*ZACHARY CARTER*
*Corporation Counsel of the City of New York*
*Attorney for City Defendants*
*100 Church Street*
*New York, New York 10007*

*Of Counsel: Holly R. Gerstenfeld*
*Michael Chestnov*
*Vincent D'Orazio*
*Tel: (212) 356-2140*
*Law Manager No. 2013-008181*

*Due and timely service is hereby admitted.*

*New York, N.Y.*........................................................................, *200...*

........................................................................ *Esq.*

*Attorney for*........................................................................