UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
RAMOOE, INC.,

                                   Plaintiff,

              -against-                       13-CV-01045 (NGG) (VMS)

THE CITY OF NEW YORK, a Municipal Corporation of
the State of New York, and the NEW YORK CITY
DEPARTMENT OF HOUSING PRESERVATION
DEVELOPMENT, an agency and governmental
subdivision of the City of New York,

                                   Defendants.
------------------------------------------------------------------- x

## CITY DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO SET ASIDE SETTLEMENT AGREEMENT

*ZACHARY CARTER*
*Corporation Counsel of the City of New York*
*Attorney for City Defendants*
*100 Church Street*
*New York, New York 10007*

*Of Counsel:  Holly R. Gerstenfeld*
*                Michael Chestnov*
*                Vincent D'Orazio*
*Tel:  (212) 356-2140*
*Law Manager No. 2013-008181*

Served on May 3, 2019

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

FACTS AND PROCEDURAL HISTORY ......................................................................... 2

      A.   The Broadway Triangle Project and the Related State
           Court Litigation.......................................................................................... 2

      B.   The Settlement Negotiations Between the City and
           Plaintiff ..................................................................................................... 6

      C.   Plaintiff's Evolving Theories on Why it Wants to
           Vacate the Settlement Agreement............................................................. 10

ARGUMENT

      THE SETTLEMENT AGREEMENT  IS ENFORCEABLE ............................... 15

      A.   Settlement Enforcement Standard.............................................................. 15

      B.   Plaintiff Cannot Establish a Unilateral Mistake
           Brought on by Misrepresentation of a Material Fact
           that was Known or Should Have Been Known to City
           Defendants ................................................................................................ 18

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                   <u>Pages</u>

ABA Consulting, LLC v. Liffey Van Lines, Inc.,
    67 A.D.3d 401 (1st Dept. 2009)...........................................................................17

Allen v. Westpoint-Pepperell, Inc.,
    945 F.2d 40 [2d Cir. 1991].................................................................................17

Aniero Concrete Co. v. New York City Constr. Auth.,
    1997 U.S. Dist. LEXIS 22 (S.D.N.Y. Jan. 3, 1997)...........................................17, 19

Bailey v. New York City Transit Auth.,
    602 N.Y.S.2d 177 (2d Dept.1993) .......................................................................16

Broadway Triangle Community Coalition et al v. Bloomberg et al.,
    35 Misc. 3d 167 (Sup. Ct. N.Y. Co. 2011) ............................................................3

Downes v. O'Connell,
    103 F. Supp. 2d 579 (E.D.N.Y. 2000) .......................................................15, 16, 25

Matter of Frutiger,
    29 N.Y.2d 143 (1971) ........................................................................................16

Matter of Galasso,
    35 N.Y.2d 319 (1974) ........................................................................................15

George Backer Management Corp. v. Acme Quilting Co.,
    46 N.Y.2d 211 (1978) ...................................................................................18, 25

Hallock v. State of New York,
    485 N.Y.S.2d 510 (1984) ...................................................................................15

Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,
    157 F.3d 933 (2d Cir. 1998)........................................................................17, 19, 22

Kulesa v. Middaugh,
    1999 U.S. Dist. LEXIS 19585 (N.D.N.Y. 1999) ...................................................16

Long v. Fitzgerald,
    240 A.D.2d 971 (3d Dept. 1997) .........................................................................17

Ludwig v. NYNEX Serv. Co.,
    838 F. Supp. 769 (S.D.N.Y 1993) ................................................................17, 19, 23

McCoy v. Feinman,
    99 N.Y.2d 295 (2002) ........................................................................................15

**Cases** <span style="float:right">**Pages**</span>

Matter of McLaughlin,
    97 A.D.3d 1051 (3d Dept. 2012) ........................................................16

National Union Fire Ins. Co. v. Walton Ins., Ltd.,
    696 F. Supp. 897 (S.D.N.Y. 1988) ....................................................18

Omega Eng'g, Inc. v. Omega, S.A.,
    432 F.3d 437 (2d Cir. 2005)..............................................................16

Rose v. State,
    24 N.Y.2d 80 (1969) ..........................................................................21

Term Indus., Inc.. v. Essbee Estates, Inc.,
    451 N.Y.S.2d 128 (1st Dept. 1982) ..................................................24

United States v. Miller,
    317 U.S. 369 (1943)...........................................................................21

Winmar Co., Inc. v. Teachers Ins. & Annuity Ass'n of Am.,
    870 F. Supp. 524 (S.D.N.Y 1994) ....................................................17

**Statutes**

EDPL § 402(B) .......................................................................................5

EDPL § 402(B)(2)(b)...............................................................................5

Fed. R. Civ. P. 60(b)(3)...........................................................................1

Fed. R. Civ. P. 60(b)(6)...........................................................................1

**Other Authorities**

Restatement (Second) of Contracts § 152 ...........................................17

Restatement (Second) of Contracts § 153 ...........................................17

## PRELIMINARY STATEMENT

The City of New York ("City") and the New York City Department of Housing Preservation and Development ("HPD")(together "City Defendants") respectfully submit this Memorandum of Law in opposition to the motion made by Plaintiff, Ramooe, Inc., ("Plaintiff") to set aside the settlement agreement filed as Document No. 18 on the instant docket, pursuant to Fed. R. Civ. P. 60(b)(3) and (6), and respectfully request that the Court issue an order directing the Plaintiff to execute a quit claim deed, and provide it to the City in an effort to effectuate the settlement and have this case finally resolved.

While the parties agreed to settle this matter in 2013, Plaintiff has changed its mind, and now wants the City to – literally – pay for its change of heart. Indeed, Plaintiff is having regrets about the "so ordered" settlement it entered into in 2013, which its president now characterizes as a "woefully low price." Declaration of Chaim Ostreicher, dated February 20, 2019, ("Ostreicher Decl.") annexed to the February 21, 2019 Declaration of Israel Goldberg, Esq. ("Goldberg Decl."), ¶ 16.

To that end, Plaintiff's current counsel has spent the past several years trying to formulate a theory upon which it can convince this Court to vacate the settlement. Its theory has changed throughout the years, because as time passes, and one theory became moot, Plaintiff's counsel formulated a new theory upon which it tried to vacate the settlement. However, Plaintiff's newest theory, like the ones before it, fails to satisfy the heavy burden needed to vacate a settlement. In particular, although Plaintiff was permitted to engage in years of discovery in order to better articulate and support a claim that the City acted in bad faith, the evidence in the record does not stand up. Indeed, Plaintiff cannot prove the requisite elements of unilateral mistake: a material fact upon which the settlement was based that was known or should have been known by the City. The "evidence" that Plaintiff provided in an attempt to show that the

City knew or should have known of Plaintiff's alleged mistake is nothing more than vague and uncorroborated hearsay, which is directly refuted by the City officials who actually participated in the settlement discussions, and is contradicted by some of Plaintiff's own statements.

Instead, the evidence shows that once an injunction issued in an unrelated New York State Court case affecting Brooklyn Tax Block 2269, Lot 45 ("the Subject Property") was lifted, the Broadway Triangle revitalization project ("Project") would proceed, either with Ridgewood Bushwick Senior Citizens Counsel, Inc. and United Jewish Organizations of Williamsburg, Inc. ("Ridgewood Bushwick" and "UJO," respectively) as developers, or with any other chosen developers in their place. Throughout the course of settlement negotiations, no representations were made by the City that UJO and Ridgewood Bushwick would develop the Subject Property. Rather, the City asserted that the Project itself had not been abandoned, and that once the injunction was lifted the Project would proceed – which is exactly what happened.

In 2017, when the State Court case involving the Subject Property was settled and the injunction was lifted, the development of the Subject Property and its neighboring parcels was permitted to proceed. Indeed, in March 2019, it was announced that UJO and Ridgewood Bushwick's successor organization (amongst others they are working together with) were chosen as developers, but the only thing holding up the Subject Property's inclusion in that development is the pendency of this litigation. Therefore, Plaintiff has not proven its case to invalidate the "so ordered" settlement.

## FACTS AND PROCEDURAL HISTORY

### A. The Broadway Triangle Project and the Related State Court Litigation

In August 1999, the City acquired the Subject Property by eminent domain as part of the City's Broadway Triangle Urban Renewal Plan for the Broadway Triangle revitalization project. Part of this Project involved the rezoning of the Broadway Triangle neighborhood of Brooklyn

from manufacturing to residential use in order to bring more affordable housing to its residents, consistent with the Broadway Triangle Urban Renewal Plan, and its first amendment. See copies of the City Planning Commission reports approving the Plan and its first amendment, annexed to the Declaration of Holly R. Gerstenfeld, dated May 3, 2019 ("Gerstenfeld Decl.") as Exhibit 1; see also the City's papers that were filed, published and posted, along with the accompanying affidavits attesting to the same, which are annexed to the Gerstenfeld Decl. as Exhibit 2.

In 2009, several community groups initiated a lawsuit against the City to challenge the rezoning, claiming, amongst other things, that the rezoning favored some ethnic groups over others. Broadway Triangle Community Coalition et al v. Bloomberg et al. (the "State Court Action") was brought in the Supreme Court of the State of New York, New York County, under Index No. 112799/2009. By Order dated December 23, 2011, Justice Emily Goodman enjoined the City from transferring City owned land and proceeding with development of three groups of sites within the Broadway Triangle, including the site referred to as "35 Bartlett Street," which includes the Subject Property. See Broadway Triangle Community Coalition et al v. Bloomberg et al., 35 Misc. 3d 167, 178 (Sup. Ct. N.Y. Co. 2011).

It is not disputed that prior to the commencement of this lawsuit, Ridgewood Bushwick and UJO had together sought tax credits and funding from the State to develop the Subject Property with affordable housing. As part of their application process with the State, Ridgewood Bushwick and UJO were required to obtain from HPD a contingent site authorization letter, which indicates that HPD has authorized these two developers to seek funding from the State for a project to develop the Subject Property, as outlined in the January 26, 2009 letter. A copy of this letter, dated January 26, 2009, is annexed to the Gerstenfeld Decl. as Exhibit 3. The purpose of the contingent site authorization letter is so that the potential developers can seek state funding

and/or tax credits for the project; "[i]n no way does it give [the potential developers] control of a site." Transcript of Matthew Shafit's Deposition, annexed as Exhibit I to the Goldberg Decl., pp. 34-35; see also Transcript of Jack Hammer's Deposition, annexed as Exhibit H to Goldberg Decl. pp. 29-30, 42. Indeed, by its express terms, the letter "only authorizes the Applicant to submit an application to the [State] for funding and does not confer any other rights or benefits upon the Applicant with respect to the Site or Project." Exhibit 3, p. 1. The letter further "specifically *does not* include: (a) permission for the Applicant to enter upon the Site . . . ; or (b) Selection of the Applicant as the as sponsor of the Project . . . ." Id., at 1-2 (emphasis added). This contingent site authorization can be revoked without cause or prior notice and is non-exclusive, so it does not preclude HPD from giving other developers authorization to seek funding to develop the very same site. Id. As both Jack Hammer (HPD's Director of Brooklyn Planning until his retirement in June 2015) and Matthew Shafit (HPD's General Counsel from 1995-2018) explained, actual site control would only be granted much later in the process, once the property is actually conveyed to the developer – which was nowhere close to happening at the time the settlement was agreed to in 2013. Goldberg Decl., Exhibit H, pp. 30-32; Goldberg Decl., Exhibit I, pp. 34-35.

Ridgewood Bushwick and UJO applied for, and contingently received, tax credits and funding from the State to develop the Subject Property. Copies of the letters awarded to Ridgewood Bushwick and UJO to develop the Subject Property, are collectively annexed to the Gerstenfeld Decl. as Exhibit 4; see also Exhibit F to the Goldberg Decl. Some of the State-imposed funding deadlines were initially extended, but due in part to the injunction issued in the State Court Action, ultimately expired on January 31, 2012 and January 24, 2013, respectively, prior to the initiation of this lawsuit. See copies of extension letters, annexed to the Gerstenfeld

Decl. as Exhibit 5; see also Exhibit G to the Goldberg Decl. This loss of funding did not automatically revoke the contingent site authorization, and it remained in place until 2016. See Transcript of former HPD Commissioner Vicki Been's Deposition, Exhibit C to the Goldberg Decl., pp. 32-33; Exhibit H to the Goldberg Decl., pp. 76, 111-112; Exhibit I to the Goldberg Decl., pp. 41, 56-57; Exhibit J to the Goldberg Decl.; Exhibit 3 to the Gerstenfeld Decl.

In February 2013, Plaintiff commenced the instant action alleging, amongst other things, due process claims against the City Defendants in relation to its taking.[1] At that time, the State Court Action was not yet resolved, and therefore the injunction was still in place. The Subject Property was not yet able to be developed as a result, but the City's intent was to move forward with development of affordable housing once it was lifted. Indeed, Mr. Hammer, testified that at the time of his retirement in June 2015, his understanding was that "eventually when [the State

---

[1] City Defendants note that discovery has not been completed with respect to the underlying claims of the lawsuit. Instead, all discovery taken in this action relates to the Plaintiff's instant motion to vacate the settlement. Therefore, any allegations and arguments brought forth in the Plaintiff's motion relating to the underlying claims is inappropriate at this procedural juncture.

The foregoing notwithstanding, the City Defendants properly commenced this condemnation proceeding pursuant to the Eminent Domain Procedure Law ("EDPL"), and acquired title to the Subject Property in August 1999. Pursuant to EDPL Section 402(B), City Defendants served the condemnation Notice of Petition and Verified Petition upon the last known owner of record at both the address on the January 15, 1997 deed giving Ramooe, Inc. title (Reel 3972, Page 1742), as well as the property address of the Subject Property. The City also properly published and posted copies of the notice and acquisition map. Gerstenfeld Decl., Exhibit 2. A copy of the deed is annexed to the Ostreicher Decl. as Exhibit A.

In reliance upon the address of Plaintiff contained within the deed, these papers were served upon 524 Bedford Avenue. Even if Plaintiff alleges that this address is incorrect because its true address is 527 Bedford Avenue, and the papers were inadvertently sent to 524 rather than 527 Beford Avenue (a typo relating to the address on the filed deed), pursuant to EDPL Section 402(B)(2)(b), "[t]he inadvertent failure to notify any condemnee, whether of record or not, will not invalidate any proceedings brought hereunder or any title acquired by the condemnor under this law." Accordingly, the City's alleged inadvertent typo did not invalidate the condemnation of the Subject Property, and any attempt by Plaintiff to assert the same, and to try and muddy the waters by suggesting that the City was obligated to change any records in the New York State Court after being informed of this alleged mistake is a red herring.

Court] litigation hopefully would be resolved that HPD could move forward on the development of not just this site [the Subject Property] but other sites in the Broadway Triangle that were subject to the rezoning [which was the subject of said litigation]."  Exhibit H to the Goldberg Decl., pp. 125-126.

**B.     The Settlement Negotiations Between the City and Plaintiff**

Prior to the City filing its Answer in May 2013, the parties had an in person meeting at the New York City Law Department on April 15, 2013 ("April 15th Meeting").  In attendance were Fred Kolikoff, counsel for City Defendants, as well as Mr. Hammer and Mr. Shafit from HPD.[2]  Plaintiff's prior counsel was in attendance, as well as Eugene Ostreicher, who was the principal of Ramooe, Inc. at that time.  Copies of correspondence between Abner Zelman of Kucker & Bruh, LLP, Plaintiff's prior counsel until 2014, and Ms. Gerstenfeld indicate the parties anticipated to be in attendance at the meeting, and annexed to the Gerstenfeld Decl. as Exhibit 7; Declaration of Fred Kolikoff, dated April 29, 2019 ("Kolikoff Decl."), annexed to the Gerstenfeld Decl. as Exhibit 8, ¶¶ 3-4; Declaration of Jack Hammer, dated April 29, 2019 ("Hammer Decl."), annexed to the Gerstenfeld Decl. as Exhibit 9, ¶¶ 3-4.  Contrary to the unsupported assertions in paragraph 13 of the Ostreicher Decl., this was the only meeting between representatives of the New York City Law Department ("Law Department"), and HPD,

---

[2] Holly R. Gerstenfeld was the lead attorney assigned to this case since its inception in 2013, and Fred Kolikoff was her supervisor up until his retirement in 2015.  Although Ms. Gerstenfeld set up this April 15th Meeting at Plaintiff's request, at the last minute she was not able to be there as she was attending a funeral.  See Copies of email correspondence, Exhibit 6 to the Gerstenfeld Decl.; Gerstenfeld Decl., ¶ 7  Mr. Kolikoff attended the meeting in her place.  While both Mr. Kolikoff and Mr. Hammer recall that Mr. Shafit was at the April 15th Meeting (and contemporaneous records indicate that he was expected to attend), Mr. Shafit testified in 2018 that he does not recall being at any meeting with anyone associated with Ramooe, Inc.  See Exhibit I to the Goldberg Decl., pp. 63-64.  As HPD's long-serving General Counsel who attended countless meetings in his career, it is unsurprising that he would fail to recall attending an unproductive meeting that occurred five years prior to his deposition.

and principals of Ramooe, Inc. that occurred in connection with the above-captioned action. Gerstenfeld Decl., ¶¶ 8-9; Kolikoff Decl. ¶ 2.  It does not appear that Chaim Ostreicher was in attendance at the April 15th Meeting, as his name was not submitted to be placed on the Law Department's office building's security list, as representatives from HPD as well as Eugene Ostreicher and Plaintiff's attorneys names were.  See Exhibit 7 to the Gerstenfeld Decl.; and Gerstenfeld Decl., ¶ 8.  In addition, Mr. Kolikoff, who was present at the April 15th Meeting only recalls one of Plaintiff's principals attending the meeting and that this representative was Eugene Ostreicher, not Chaim Ostreicher. Kolikoff Decl., ¶¶ 4-5; see generally Hammer Decl., ¶ 5.

The April 15th Meeting focused on Plaintiff's proposal to obtain (or retain) title to the Subject Property so that it could develop it, as it had intended to do prior to the condemnation.[3] See Kolikoff Decl., ¶ 6. Mr. Kolikoff recalls that at the April 15th Meeting, Eugene Ostreicher asked if he would be able to get the Subject Property back.  He set forth in general terms a development proposal that involved the Subject Property, and said that he could give the City a more detailed one in 30 days if the City would consider it.  Following the April 15th Meeting, the City informed Plaintiff that it was not interested in giving back the Subject Property, but that it would be willing to discuss a monetary settlement.  Kolikoff Decl., ¶ 7; Gerstenfeld Decl., ¶ 15.

The entire discussion at the April 15th Meeting rested on the notion that Plaintiff wanted to develop the Subject Property itself.  Kolikoff Decl., ¶¶ 6-7, 9-10; Hammer Decl., ¶ 7.   There was no discussion about HPD providing (or rescinding) contingent site authorization to Ridgewood Bushwick and/or UJO at the April 15th Meeting.  See Exhibit H to the Goldberg Decl., pp. 122-23.  Neither Mr. Kolikoff nor Mr. Hammer recall Plaintiff indicating during the April 15th Meeting, or at any time during settlement discussions with Plaintiff or its counsel

---

[3] Indeed, it is not in dispute that prior to the City's taking in 1999, Plaintiff was granted permit(s) from the City's Department of Buildings relating to the development of the Subject Property.

during the course of 2013, that it wished for Ridgewood Bushwick and UJO to instead be the developers. Kolikoff Decl., ¶ 9; Hammer Decl., ¶ 6.

Moreover, the City's lead counsel in this case since its inception is Ms. Gerstenfeld, who, along with Mr. Kolikoff, were the only representatives of the City to engage in settlement discussions with anyone on Plaintiff's behalf in 2013, with the exception of the April 15th Meeting. Gerstenfeld Decl., ¶ 12. Neither Plaintiff's former counsel, Mr. Zelman, who represented Plaintiff through early 2014 following the execution of the settlement discussed herein, nor anyone else on Plaintiff's behalf, ever expressed to Ms. Gerstenfeld or Mr. Kolikoff Plaintiff's supposed desire to have UJO or Ridgewood Bushwick, or any other third party developers, build out the Subject Property. Gerstenfeld Decl., ¶ 13; Kolikoff Decl., ¶ 9. Instead, it was expressed to Ms. Gerstenfeld and Mr. Kolikoff during settlement discussions that Plaintiff wished to obtain (or retain) title to the Subject Property so that *Plaintiff* could develop it. Gerstenfeld Decl., ¶¶ 12-14; Kolikoff Decl., ¶¶ 6-7, 9-10; see also Hammer Decl., ¶ 7.  Once Plaintiff's counsel was informed that the City would not settle on those terms, the settlement discussions focused solely on the monetary value of the Subject Property, without regard to who would subsequently develop it. Gerstenfeld Decl., ¶¶ 15-16; Kolikoff Decl., ¶ 7.

This is corroborated by Plaintiff's June 24, 2014 letter to the Court, whereby Plaintiff asserted that "[t]hroughout negotiations with the City, Mr. Ostreicher made clear that his goal was for the return of the property so that *Ramooe* could continue developing the Property as it was prior to the City's unlawful taking." A copy of this letter is annexed to the Gerstenfeld Decl. as Exhibit 12, p. 2 (emphasis added).  Plaintiff further asserted that "Mr. Ostreicher was told repeatedly that his property was necessary for the success of the Project. Mr. Ostreicher was

- 8 -

given to understand that he could not maintain ownership of his property and his only option was to accept the City's offer of monetary remuneration for Ramooe's Property." Id.

Conspicuously absent from Plaintiff's June 24, 2014 letter are any assertions that Plaintiff agreed to settle because the Project was being developed by UJO or Ridgewood Bushwick, or any other specific developer, let alone that Plaintiff conveyed such reasoning to the City. See id. Instead, Plaintiff made clear that it was only the City's supposed assertions that the Project had not been abandoned, and that the City would not be willing to return the Subject Property to Plaintiff, that induced Plaintiff to settle. See id.

It is not in dispute that following initial disclosures and minimal discovery, the parties entered into a Stipulation of Settlement and Order of Dismissal, dated December 17, 2013, which was "so ordered" by the Honorable Sandra L. Townes on December 30, 2013 (Docket No. 18). Paragraph No. 5 of the stipulation indicated that as a term of the settlement Plaintiff "agrees to execute and deliver to the City a quitclaim deed, in recordable form, granting the City any rights that plaintiff may have with respect to Brooklyn Tax Block 2269, Lot 45." In accordance with the terms of the stipulation, on January 8, 2014, Ms. Gerstenfeld forwarded a quitclaim deed to Mr. Zelman. On January 14, 2014, Mr. Zelman informed Ms. Gerstenfeld that he had forwarded it to Plaintiff for signature. On February 13, 2014, Ms. Gerstenfeld received the deed from counsel, but it was missing certain information such as the date, and name and title of signatory. She asked that the deed be returned only after it was fully completed. Following regular inquiries to Plaintiff's counsel, on June 9, 2014, Ms. Gerstenfeld was informed in an email: "We regret the delay that has occurred in finalizing this matter, but it has unfortunately become necessary for us to withdraw as counsel, and we will be making such application shortly." Copies of the email correspondence between counsel are annexed to the Gerstenfeld Decl. as

Exhibit 11.   Counsel then withdrew, and Plaintiff has been represented since that time by Goldberg, Weg & Markus PLLC, and its firm's predecessors.

**C.     Plaintiff's Evolving Theories on Why it Wants to Vacate the Settlement Agreement**

Plaintiff's new counsel Goldberg, Weg & Markus PLLC, sent a letter to the Court dated June 24, 2014, seeking to vacate the settlement.   As discussed above, the stated reason why Plaintiff wanted to vacate the settlement was because the City had asserted that the Project had not been abandoned, *not* because the City purportedly asserted that a specific developer would be the one to develop the property.   See Exhibit 12 to the Gerstenfeld Decl.   Indeed, Plaintiff made clear that "the *only* reason it agreed to sign the settlement agreement transferring the property" was because Plaintiff "was informed that the City was proceeding with the Project."   Id., at 2 (emphasis added).   Plaintiff believed this to be a misrepresentation, as Plaintiff believed at that time that the Project had actually been abandoned.   See id.

Plaintiff reiterated this theme at a conference with Magistrate Judge Scanlon on June 26, 2014.   See Transcript of the June 26, 2014 Conference, annexed to the Gerstenfeld Decl. as Exhibit 13.   Specifically, Plaintiff set forth that while the City had represented during settlement negotiations that the Project had not been abandoned, Plaintiff subsequently came to believe that the Project had actually been abandoned because funding for the Project was not included in the City's budget, that Plaintiff was supposedly "told" that unidentified "individuals who received letters concerning condemnation of their properties in that same project area have now been told that they can keep their property[,]"[4] and that "governmental leaders who were pushing the project are not in the government anymore."   Id. at 9.

_____

[4]   At the conference, Plaintiff's counsel indicated that these unidentified property owners supposedly received letters indicating that the City no longer sought to acquire their properties. Exhibit 13 to the Gerstenfeld Decl., at 14.   However, Plaintiff's counsel conceded that they had not actually seen these supposed letters and sought time to "investigate the letters" and bring

At this conference, Plaintiff represented to the Court that the "only mistake" Plaintiff is alleging is that Plaintiff thought that the Project had not been abandoned, but "now he believes, in fact, it was abandoned." Exhibit 13, p. 19 ("THE COURT: -- the only mistake that your client is claiming is his understanding that the project had not been abandoned and now he believes, in fact, it was abandoned? [Plaintiff's Counsel]: That's correct. That is the only statement he's claiming."). Plaintiff's counsel explicitly conceded that if the Project was not actually abandoned, then there would be no basis for Plaintiff to vacate the settlement. Id. at 22 ("...if the City hasn't abandoned the project, *then they haven't abandoned the project and it's not a mistake*. But if the City has abandoned the project, then he signed the stipulation not knowing that the City has abandoned the project) (emphasis added). Moreover, Plaintiff's counsel indicated that "we're not saying the City intentionally misled [Plaintiff]. The only thing I can say is that he was repeatedly told and he heard that the City ... had not abandoned the project and was not abandoning the project." Id. at 22.

The City explained at this conference that the Project had not been abandoned, but that it was subject to a preliminary injunction issued in the State Court Action and could not proceed until that injunction was lifted. Id. at pp. 5-6, 26-27. The City indicated that its intention was to move forward with the Project once the injunction was lifted. See id. Indeed, as will be set forth in more detail below, that is exactly what happened.

---

them to court. Id. at 17-18. In a letter dated July 7, 2014, Plaintiff's counsel clarified that he spoke to some of the neighboring property owners and that "neighboring landowners have been allowed to develop their properties despite previously receiving notices from the City that the neighboring property was to be condemned." This letter is annexed to the Gerstenfeld Decl. as Exhibit 14. No documentation was provided to support this assertion. Regardless, counsel for the City explained at the conference that the fact that some properties may have originally been included in the Project but no longer are needed for it, does not mean that the Project itself has been abandoned, or that the Subject Property is no longer needed for the Project. Exhibit 13 to the Gerstenfeld Decl., at 28.

Over two years later, on September 9, 2016, the Court held another conference on this matter, and Plaintiff reiterated its belief that the City had abandoned the Project. See Transcript from September 9, 2016 Conference, annexed to the Gerstenfeld Decl. as Exhibit 15, pp. 4-9. Specifically, Plaintiff indicated that no development had occurred, that the related state court proceeding had been dormant for years, and that it believed that the City no longer intended to develop the property in accordance with the urban renewal plan. Id. at pp. 4-9, 22. As further evidence that the Project was not going forward, Plaintiff raised the fact that the contingent site authorization issued to Ridgewood Bushwick (and UJO) was withdrawn by the City earlier in 2016 and argued that the City knew this in 2013 but did not disclose it to Plaintiff. Exhibit 15 to the Gerstenfeld Decl., pp. 4-9, 20. Additionally, Plaintiff believed that because the City supposedly withdrew the contingent site authorization from Ridgewood Bushwick and UJO that this also meant that the Subject Property could no longer be developed in accordance with the urban renewal plan. Indeed, Plaintiff's counsel stated: "the entire plan to develop the community in a particular fashion, its for lack of a better words, went down the tubes." Id. at p. 21.

At this September 9, 2016 conference, counsel did not claim that the City misrepresented any facts, just that the City did not affirmatively disclose the fact that the contingent site authorization letter issued by HPD to Ridgewood Bushwick and UJO regarding the Subject Property was formally terminated. Id. at pp. 9-11 ("THE COURT: So it's unilateral mistake but based on a failure to be forthcoming and as you said, you – there was no way for you to get the information; MR, GOLDBERG (Plaintiff's counsel): Correct"). However, counsel admitted that this letter rescinding Ridgewood Bushwick and UJO's contingent site authorization was not issued until a few months prior to the September 2016 conference. Id. at pp. 10-12. This letter, dated June 20, 2016, was drafted by Mr. Shafit, HPD's General Counsel, as the City was in

- 12 -

"settlement discussions" in the State Court Action, and it was signed by HPD Commissioner Vicki Been who made the ultimate decision to rescind the contingent site authorization. <u>See</u> Exhibit J to the Goldberg Decl.; Exhibit C to the Goldberg Decl., pp. 32-36; 40; Exhibit I to the Goldberg Decl., pp. 31-35, 45.

Therefore, the contingent site authorization did not terminate until 2016 – years *after* the settlement agreement was reached. Indeed, the terms of the 2009 letter granting contingent site authorization did not provide for automatic rescission if the state funding expired, and Mr. Hammer testified that the contingent site authorization was not rescinded at the time he retired from HPD in 2015. <u>See</u> Exhibit H to the Goldberg Decl., pp. 76, 111-112; Exhibit 3 to the Gerstenfeld Decl.; Exhibit J to the Goldberg Decl. Former HPD Commissioner Been testified that the decision to rescind the contingent site authorization was made around the time the letter was issued in 2016, and this decision was made in connection with settlement negotiations in the State Court Action. See Exhibit C to the Goldberg Decl., pp. 32-33.[5]

At no point during the September 2016 conference did Plaintiff express that the reason it entered into the settlement agreement was because UJO or Ridgewood Bushwick specifically would be developing the Subject Property; only that they agreed to settle because they thought that the Project, as described in the Urban Renewal Plan, would proceed. Indeed, Plaintiff again

---

[5] Plaintiff accuses the City of hiding "behind the attorney-client privilege" with respect to its failure to precisely explain why it waited until 2016 to revoke the contingent site authorization. <u>See</u> Plaintiff's February 21, 2019 Memorandum of Law in Support of its Motion, p. 9. However, as set forth above, the decision was made in the context of settlement negotiations in the State Court Action. Plaintiff has not challenged this assertion of privilege and it bears noting that Magistrate Judge Scanlon initially discouraged Plaintiff from even taking the deposition of Mr. Shafit because "that doesn't seem helpful… or at least efficient because the parsing of the privilege versus the non-privilege will be very difficult." Transcript of December 20, 2017 hearing, annexed to the Gerstenfeld Decl. as Exhibit 19, p. 38.

reiterated at this conference that its intention was to develop the Subject Property on its own. See Exhibit 15 to the Gerstenfeld Decl., p. 8.

In December 2017, the State Court Action settled, and therefore the injunction was no longer in place. See A copy of the State Court Action settlement is annexed to the Gerstenfeld Decl. as Exhibit 16. As a result, and contrary to the contentions Plaintiff made from 2014-2016, the Project moved forward. Last year, HPD began the RFP process to select developers for all of the Broadway Triangle properties that were previously bound by the injunction. Under the terms of the settlement of the State Court Action, HPD issued a RFP for the Project, which remained open through October 1, 2018. See id.; Broadway Triangle RFP information, a copy of which is annexed to the Gerstenfeld Decl. as Exhibit 17, also found at: https://www1.nyc.gov/site/hpd/developers/request-for-proposals/broadway-triangle-rfp.page. Because the City's statements that the Project had not been abandoned were proven true, Plaintiff was forced to abandon its abandonment theory and had to come up with a new reason for vacating the settlement.

Astoundingly, Plaintiff's counsel asserted in open court for the first time on March 28, 2018 that the Plaintiff agreed to the settlement because it was "under the impression that it [the development of the Subject Property by UJO and Ridgewood Bushwick] was going to be helpful to their community." See A copy of the transcript of the March 28, 2018 hearing is annexed to the Gerstenfeld Decl. as Exhibit 18, pp. 29-30. When the Court asked for clarification, Plaintiff's counsel asserted that his client had "communal concerns" relating to the "Hasidic community in Williamsburg." See id. at p. 30. Indeed, counsel indicated that had Plaintiff known that these two community groups were not going to be the developers, "they [the Plaintiff] would have demanded their number and not caved for a lower number based on the

communal benefit that they would have received." See id. at pp. 31-32. Amplifying this statement, counsel asserted that the Plaintiff's potential "economic benefit" of a higher settlement award was weighed against the importance of the communal benefit to the Plaintiff's religious group within Williamsburg. Id.

To the extent that any credence could be given to this new theory, it was undermined completely on March 19, 2019, when the chosen winner of the RFP for the Project was announced. See Exhibit 17 to the Gerstenfeld Decl. HPD designated the Unified Neighborhood Partners, a development team comprised of five distinct groups, to develop the Project. Two of the members of this development team are UJO and Ridgewood Bushwick's successor organization, called RiseBoro Community Partnership. Id. Thus, the community groups that Plaintiff claims it is aligned with will be developing the Project, and the only thing holding up the Subject Property's inclusion in that development is the pendency of this litigation.

## ARGUMENT

### THE SETTLEMENT AGREEMENT IS ENFORCEABLE

**A.    Settlement Enforcement Standard**

The law surrounding settlement enforcement is unequivocally clear. In New York, "[s]tipulations of settlement are favored by the courts and not lightly set aside." Hallock v. State of New York, 485 N.Y.S.2d 510, 512 (1984) (citing Matter of Galasso, 35 N.Y.2d 319, 321 (1974)); see also Downes v. O'Connell, 103 F. Supp. 2d 579, 582 (E.D.N.Y. 2000). "Stipulations not only provide litigants with predictability and assurance that courts will honor their prior agreements, but also promote judicial economy by narrowing the scope of issues for trial." McCoy v. Feinman, 99 N.Y.2d 295, 302 (2002)(internal citations omitted). Moreover, in order "[t]o achieve these policy objectives, a stipulation is generally binding on parties that have

legal capacity to negotiate, do in fact freely negotiate their agreement and either reduce their stipulation to a properly subscribed writing or enter the stipulation orally on the record in open court." Id. (internal citations omitted).

"Settlement agreements are contracts and must therefore be construed according to general principles of contract law." Downes, 103 F. Supp. 2d at 581. "A trial court has inherent power to enforce summarily a settlement agreement when the terms of the agreement are 'clear and unambiguous.'" Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 444 (2d Cir. 2005) (internal citation omitted). Further, "[a]n order requiring a party to specifically perform in accordance with the terms of a valid contract is a proper remedy. Specific performance is particularly appropriate where, as here, the defendants have acted in good faith throughout the settlement negotiations and thereafter." Kulesa v. Middaugh, 1999 U.S. Dist. LEXIS 19585, at *13 (N.D.N.Y. 1999) (internal citations omitted) (the court enforced the settlement stipulation and ordered specific performance, because it found plaintiff to be competent at the time he signed the stipulation).

"Stipulations of settlement…are judicially favored and, as such, will not be set aside absent grounds sufficient to invalidate a contract, i.e., fraud, collusion, mistake or accident." Matter of McLaughlin, 97 A.D.3d 1051, 1052 (3d Dept. 2012)(internal citations omitted); Downes, 103 F. Supp. 2d at 582; see also Matter of Frutiger, 29 N.Y.2d 143, 149-150 (1971); Bailey v. New York City Transit Auth., 602 N.Y.S.2d 177, 178 (2d Dept.1993).

"[A] unilateral mistake—in and of itself—is an insufficient basis upon which to set aside a stipulation of settlement." Matter of McLaughlin, 97 A.D.3d at 1053 (citation omitted). Instead, "[i]t is well settled that in order for a court to allow rescission of a contract on the basis of a unilateral mistake, a party must establish that (i) he entered into a contract under a mistake

of material fact, and that (ii) the other contracting party either knew or should have known that such mistake was being made." Ludwig v. NYNEX Serv. Co., 838 F. Supp. 769, 795 (S.D.N.Y 1993). Moreover, the mistake must be "accompanied by some fraud committed by the other contracting party." Aniero Concrete Co. v. New York City Constr. Auth., 1997 U.S. Dist. LEXIS 22 at *52 (S.D.N.Y. Jan. 3, 1997)(citations omitted); see also ABA Consulting, LLC v. Liffey Van Lines, Inc., 67 A.D.3d 401, 403 (1st Dept. 2009) (there must be evidence of fraudulent inducement to rescind a settlement based on unilateral mistake); Long v. Fitzgerald, 240 A.D.2d 971, 974 (3d Dept. 1997) ("Plaintiffs cannot obtain relief for unilateral mistake of contract absent a showing of fraud, duress or similar inequitable conduct").

"To rescind a contract because of unilateral mistake, therefore, the plaintiff must show 'misrepresentation, concealment or nondisclosure of a material fact; an intent to deceive; and an injury resulting from justifiable reliance by the aggrieved party.'" Aniero Concrete Co., 1997 U.S. Dist. LEXIS 22 at *53 (quoting Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 [2d Cir. 1991]). Furthermore, a unilateral mistake can only void a contract "where the asserted mistake concerns 'a basic assumption on which the contract was made.'" Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc., 157 F.3d 933, 940 (2d Cir. 1998) (quoting Restatement (Second) of Contracts §§ 152 and 153).

The party claiming unilateral mistake "bears the burden of proving both its own mistake and fraudulent concealment by the other party." See Winmar Co., Inc. v. Teachers Ins. & Annuity Ass'n of Am., 870 F. Supp. 524, 537 (S.D.N.Y 1994). In order "to overcome the heavy presumption that a deliberately prepared and executed written instrument manifested the true intention of the parties, evidence of a very high order is required. And well that it is, for freedom to contract would not long survive courts' ready remaking of contracts that parties have agreed

- 17 -

upon." George Backer Management Corp. v. Acme Quilting Co., 46 N.Y.2d 211, 219 (1978).

This "evidentiary requirement operates as a weighty caution upon the minds of all judges, and it

forbids relief whenever the evidence is loose, equivocal or contradictory.'" Id. at 220 (internal

quotations and citations omitted).   Indeed, "a party seeking to overturn an otherwise

unambiguous contract on the grounds of mistake bears a heavy burden because there is a

conclusive presumption that a party who signs a contract has knowledge of its contents, assents

to the contents, and is thus bound by the contract." National Union Fire Ins. Co. v. Walton Ins.,

Ltd., 696 F. Supp. 897, 903 (S.D.N.Y. 1988).

**B.      Plaintiff Cannot Establish a Unilateral Mistake Brought on by Misrepresentation of
         a Material Fact that was Known or Should Have Been Known to City Defendants**

As set forth above, Plaintiff bears a high burden to prove that City Defendants materially

misrepresented a basic assumption of the settlement agreement, and therefore caused Plaintiff to

make a unilateral mistake which could serve as the basis to void such contract.   Plaintiff has

failed to do so.

Throughout the litigation of this case, Plaintiff has presented various arguments and/or

theories which it asserts would support vacatur of the 2013 settlement, and pursued discovery in

support thereof.   Plaintiff originally informed the Court that it should not be held to the terms of

the settlement because Plaintiff believed that the Project had been abandoned, contrary to

assertions made by the City at the time of the settlement. See Exhibit 12 to the Gerstenfeld Decl.;

Exhibit 13 to the Gerstenfeld Decl., pp. 9, 19 and 22.   However, the settlement of the State Court

Action in December 2017 unequivocally proved that the Project was indeed not abandoned, but,

rather, moving forward.   Plaintiff's Project abandonment theory was itself abandoned by

counsel, who were forced to proffer another theory: the Plaintiff only entered into the 2013

settlement agreement because at the time it was signed, Plaintiff believed that the lot would

ultimately be jointly developed by Ridgewood Bushwick and UJO, the two local Brooklyn-based community groups whose interests were purportedly aligned with those of Plaintiff. This new theory fares no better, and even if it was credited, Plaintiff still cannot show that the City knew or should have known that this was a basic assumption on which the contract was made, let alone that there was any fraud on the City's part. See e.g., Independent Order of Foresters, 157 F.3d at 940; Ludwig, 838 F. Supp. at 795; Aniero Concrete Co., 1997 U.S. Dist. LEXIS 22 at *52.

We note at the outset that at no time has Plaintiff asserted that any of the members of Ramooe, Inc. are also members of either Ridgewood Bushwick or UJO, or that this was conveyed to the City. Instead, Plaintiff's allegations, made through the Ostreicher Decl., are that Plaintiff's interests were vaguely "aligned" with UJO and Ridgewood Bushwick, that Plaintiff "reinforce[d]" this to the City's representatives, and thus the City should have known that UJO and Ridgewood Bushwick's involvement "was important to [Plaintiff's] agreement to settle." Ostreicher Decl., ¶¶ 12-14.[6] What is conspicuously absent from Chaim Ostreicher's Decl. are any specifics about what was conveyed, to whom, and when. While he claims to have attended a settlement meeting with the City along with his father Eugene (Ostreicher Decl., ¶ 13), the only meeting between Plaintiff's principals and the City was the April 15th Meeting, which he did not appear to attend. Gerstenfeld Decl., Exhibit 7; Gerstenfeld Decl., ¶ 8; Kolikoff Decl., ¶ 2.

Mr. Kolikoff, who attended the April 15th Meeting, attests that only one of Ramooe's principals was present, and contemporaneous records show that it was Chaim's father Eugene

---

[6] Mr. Ostreicher also suggests that the City's supposed "general understanding of the political and communal landscape in South Brooklyn," Chaim and Eugene Ostreicher's "appearance to be that of Hasidic Jews" and the City's representatives supposed knowledge "that Plaintiff's address on Bedford Avenue is in . . . an area in which Hasidic Jews reside" is somehow evidence that the City should have known that Plaintiff was aligned with Ridgewood Bushwick and UJO and would not have settled had it known that they would not develop the Project. Ostreicher Decl., ¶¶ 12-13. Not only is this not true, but the argument is repugnant.

who would be attending. See Exhibit 7 to the Gerstenfeld Decl.; Kolikoff Decl., ¶¶ 4-5. While Chaim Ostreicher suggests that there were supposedly other meetings that his father attended without him (which gives further credence to the fact that he was not at the April 15th Meeting), he tellingly provides no details about these supposed meetings. Ostreicher Decl., ¶ 13. There was no discussion at the April 15th Meeting, or at any other time during settlement negotiations, that Plaintiff's interests were supposedly aligned with Ridgewood Bushwick and UJO. See Gerstenfeld Decl., ¶ 13; Kolikoff Decl., ¶¶ 8-10; see also Hammer Decl., ¶ 6. In fact, there was no discussion of UJO or Ridgewood Bushwick's potential development of the Project during the April 15th Meeting, or at any other point during settlement negotiations. See Gerstenfeld Decl., ¶ 13; Kolikoff Decl., ¶¶ 8-9; Hammer Decl., ¶ 6. The City attorneys had no idea that Ridgewood Bushwick or UJO's involvement in the development of the Subject Property for the City was supposedly the impetus for Ramooe's agreement to settle. This alleged motivating factor was not conveyed at the April 15th Meeting or at any other point during settlement discussions. See Gerstenfeld Decl., ¶ 13; Kolikoff Decl., ¶¶ 8-10. Moreover, common sense would dictate that if Ridgewood Bushwick and UJO's involvement was pivotal to Plaintiff's settlement position, the settlement agreement itself would have recited such a condition, and if that no longer was the case, the settlement would be void. The settlement agreement contains no such language. Instead, the focus of the April 15th Meeting, and other settlement discussions between counsel, was *Plaintiff's* desire to develop the Subject Property (Kolikoff Decl., ¶¶ 6-7, 9-10; Gerstenfeld Decl., ¶¶ 13-14); *something that would put it in conflict with UJO and Ridgewood Bushwick.*

There were simply no discussions about who would be developing the Subject Property for the City; only that the City had not abandoned the Project. Only after it was made clear that the City was not willing to give back the Subject Property, did Plaintiff agree to negotiate a

monetary settlement.    Kolikoff Decl., ¶ 7; Gerstenfeld Decl, ¶¶ 15-16.   Moreover, emails between counsel following the April 15th Meeting show that negotiations over a monetary settlement focused on whether the Subject Property should be valued as of 1999 or 2013 for settlement purposes, not any discussions about a supposed discount because of who would be developing the Project.[7]   See Copies of these emails are annexed to the Gerstenfeld Decl. as Exhibit 10; Gerstenfeld Decl., ¶¶ 16-18.

Not only do the City officials who participated in the settlement discussions refute Plaintiff's new theory, but so does Plaintiff itself.   Before it crafted its new theory, Plaintiff asserted that "[t]hroughout negotiations with the City, *Mr. Ostreicher made clear that his goal was for the return of the property so that Ramooe could continue developing the Property* as it was prior to the City's unlawful taking." Exhibit 12, p. 2 (emphasis added).   This is entirely consistent with the City's recounting of the settlement negotiations, and directly contradicts Plaintiff's *post hoc* assertions that it settled to "keep the peace with the two local community organizations" who were slated to develop the Subject Property. Ostreicher Decl., ¶ 10.

---

[7] The City indicated that it would only negotiate on the basis of the 1999 value of the Subject Property, since that it is when it was acquired via eminent domain.   See Exhibit 10 to the Gerstenfeld Decl.   In eminent domain, the relevant valuation date of the condemned property is as of the date the City vests title; the current market value is irrelevant.  Rose v. State, 24 N.Y.2d 80, 87 (1969) ("The constitutional requirement of compensation mandates that the property owner be indemnified so that he may be put in the same relative position, insofar as this is possible, as if the taking had not occurred.")   Additionally, increases in property values that are a result of a public project may not be considered in valuing property acquired for said project ("the project influence rule").  United States v. Miller, 317 U.S. 369 (1943).   It is for this reason that Ms. Gerstenfeld communicated to Mr. Zelman that "we consider the current market value of the subject property to be irrelevant, especially since its current value is influenced by the fact that the property is in the middle of an urban renewal area created by the City." Exhibit 10 to the Gerstenfeld Decl. The settlement amount of $400,000 was actually above the City's appraised value of $125,000, which was the amount of the condemnation advance payment awarded to Plaintiff.  See Exhibit B to the Goldberg Decl., which is a Certification of Advance Payment that the Law Department sent to Plaintiff, and then re-sent to Mr. Zelman following the initiation of this lawsuit in 2013, with the correct address hand-written by Ms. Gerstenfeld in 2013; Gerstenfeld Decl., ¶¶ 17-18.

Furthermore, even if Plaintiff's new theory that it informed the City that its interests were vaguely "aligned" with Ridgewood Bushwick and UJO were credited, this would still not enable Plaintiff to vacate the settlement.  Merely saying that Plaintiff's interests are "aligned" with the developers is not nearly enough for the City to have known that Ridgewood Bushwick and UJO's continued involvement in the Project was "'a basic assumption on which the contract was made.'"  Independent Order of Foresters, 157 F.3d at 940 (citation omitted).

Nor was there any fraud on the City's part.  While it is true that Ridgewood Bushwick and UJO's state funding had expired at the time the settlement was reached, this does not mean that UJO and Ridgewood Bushwick could not reapply for funding at a later date, and certainly did not mean that they would not be developing the Project.  Indeed, the contingent site authorization issued to them did not automatically expire with the state funding, and remained in place until 2016, long after the settlement agreement was reached. See Exhibit H to the Goldberg Decl., pp. 76, 111-112; Exhibit C to the Goldberg Decl., pp. 32- 33; Exhibit 3 to the Gerstenfeld Decl.; Exhibit J to the Goldberg Decl.

To suggest that the City improperly kept Plaintiff out of the loop regarding the development of the Subject Property, which Plaintiff hadn't owned since 1999, is a red herring.[8]

---

[8] Another red herring is Plaintiff's misplaced focus on HPD's internal processes relating to contingent site authorization letters' issuance and extension of deadlines within said letters.  The internal processes within HPD for issuing contingent site authorization letters (which Plaintiff has erroneously referred to throughout this litigation as achieving "site control") was monitored by the Site Control Committee (the "Committee") that periodically met to "discuss proposals" and review applications by developers for such contingent site authorization letters.  Exhibit H to the Goldberg Decl., p. 26.  Contrary to the assertions of Plaintiff on pages 9 and 11 of its Memorandum of Law, the fact that the Committee's processes regarding issuance of contingent site authorization has been informal and fluid over time, and may have changed through the years, along with the role of the Committee itself within HPD, is of no import here.  Nor is the fact that Matthew Shafit was not overly familiar with the specific procedures of the Committee, because he was not involved with the Committee.  See Exhibit I to the Goldberg Decl., pp. 36, 43-44.  It is clearly a tactic of last resort by Plaintiff to focus on HPD's formal practices, or lack

- 22 -

Plaintiff was not one of the private developers, never indicated that any of its members might also be members of either Ridgewood Buswick and/or UJO, nor did it ever indicate its alleged alliance with them until March 2018, some four years after the settlement was reached.

Therefore, whether HPD or its employees knew during the pendency of the instant litigation in 2013 that the tax credits and funding awarded by the State on a contingent basis had ultimately expired is of no moment here.  The City representatives had no reason to know that this information was relevant to the Plaintiff's decision making, and does not constitute either fraud or a misrepresentation of a material fact made by City Defendants. See Ludwig, 838 F. Supp. at 795.  It is rather curious that there is no contemporaneous document memorializing Plaintiff's assumptions or desires regarding Ridgewood Bushwick and/or UJO in the development of the Subject Property.

The City has been frank with Plaintiff regarding the Project ultimately moving forward. Indeed, that the Project is coming to fruition can be seen in the recent selection of developers through the RFP process, which include both UJO and Ridgewood Bushwick's successor organization.   Ironically, even if the City knew, or had reason to know, that Ridgewood Bushwick and UJO's development of the Subject Property was important to Plaintiff's agreement to settle, it would have been false and misleading for the City to say in 2013 that Ridgewood Bushwick and UJO were *not* going to be the developers on the Project.  At that time, the contingent site authorization letters had not been withdrawn, and there was still a very real possibility that they would be the developers, assuming the Project was allowed to go forward - *which is exactly what happened.*

---

thereof, and individual's recollections years after the fact of what was done or not done, in order to mask Plaintiff's inability to produce evidence sufficient to overturn its settlement.

If the sole reason Plaintiff agreed to settle was truly because it thought Ridgewood Bushwick and UJO would be the developers for the Project, then one would expect that because UJO and Ridgewood Bushwick's successor organization will in fact be among the developers of the Project, this litigation should be withdrawn because it no longer serves any purpose. The fact that this matter continues to be litigated leads credence to the conclusion that Plaintiff's *post hoc* and self-serving statements about its supposed alignment with these developers are nothing more than a pretext to void the settlement agreement so that Plaintiff can attempt to extract more money from the City. The City is constrained to note that the only thing preventing the development of the Subject Property within the Project is the pendency of this litigation.[9]

In sum, Plaintiff cannot make out the requisite elements of unilateral mistake as a defense to contract enforcement. Thus, while Plaintiff's arguments for settlement rescission have become a moving target, none of the iterations offered by Plaintiff warrant a reversal of the contractual obligation it entered into over five years ago. Moreover, the fluid nature of Plaintiff's various theories as to why the settlement should be vacated are more probative of Plaintiff's desire to renege on the settlement, and motivated simply by a change of mind, rather than any actual misrepresentation or mistake. "Equity will not relieve a party of its obligations under a contract merely because subsequently, with the benefit of hindsight, it appears to have been a bad bargain." Term Indus, Inc.. v. Essbee Estates, Inc., 451 N.Y.S.2d 128, 129 (1st Dept. 1982). Rather transparently, Plaintiff pursues this litigation motivated solely by its desire to get more money from the City, rather than adhere to the settlement its prior counsel negotiated in good faith.

---

[9] Under the terms of the State Court settlement, if this litigation is resolved in a timely manner, the Subject Property can be included within the plans for the Project, and the homeless and low income housing will reach its full potential. See Exhibit 16 to the Gerstenfeld Decl.

The parties to this litigation entered into a fair settlement agreement that was negotiated in 2013, and ultimately "so ordered" by the Court.  Plaintiff has come forward with nothing but "loose, equivocal or contradictory" evidence of a supposed unilateral mistake, and thus the settlement must be adhered to as a matter of contract law.  See George Backer Management Corp., 46 N.Y.2d at 220 (citation omitted); Downes, 103 F. Supp. 2d at 581.  In light of the above considerations, City Defendants respectfully assert that the "so ordered" settlement agreement should be enforced.  To that end, City Defendants respectfully request that the Court issue an order directing the Plaintiff to execute the quit claim deed, and provide it to the City in an effort to effectuate the settlement and have this case finally resolved.

## CONCLUSION

For the foregoing reasons, this Court should issue an order denying Plaintiff's motion to vacate the settlement and directing that the settlement agreement signed by the parties and "so ordered" by Judge Townes on December 30, 2013 be enforced. City Defendants respectfully request that the Court also issue an order directing the Plaintiff to execute the quit claim deed, and provide it to the City in an effort to effectuate the settlement and have this case finally resolved.

Dated:      New York, New York
            May 3, 2019

                              **ZACHARY W. CARTER**
                              Corporation Counsel of the
                                City of New York
                              Attorney for City Defendants
                              100 Church Street, Room 5-235
                              New York, New York 10007
                              (212) 356-2140

            By:      _____
                     Holly R. Gerstenfeld, Senior Counsel