UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RAMOOE, INC.,

                Plaintiff,

-against-

THE CITY OF NEW YORK, a Municipal Corporation of the State of New York, and the NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT, an agency and governmental subdivision of the City of New York

                Defendants.

**MEMORANDUM & ORDER**
**13-CV-1045 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Ramooe, Inc. brought this action against Defendants the City of New York (the "City") and the New York City Department of Housing Preservation and Development ("HPD") seeking to recover property acquired by the City pursuant to the New York Eminent Domain Procedure Law. (*See* Complaint ("Compl.") (Dkt. 1).) The City subsequently settled with Plaintiff and the case was dismissed. (Stip. of Settlement & Order Dismissing Case ("Settlement & Order") (Dkt. 18).)

Plaintiff now moves to vacate the settlement agreement under Federal Rules of Civil Procedure 60(b)(3) and (6). (Mot. to Set Aside Order Dismissing Case ("Mot.") (Dkt. 82).) For the following reasons, Plaintiff's motion is DENIED.

## I. BACKGROUND

In 1989, the New York City Board of Estimate established the Broadway Triangle Urban Renewal Plan ("the Renewal Plan") to develop approximately 30 acres in the Broadway Triangle Renewal Area (the "Renewal Area"), a roughly 30-acre plot of land

in Brooklyn surrounding an industrial facility then owned by Pfizer. (Compl. ¶ 6; May 15, 1989 City Planning Comm'n Res. (Dkt. 86-1).) In 1997, Plaintiff acquired real property within the Renewal Area at 43 Bartlett Street, Brooklyn, NY 11206 (the "Property"). (Decl. of Chaim Ostreicher ("Ostreicher Decl.") (Dkt. 83) ¶ 2; Executor's Deed dated Jan. 13, 1997 ("Deed") (Dkt. 83-1).) Shortly thereafter, the New York City Department of Buildings issued Plaintiff a building permit for the Property. (Compl. ¶¶ 13-14; June 15, 1999 Work Permit Data ("Work Permit Data") (Dkt. 83-2).)

### A. Condemnation Proceedings

The City acquired title to the Property in 1999 pursuant to a condemnation proceeding. (*See* Order, *In re Appl. of the City of New York*, Ind. No. 22528/1999 (Kings Cty. Sup. Ct. Aug. 15, 1999) ("Condemnation Order") (Dkt 86-6 at ECF 3-5).) The City sent notice of the proceeding to Plaintiff at the address listed on Plaintiff's recorded deed to the Property, *i.e.*, 524 Bedford Avenue, Brooklyn, New York 11211. (June 22, 1999 Not. of Proceeding (Dkt. 86-6 at ECF 17-20); Deed.) Plaintiff's actual address, however, was 527 Bedford Avenue and, as such, Plaintiff did not receive the notice sent to 524 Bedford Avenue. (Compl. ¶ 18; Ostreicher Decl. ¶ 5.) However, the City also sent notice to the Property itself, and posted copies of the notice and acquisition map on and near the Property. (Aff. of Serv. (Dkt. 86-7 at ECF 3-4); Aff. of Posting of Not. of Pet. (Dkt 86-7 at ECF 5).)

The condemnation proceeding allowed one year for any persons claiming an interest in the Property to appear and object; however, Plaintiff failed to do so and, in 2000, compensation was certified for the Property. (Condemnation Order; Compl. ¶ 21; Ostreicher Decl. ¶ 6; Nov. 20, 2000 Cert. of Advance Payment (Dkt. 84-2).) Plaintiff, however, never received the compensation, and after Plaintiff's building permit expired in 1999 the

Property remained a vacant lot through at least 2013. (Work Permit Data; Tr. of July 18, 2013 Conf. ("Tr. 2013 Conf.") (Dkt. 28) at 17:12-24, 49:2-16.)

### B. Renewal Plan Rezoning and Litigation

In 2009, the City rezoned Renewal Area to allow residential development in furtherance of the Renewal Plan. (City Council Res. No. 2319 (Dkt. 86-5 at ECF 27-28).) In January of that year, HPD granted two local community groups, Ridgewood Bushwick Senior Citizens Council ("RB") and United Jewish Organizations of Williamsburg, Inc. ("UJO"), site authorization to apply for state funding and tax credits to develop properties in the Renewal Area. (Jan. 26, 2009 HPD Site Authorization Letter ("Site Authorization Letter") (Dkt. 86-8).) Thereafter, the groups received several million dollars of contingent grants and tax credits. (Funding Letters (Dkt. 86-9).) In September 2009, several other community groups filed suit against the City challenging the rezoning on the grounds that it favored some ethnic groups over others (the "State-Court Action"). *See* Verified Pet., *Broadway Triangle Cmty. Coal. v. Bloomberg*, Ind. No. 112799/2009, 2009 WL 875803 (New York Cty. Sup. Ct. Sept. 9, 2009). On September 9, 2011, New York County Supreme Court Justice Emily Goodman enjoined further development under the Renewal Plan pending resolution of the State-Court Action. *Broadway Triangle Cmty. Coal. v. Bloomberg*, 941 N.Y.S.2d 831, 839 (Kings Cty. Sup. Ct. 2011).

While development was enjoined, RB and UJO's state funding grants were extended before ultimately expiring in in 2012 and 2013. (Jan. 31, 2011 Credit Letter (Dkt. 86-10); Jan. 24, 2013 Withdrawal Letter (Dkt. 84-7).) However, the site authorization from HPD allowing RB and UJO to seek state funding remained in effect until 2016. (June 20, 2016 Site Authorization Withdrawal Letter ("Site Authorization Withdrawal") (Dkt. 84-10).)

3

In 2017, the State-Court Action settled, which lifted the injunction and allowed HPD to issue a Request for Proposals ("RFP") for the Renewal Plan and select developers as the project moved forward. (Dec. 8, 2017 Stip. of Settlement & Order (Dkt. 86-23).) In 2019, UJO and RB's successor organization, RiseBoro Community Partnership, were among the groups designated to the Renewal Plan development team. (Mar. 19, 2019 Broadway Triangle RFP Designation (Dkt. 86-27).)

### C. The Instant Case

Plaintiff commenced this case, which was initially assigned to Judge Sandra L. Townes, on February 27, 2013. On April 15, 2013, Plaintiff met with the Defendants to discuss Plaintiff's proposal to obtain or retain title to the Property. (*See* Emails Between Counsel re: Meeting (Dkts. 86-11, 86-12).) Defendants' understanding of Plaintiff's position at the time was that Plaintiff wished to develop the Property itself. (Kolikoff Decl. in Opp. to Mot. ("Kolikoff Decl.") (Dkt. 86-13) ¶ 7; Hammer Decl. Opp. to Mot. ("Hammer Decl.") (Dkt. 86-14) ¶ 7; Gerstenfeld Decl. in Opp. to Mot. ("Gerstenfeld Decl.") (Dkt. 86) ¶ 14.) After the meeting, the City advised Plaintiff that it was not interested in relinquishing title to the Property, but that it would discuss a monetary settlement. (Kolikoff Decl. ¶ 7; Gerstenfeld Decl. ¶ 15.) This was the only meeting between representatives of the City, HPD, and Plaintiff in connection with this litigation. (Gerstenfeld Decl. ¶ 9; Kolikoff Decl. ¶ 2.)

On December 10, 2013 Plaintiff informed the court that the parties had agreed to a settlement. (Dec. 10, 2013 Settlement Letter (Dkt. 16).) On December 30, 2013 Judge Townes certified the settlement agreement, under which Plaintiff was obligated to execute and deliver to the City a quitclaim deed to the Property in exchange for $400,000, and dismissed the case with prejudice while retaining jurisdiction to enforce the settlement agreement. (Settlement & Order.)

### D. Defendants' Attempts to Enforce the Settlement

On February 13, 2014 Plaintiff sent a signed quitclaim deed for the Property to the City; counsel for the City, however, noticed certain information missing from the deed and requested that Plaintiff make the necessary corrections. (Quitclaim Status Emails ("Quitclaim Emails") (Dkt. 86-16 at ECF 1-5); Quitclaim Indenture ("Quitclaim Deed") (Dkt. 86-16 at ECF 6-8).) On June 9, counsel for the City again requested a completed deed from Plaintiff, at which point Plaintiff's counsel informed the City they were withdrawing from the case. (Quitclaim Emails.) In response, Defendants filed a motion for settlement enforcement on June 12, 2014. (Def. Mot. for Settlement Enforcement (Dkt. 19).) On June 26, 2014 Plaintiff retained new counsel, who informed the court of Plaintiff's intention to move to set aside the settlement agreement due to unilateral mistake on Plaintiff's part. (June 24, 2014 Letter (Dkt. 23).) On June 26, 2014 Plaintiff's new counsel appeared before Magistrate Judge Vera M. Scanlon and explained that Plaintiff had mistakenly signed the settlement agreement under the belief that the City was continuing with the Renewal Plan, but now believed that the Renewal Plan had been abandoned. (Tr. of June 26, 2014 Conf. ("Tr. 2014 Conf.") (Dkt. 27) at 19:8-13.)

After an unexplained scheduling lapse, the parties appeared before Judge Scanlon again on September 9, 2016, during which Plaintiff continued to argue that the settlement agreement should be vacated under a theory of unilateral mistake. (*See generally* Tr. of Sept. 9, 2016 Conf. (Dkt. 39).) Plaintiff further argued that HPD's rescission of site authorization from RB and UJO in June 2016 was further evidence that the City had abandoned the Renewal Plan and that Defendants had kept that information from Plaintiff at the time of the settlement in 2013. (*Id.* at 2:18-22, 4:12-25, 10:21-25, 11:1-11.) Thereafter, Judge Scanlon denied Defendant's motion for settlement enforcement and ordered discovery on the issue of unilateral mistake. (Order

Denying Mot. for Settlement (Dkt. 29).) On November 29, 2016 Judge Scanlon reopened the case. (November 29, 2016 Order Reopening Case.)

On February 22, 2018 this case was reassigned to the undersigned. After the conclusion of the limited-issue discovery, the parties again appeared before Judge Scanlon on March 28, 2018. (Tr. of March 28, 2018 Conf. (Dkt. 79).) At this conference Plaintiff argued that when the settlement agreement was signed Plaintiff was under the impression that RB and UJO would be involved in the Renewal Plan development, which was a key factor in Plaintiff's decision to settle because the inclusion of these organizations in the Renewal Plan would benefit Plaintiff's community. (*Id.* at 29:2-19, 30:1-23.) Plaintiff asserted that it would not have settled the case had it known RB and UJO would not be part of the Renewal Plan. (*Id.* at 30:10-14.) After further discovery, including depositions of HPD and City Law Department officials, Plaintiff filed the instant motion to set aside the settlement under Federal Rules of Civil Procedure 60(b)(3) and (6) on May 31, 2019. Defendants oppose Plaintiff's motion and seek enforcement of the original settlement. (Mem. in Opp. to Mot. ("Opp.") (Dkt. 87).)

## II. LEGAL STANDARD

Rule 60(b) allows a court to "relieve a party . . . from a final judgment, order, or proceeding." Fed. R. Civ. P. 60(b). Under Rule 60(b)(3), a party may obtain such relief when it demonstrates that a judgment was procured by "fraud . . . , misrepresentation, or misconduct by an opposing party." *Id.* Because Plaintiff argues a theory of unilateral mistake, it must additionally demonstrate that it "entered into a contract under a mistake of material fact, and that (ii) the other contracting party either knew or should have known that such mistake was being made." *Andre v. Mattress Firm*, No. 18-CV-8244 (VB), 2019 WL

3066321, at *5 (S.D.N.Y. July 12, 2019) (citation omitted). Such mistake must concern "a basic assumption on which the contract was made." *Ind. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998).

"Since 60(b) allows extraordinary judicial relief, it is invoked only upon a showing of exceptional circumstances." *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986). As such, "a Rule 60(b)(3) motion cannot be granted absent clear and convincing evidence of material misrepresentations and cannot serve as an attempt to relitigate the merits." *Fleming v. New York Univ.*, 865 F.2d 478, 484 (2d Cir. 1989) (citing *Mastini v. American Tel. & Telegraph Co.*, 369 F.2d 378, 379 (2d Cir.1966)). The burden of proof rests with the party seeking relief. *United States v. Int'l Brotherhood of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001). Further, "[t]he decision whether to grant a party's Rule 60(b) motion is committed to the sound discretion of the district court." *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012) (citation and internal quotation marks citation omitted).

### III. DISCUSSION

Plaintiff moves this court pursuant to Rule 60(b)(3) and (6) seeking relief from the settlement agreement. (Mot.) However, Rule 60(b)(6) "grants federal courts broad authority to relieve a party from a final judgment 'upon such terms as are just,' provided that the motion is . . . not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988). As such, "Rule 60(b)(6) relief is only available if Rules 60(b)(1) through (5) do not apply." *ISC Holding AG v. Nobel Biocare Fin. AG*, 688 F.3d 98, 109 (2d Cir. 2012). Given that Plaintiff premises its entitlement to relief on its assertion that Defendants purposely withheld information to induce Plaintiff to settle, Plaintiff's motion is properly analyzed under solely Rule 60(b)(3).

Additionally, Rule 60(c)(1) specifically provides that a motion for relief under 60(b) must be made "for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1). This limitations period is "absolute." *Warren v. Garvin*, 219 F.3d 111, 114 (2d Cir. 2000) (citations omitted). Accordingly, Plaintiff's Rule 60(b)(3) motion filed on May 31, 2019 is time barred from seeking relief from a settlement ordered on January 7, 2014. (Mot.; Settlement & Order.)

However, even if the motion were timely, Plaintiff would fail to meet the high burden required to vacate a settlement.

Plaintiff asserts that the City purposely concealed the lapse in funding to RB and UJO along with the withdrawal of their site authorization to induce Plaintiff to settle. (Pl. Mem. in Supp. of Mot. ("Mem.") (Dkt. 85) at 4.) As an initial matter, there is no indication in the contract itself that the continued funding to RB and UJO was a basic assumption on which the agreement was made. The agreement, which contains a full integration clause (Settlement & Order at ¶ 8), does not even reference such funding, and the primary consideration for Plaintiff appears to be the $400,000 cash payment it was to receive.

Assuming, however, that RB and UJO's funding was a basic assumption of the agreement, in order to succeed on its Rule 60(b)(3) motion, Plaintiff must put forth "clear and convincing evidence of material misrepresentations" regarding the City's plans or intentions concerning that funding. *Fleming*, 865 F.2d at 484. However, Plaintiff fails to supply convincing evidence of the City's misrepresentations, and the timing of both the funding and site authorization withdrawal from RB and UJO does not support Plaintiff's theory that those pieces of information could have been used to induce a settlement in December 2013. Plaintiff states that at the time of the settlement, it was well known that RB and

8

UJO, "two organizations with strong ties to the local community," had been chosen to develop the Property and that Plaintiff settled to "keep the peace with the two local community organizations." (Ostreicher Decl. ¶¶ 9-10.) And yet, Plaintiff "did not know at the time that RB and UJO had lost their funding from New York State." (*Id.* ¶ 15.) RB and UJO's site authorization, however, was not withdrawn until 2016, two-and-a-half years after the settlement agreement was signed, and three years after Plaintiff first asserted unilateral mistake. (Site Authorization Withdrawal; June 24, 2014 Letter (Dkt. 23); Settlement & Order.)

Plaintiff asserts that site authorization was actually terminated in 2013 and that it was not formalized until 2016 because "Defendants knew that if they buried the site control issue within their agency for a few years then Plaintiff would never find out in time to raise objection." (Mem. at 11; Ostreicher Decl. ¶ 15.) This assertion, however, is not supported by the record. Mr. Jack Hammer, a director at HPD who attended the April 13, 2015 meeting between the parties, testified that site authorization had not been withdrawn from RB and UJO at the time he left HPD in 2015. (Dec. 7, 2017 Tr. of Hammer Dep. (Dkt. 84-8) at 76:11-19.) Former HPD Commissioner Vicki Been testified that the decision to rescind site authorization was made around the time the letter was issued in 2016. (May 23, 2018 Tr. of Been Dep. (Dkt. 84-3) at 33:12-24.) Matthew Shafit, the General Counsel of HPD who drafted the letter rescinding site authorization, testified that he received the request to draft the letter approximately one month before it was issued. (June 26, 2018 Tr. of Shafit Dep. ("Shafit Dep.") (Dkt. 84-9) at 56:18-23, 57:20-22.)

Further, even if Plaintiff's settlement agreement had incorporated the site authorization granted to RB and UJO as a condition of the settlement (or, for that matter, referred to it at all), the terms of the authorization letter HPD issued to RB and UJO in

9

2009 allowed the agency to "in its sole discretion . . . revoke and terminate all or any portion of this Authorization at any time without cause and without prior notice." (Site Authorization Letter ¶ 5.) In fact, Mr. Shafit testified that, "[t]he term site control is an erroneous term . . . [t]hat letter authorizes somebody to apply for funding. In no way does it give that entity control of a site. It doesn't even let them go on the site." (Shafit Dep. at 34:14-17.) Indeed, the authorization letter itself states that the authorization is "non-exclusive" and "only authorizes the Applicant to submit an application to the Funding Entity and does not confer any other rights or benefits upon the Applicant." (Site Authorization Letter ¶¶ 1, 3.) As such, not only does Plaintiff fail to offer evidence that withdrawal of this authorization was concealed from Plaintiff at any point in time, but the very terms of the authorization were revocable from the time they were issued (four years prior to the initiation of this lawsuit) and never actually guaranteed that RB and UJO would be involved in the Renewal Plan development in the first place. Plaintiff's contention that Defendants revoked "site control" from the two community organizations "sole sourced to develop the [P]roperty" is simply implausible, as RB and UJO had neither control over, nor exclusive rights to develop the Property. (Mem. at 3, 10; Site Authorization Letter.)

Accordingly, Plaintiff has failed to put forth "clear and convincing evidence of material misrepresentations" by Defendants to meet the Rule 60(b)(3) standard and the court therefore denies Plaintiff's motion to set aside the settlement.

Finally, Defendants ask this court to enter an order directing Plaintiff to fulfill its obligations under the settlement agreement. As Plaintiff makes no further argument that the agreement is unenforceable (and any such argument would be frivolous), the court will grant that request.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's (Dkt. 82) motion to set aside the settlement and order dismissing the case is DENIED. Further, Plaintiff is ORDERED to take the steps necessary to discharge its obligations under the settlement agreement.

The Clerk of Court is respectfully DIRECTED to close this case.

SO ORDERED.

Dated:   Brooklyn, New York
         March 31, 2020

      /s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge